UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

INTERNATIONAL EQUITY INVESTMENTS, INC., and :
CITIGROUP VENTURE CAPITAL INTERNATIONAL :
BRAZIL, LLC, ON BEHALF OF ITSELF AND :
CITIGROUP VENTURE CAPITAL INTERNATIONAL :
BRAZIL, L.P. (f.k.a. CVC/OPPORTUNITY EQUITY :
PARTNERS, L.P.), :
                                             :
                    Plaintiffs,              :
                                             :
            v.                               :
                                             :
OPPORTUNITY EQUITY PARTNERS LTD. (f.k.a. :
CVC/OPPORTUNITY EQUITY PARTNERS LTD.) and :
DANIEL VALENTE DANTAS, :
                                             :
                    Defendants.              :
                                             :
-------------------------------------------------------------------- X

05 Civ. 2745 (LAK)

**AMENDED COMPLAINT**

JURY TRIAL
DEMANDED

        Plaintiffs International Equity Investments, Inc. ("IEII") and Citigroup Venture

Capital International Brazil, LLC ("CVC Brazil"), on behalf of itself and Citigroup Venture

Capital International Brazil, L.P. (the "CVC Fund," formerly known as CVC/Opportunity Equity

Partners, L.P.), by their undersigned counsel, allege for their Amended Complaint:

## THE PARTIES

        1.      Plaintiff IEII is a corporation incorporated under the laws of the State of

Delaware having its principal place of business at One Penn's Way, New Castle, Delaware. IEII

is a wholly owned subsidiary of Citibank, N.A. ("Citibank") and is, and was at all relevant times

hereto, the sole limited partner of the CVC Fund.

        2.      Plaintiff CVC Brazil is a Delaware limited liability company and the

newly appointed sole general partner of the CVC Fund, a private equity fund registered as a

Cayman Islands Exempted Limited Partnership. CVC Brazil is a subsidiary of IEII and its principal place of business is 399 Park Avenue, New York, New York.

3.    Defendant Opportunity Equity Partners Ltd. ("Opportunity"), formerly known as CVC/Opportunity Equity Partners Ltd., is a corporation incorporated under the laws of the Cayman Islands with registered offices at P.O. Box 309 Ugland House, South Church Street, Grand Cayman, Cayman Islands, British West Indies. Upon information and belief, Opportunity's principal place of business is Avenida Presidente Wilson no. 231, 28th floor, Rio de Janeiro, Brazil. Opportunity was the duly appointed general partner of the CVC Fund until March 9, 2005, when it was removed by IEII.

4.    Defendant Daniel Valente Dantas ("Dantas") is a citizen of Brazil residing in Rio de Janeiro, Brazil. His principal office is located in Avenida Presidente Wilson no. 231, 28th floor, Rio de Janeiro, Brazil. Dantas founded and controls Opportunity, as well as other affiliated funds and companies (together with persons acting under his control or at his discretion, the "Opportunity Group").

### JURISDICTION & VENUE

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000, exclusive of interest and costs.

6.    This Court has personal jurisdiction over the defendants because each defendant consented to this Court's jurisdiction in Article 13.18(b) of the Amended and Restated Limited Partnership Agreement of CVC/Opportunity Equity Partners, L.P., dated as of December 30, 1997 (the "Limited Partnership Agreement") and in Article 7.06 of the Operating Agreement, dated as of December 30, 1997 (the "Operating Agreement"). This Court also has personal jurisdiction over defendants pursuant to N.Y. C.P.L.R. Section 302(a).

2

7. Venue is proper in the Southern District of New York pursuant to

28 U.S.C. § 1391(d) because each of the defendants is an alien. Venue is also proper pursuant to

28 U.S.C. § 1391(a)(3) because each defendant is subject to personal jurisdiction in this district

and there is no district in which the action may otherwise be brought.

## FACTUAL ALLEGATIONS

### A.    The Limited Partnership And Operating Agreements

8. As of December 30, 1997, Citibank, IEII and Opportunity executed the

Limited Partnership Agreement for the CVC Fund. Dantas executed this Agreement as

Opportunity's "Principal."

9. Also on December 30, 1997, Citibank, Opportunity, Dantas and various

Opportunity affiliates executed the Operating Agreement. Article 7.07 of the Operating

Agreement provides that Citibank and its affiliates, including IEII, are entitled to the benefits of

the Operating Agreement.

10. Until its removal on March 9, 2005, Opportunity, as the sole general

partner in the CVC Fund, and Dantas, as Opportunity's principal, were responsible for the CVC

Fund's management and investment decisions. In Article 6.1.5 of the Limited Partnership

Agreement, both Opportunity and Dantas explicitly acknowledged that they were fiduciaries to

IEII.

11. Article 2.1 of the Limited Partnership Agreement provides that the

primary purpose of the CVC Fund was to invest through "equity and equity-related investments

in companies based and primarily operating in Brazil" (the "Portfolio Companies"). IEII has

contributed approximately $728,000,000 to the CVC Fund since its inception. Neither

Opportunity nor Dantas contributed any capital to the CVC Fund.

3

12.     Article 7.3 of the Limited Partnership Agreement provides for the removal
of the general partner for cause by the limited partners that have made a majority of the total
commitments to contribute capital to the CVC Fund (here, IEII). In addition, Article 7.4 grants
the limited partners that have made at least three-quarters of the total commitments to contribute
capital to the CVC Fund the unqualified right to remove the general partner at any time without
cause. Accordingly, IEII, as the sole limited partner of the CVC Fund, could at any time remove
Opportunity as general partner with or without cause.

13.     To protect further the interests of IEII and the CVC Fund, Article 6.4 of
the Limited Partnership Agreement required the creation of an Advisory Committee, comprised
of IEII and Citibank personnel or representatives, to approve, among other things, any
transaction by Opportunity that might constitute a conflict of interest.

**B.      The CVC Fund's Management And Investments**

14.     Pursuant to the Limited Partnership and Operating Agreements,
defendants were required to manage the CVC Fund's investments on a "side-by-side" basis with
other Dantas-managed investment funds, Investidores Institucionais Fundo de Investimento em
Ações (the "Onshore Fund")[1] and Opportunity-affiliated funds (the "Opportunity Funds" and
collectively with the CVC Fund and the Onshore Fund, the "Funds").

15.     Virtually all of the investors in the Onshore Fund are Brazilian pension
funds.

16.     The Opportunity Funds are managed and controlled by Dantas.

17.     The side-by-side requirement set forth in the parties' agreements was
designed to prevent Dantas from taking unfair advantage of his position as manager of the CVC

---

[1]     Prior to the removal of its Dantas-affiliated manager in October 2003, the Onshore Fund was
known as CVC/Opportunity Equity Partners Fundo de Investimento Em Ações.

Fund to benefit his Opportunity Funds or any other member or affiliate of the Opportunity Group at the expense of the CVC Fund.

18.     Accordingly, for so long as Opportunity managed the CVC Fund, the side-by-side principle, inter alia, required the Opportunity Funds or any other member or affiliate of the Opportunity Group, when purchasing or selling shares in any of the Portfolio Companies, to offer the CVC Fund the opportunity to participate in the transaction on the same terms. This ensured that defendants could not abuse their position as manager of the CVC Fund to appropriate for themselves or their affiliates investment opportunities in the Portfolio Companies, or to alter the Funds' respective percentages of ownership in the Portfolio Companies in a manner that would benefit Dantas, any of the Opportunity Funds or any other member or affiliate of the Opportunity Group at the expense of IEII and the CVC Fund.

19.     Until October 2003, Dantas and various Opportunity Group entities controlled by Dantas managed the CVC Fund, the Onshore Fund, and of course, the Opportunity Funds. In October 2003, however, the Onshore Fund removed its Dantas-affiliated manager for cause.

20.     The CVC Fund, along with the Onshore and Opportunity Funds, has primarily invested in a series of holding companies that own equity interests in certain Brazilian telecommunications companies, most notably Brasil Telecom Participacoes S.A. ("Brasil Telecom"), a fixed-line telecommunications firm operating in the south and west of Brazil, Telemig Celular S.A. ("Telemig") a wireless telecommunications firm, and Amazonia Celular S.A. ("Amazonia"), also a wireless firm.

21.     The CVC Fund owns an indirect controlling interest in Telemig and Amazonia through various holding companies.

5

22.     The CVC Fund and the Onshore Fund in the aggregate own an indirect controlling interest in Brasil Telecom through various holding companies.

C.     **Defendants' Wrongful Conduct**

23.     Over approximately the past year, evidence has come to light of extensive misconduct by defendants in the management of the CVC Fund, including fraud and breaches of contractual and fiduciary duties.

24.     Among other things, defendants have entered into a series of alleged agreements signed only by defendants or their representatives, purportedly on behalf of the CVC Fund, that served only to benefit defendants at the expense of IEII and the CVC Fund.  If enforced, these agreements, as defendants intended, would cause incalculable harm to plaintiffs by materially impeding plaintiffs' ability to sell and thereby realize any gain on their investments in the Portfolio Companies and entrenching defendants in control of those investments even after their removal as the CVC Fund's general partner and even though defendants hold minority (and, in many cases, almost nominal) ownership interests in the Portfolio Companies.  Defendants' conduct in manufacturing these purported agreements on behalf of the CVC Fund was a breach of their contractual and fiduciary duties set forth in the Limited Partnership Agreement and the Operating Agreement and the alleged agreements are all null and void.

25.     Defendants have engaged in additional transactions and conduct designed solely to benefit themselves at plaintiffs' expense and in complete disregard of defendants' fiduciary and contractual duties.

(i)     The Highlake Transaction

26.     In early 2001, various Opportunity Group companies became engaged in litigation with, among others, Telesystem International Wireless Inc. ("TIW") and various of its subsidiaries relating to control of Telemig.

6

27.    At that time, TIW, through certain holding companies, owned a minority interest in Telemig.  In particular, TIW's affiliate, TPSA Investment Corporation, owned TPSA do Brasil Ltda. ("TPSA"), which owned approximately 49% of Telpart Participacoes ("Telpart"), the direct parent of Telemig and Amazonia.

28.    The CVC Fund owned an indirect controlling interest in Telpart through its majority interest in Futuretel S.A. ("Futuretel").  Futuretel held a majority interest in Opportunity Mem S.A. ("Mem"), which in turn held a majority interest in Newtel Participacoes S.A. ("Newtel"), which held a majority interest in Telpart.

29.    During the summer of 2002, in connection with ongoing negotiations between Dantas and TIW, Dantas informed Mary Lynn Putney, a Managing Director of CVC International then in charge of CVC's investment through IEII, that as part of a potential settlement with TIW, Dantas was considering creating a new entity to purchase TIW's interest in TPSA.  Dantas proposed to Putney that IEII, through the CVC Fund, contribute $22 million to this entity (which was later named Highlake International Business Company Ltd. ("Highlake")).

30.    Putney informed Dantas that she was considering the $22 million contribution on the understanding that IEII, through the CVC Fund, would receive a pro rata share of Highlake's equity.

31.    As Dantas' negotiations with TIW progressed, Dantas instead proposed to Putney that the CVC Fund purchase debt from Highlake, rather than equity.

32.    Putney responded that the CVC Fund would only purchase debt from Highlake if the debt was convertible into a pro rata share of Highlake's equity at the CVC Fund's sole discretion.  Dantas, on behalf of himself and Opportunity, stated that the transaction would be on those terms with intent to induce plaintiffs to invest $22 million in his proposed acquisition

7

of TPSA. Dantas made this misrepresentation knowing it to be false when made or otherwise with reckless disregard for its falsity.

33.    In reliance on Dantas' representations, IEII made a $22 million contribution to Highlake.

34.    In or about January 2003, Opportunity settled the litigation with TIW. As part of the settlement, TIW agreed to sell its 49% interest in Telpart to defendants and their affiliates at a reduced price. To effect the sale, defendants and their affiliates formed and capitalized Highlake, which purchased TIW's interest in TPSA for $66 million.

35.    In or about January 2003, however, Dantas caused Highlake to issue to the CVC Fund a $22 million promissory note (the "Note"), which cannot be assigned or transferred without Highlake's prior consent. Though Dantas promised that the Note would be convertible by the CVC Fund into a pro rata share of Highlake's equity, the Note provides that such "conversion" can occur only at Highlake's election.

36.    Moreover, the "conversion" right at issue in the Note is not in fact a conversion right at all, but merely an option for Highlake to make payments on the Note in the form of shares having a market value equivalent to the amount of the Note plus interest.

37.    After subsequently learning of the Note's terms, IEII complained that it had not received a debt interest convertible into a pro rata (one-third) share of Highlake's equity as promised. In response, Dantas represented to Putney that he would modify the Note so that the CVC Fund would receive debt convertible into a pro rata share of Highlake's equity, as he originally represented.

38.    Defendants nonetheless failed to modify the Note to give the CVC Fund a conversion option to a pro rata share of Highlake's equity.

8

39.     Upon information and belief, in or about January 2004 defendants and
their Opportunity Group affiliates caused Highlake to extend unilaterally until August 31, 2004
the date on which the Note was due to the CVC Fund.  Without consulting either the Advisory
Committee or IEII, defendants also agreed to such an extension, supposedly on behalf of the
CVC Fund.

40.     Upon information and belief, Opportunity – again purporting to act on
behalf of the CVC Fund, but failing to consult either the Advisory Committee or IEII – granted
another extension of the date on which the Note was payable, this time until March 31, 2005.
The extension is purportedly dated as of August 24, 2004, but Opportunity did not notify IEII of
this extension until after its removal as general partner in March 2005.

41.     On March 31, 2005, after its removal as general partner, Opportunity
forwarded a notice to CVC Brazil, purportedly from Highlake itself, notifying CVC Brazil that
the Note was payable on March 31, 2005 but stating that "as a result of the recent order obtained
by [IEII], Highlake does not have the ability to repay the Note in cash at this time."  The notice
indicated that Highlake would exercise its "conversion" option and make payment in the form of
$22.01 million worth of Highlake shares unless CVC Brazil agreed to extend the payment date
on the Note for another six months "in a manner consistent with the two prior extensions."

42.     On April 1, 2005, CVC Brazil notified Highlake that in accordance with
plaintiffs' prior communications to Opportunity and their court filings in New York, it disputed
the validity of the Note and all of the amendments thereto and believed the CVC Fund was
entitled to a pro rata (i.e., one-third) share of Highlake's total equity.

43.     Highlake still has not made any payment – either in cash or Highlake
shares – on the $22 million Note it issued to the CVC Fund.

9

44.     In sum, defendants obtained $22 million from IEII under false pretenses, by fraudulently misrepresenting to IEII that in exchange for its $22 million contribution, the CVC Fund would receive debt convertible at its discretion into a pro rata (one-third) share of the equity in Highlake.  In fact, Dantas only provided the CVC Fund with a $22 million note, containing improper and highly unfavorable terms, the repayment of which was repeatedly extended without IEII's consent and without the approval of the Advisory Committee. Improperly refusing to recognize that the CVC Fund is entitled to a one-third share in Highlake's equity as discussed above, defendants claim that they and their Opportunity Group affiliates own 95% of Highlake while the CVC Fund owns a mere 5%.

(ii)     Attempt To Auction Telemig And Amazonia

45.     Through its 54% majority interest in Futuretel, the CVC Fund currently owns an indirect controlling interest in Telpart, which in turn owns an indirect controlling interest in Telemig and Amazonia.  The Onshore Fund owns approximately 46% of Futuretel, while the Opportunity Fund owns a mere .01%.

46.     Highlake, in which defendants claim that they and their affiliates own 95% of the equity, indirectly owns 49% of Telpart.

47.     In sum, IEII and the CVC Fund, through Futuretel, indirectly own majority interests in Telemig and Amazonia.  Members of the Opportunity Group, through Highlake, indirectly own minority interests in those companies.

48.     Late in the afternoon of Friday, March 4, 2005, defendants issued a press release announcing that Futuretel and Highlake would "start a competitive bidding process for the sale of indirect corporate participation representing more than 50% of the voting capital of [Telemig] and Tele Norte Celular Participacoes S.A." ("Tele Norte"), the direct parent of Amazonia.

10

49.     Upon information and belief, the board of directors of Futuretel never held a meeting to consider the auction initiated by defendants, much less to approve it.

50.     Prior to the announcement of the auction, defendants had proposed similar transactions involving the sale of the CVC Fund's controlling interests in Telemig and Amazonia, which were rejected by IEII.  IEII then explained that such transactions would require Advisory Committee approval, given the parties' differing interests in Telemig and Amazonia.

51.     Despite this, and in violation of their contractual and fiduciary duties, defendants commenced the auction process on March 4, 2005 without even consulting IEII or the Advisory Committee, much less obtaining their approval.

52.     Upon information and belief, defendants started the auction to benefit the Opportunity Group at IEII's expense.  Defendants' affiliates in the Opportunity Group are, through Highlake, minority indirect shareholders in Telemig and Amazonia.  Because prospective purchasers are not likely to pay a control premium for those minority interests, defendants sought to use their position as manager of the CVC Fund to benefit the Opportunity Group by requiring Futuretel to sell its shares along with Highlake.  As a result, in breach of their fiduciary duties, defendants sought to force the CVC Fund to surrender to Highlake a substantial portion of the control premium in any sale to a third-party purchaser.

53.     Defendants' auction threatened to irreparably harm IEII by interfering with its right to have a faithful general partner without conflicting interests determine when and in what manner the CVC Fund would dispose of its indirect controlling interests in Telemig and Amazonia.

54.     IEII strenuously objected to the proposed auction of Futuretel's indirect controlling interests in Telemig and Amazonia as being totally contrary to IEII's commercial interests, and Dantas stated on two occasions that in view of IEII's objections he would suspend

11

the auction. Nonetheless, defendants did not publicly stop the auction until this Court intervened, as discussed below.

      (iii)    The Alleged BrT Tag-Along Agreement

      55.    In another blatant violation of their representations to IEII and their fiduciary duties, defendants executed a so-called Instrument of Covenant purportedly dated as of December 1, 2000 (the "BrT Tag-Along Agreement"). Although purportedly dated as of December 1, 2000, defendants do not appear to have filed the alleged BrT Tag-Along Agreement with the Brazilian Titles and Deeds Registry until November 26, 2004.

      56.    The BrT Tag-Along Agreement is signed only by Dantas, or persons acting under his control, in the name of various Opportunity Group entities and the CVC Fund.

      57.    The BrT Tag-Along Agreement unusually provides that in the event the CVC Fund sells 5% or more of its interest in the holding company through which the CVC Fund holds its indirect interest in Brasil Telecom, the prospective buyer of that interest must also purchase on identical terms 100% of the publicly traded shares in Brasil Telecom held by certain Opportunity Funds.

      58.    The BrT Tag-Along Agreement does not impose any obligations on the Opportunity Funds that are a party to it, or otherwise provide any benefit to the CVC Fund.

      59.    The BrT Tag-Along Agreement purports to be binding on the CVC Fund whether or not IEII removes Opportunity as general partner of the CVC Fund, and further purports to remain effective until 2028 (and its term may be extended beyond that date). Unusually, the Agreement contains no restriction on the number of shares that the Opportunity Funds party to the BrT Tag-Along Agreement may purchase, which would then supposedly be eligible for the tag-along rights, that would further divert to defendants the total control premium.

60.    IEII never consented to this BrT Tag-Along Agreement, which purports to grant enormous (virtually limitless) benefits to Dantas and his Opportunity Group companies at IEII's expense. Nor did defendants seek and obtain Advisory Committee approval for the Agreement, as required by the Limited Partnership Agreement.

61.    Though defendants had a duty to disclose the precise terms of the BrT Tag-Along Agreement to IEII, defendants fraudulently concealed the alleged Agreement from IEII by failing to disclose its existence for more than three years after its purported execution. Indeed, Opportunity representatives first disclosed the existence of the alleged BrT Tag-Along Agreement at a meeting with IEII representatives on or about June 27, 2004, in an effort to extort concessions from IEII in connection with possible exit scenarios that IEII was then considering for its investments in the Portfolio Companies. On June 29, 2004 and July 2, 2004, IEII representatives specifically requested a copy of the alleged Agreement from Opportunity by e-mail, but Opportunity failed to provide such a copy until July 13, 2004, when Danielle Silbergleid of Opportunity e-mailed one to IEII's representatives.

62.    IEII reasonably relied on defendants, its fiduciaries, to disclose the existence of any material agreement relating to the CVC Fund. Defendants' concealment of the alleged BrT Tag-Along Agreement harmed plaintiffs because it prevented them from contesting the alleged Agreement.

63.    The BrT Tag-Along Agreement represents a fundamental violation by defendants of their contractual and fiduciary duties to IEII and the CVC Fund under both the Limited Partnership and Operating Agreements.

64.    IEII and the CVC Fund received no benefit or consideration for this agreement. To the contrary, the alleged agreement caused, and continues to cause, significant

13

harm to IEII and the CVC Fund by materially impeding CVC Brazil's ability to manage, sell and maximize the return on the CVC Fund's investment in Brasil Telecom on behalf of IEII.

65.    Moreover, although the CVC Fund holds more than four times the number of shares that the Opportunity Funds collectively hold in the holding structure that controls Brasil Telecom, the alleged BrT Tag-Along Agreement purports to ensure that the Opportunity Funds realize a greater portion of the proceeds than IEII or the CVC Fund upon any sale of control in Brasil Telecom.

66.    Defendants have compounded their self-dealing and wrongful conduct by warning potential purchasers of IEII's and the CVC Fund's interest in Brasil Telecom about Dantas' and his Opportunity Funds' purported rights under the BrT Tag-Along Agreement. The alleged BrT Tag-Along Agreement substantially increases the cost of purchasing control of Brasil Telecom by requiring the purchase of shares held by the Opportunity Funds, despite the fact that such shares are not needed to acquire control. Alternatively, a purchasing party would pay a significantly lower price to plaintiffs if forced to purchase the unneeded shares held by the Opportunity Funds. In this way the BrT Tag-Along Agreement would achieve defendants' intended effect of diverting to themselves a windfall gain at plaintiffs' expense.

(iv)    The Umbrella Agreement

67.    In the fall of 2003, defendants allegedly executed the Amendment to the Amended and Restated Shareholders' Agreement dated as of September 12, 2003 (the "Umbrella Agreement"). The alleged Umbrella Agreement is drafted so that the removal of an Opportunity affiliate as general partner of either the CVC Fund or the Onshore Fund would automatically strip the removing party of its voting rights in the Portfolio Companies. This purported Agreement, if valid, would vest control over the Portfolio Companies in the Opportunity Group and Dantas, despite the fact that they collectively own only a small proportion of the shares in

14

the Portfolio Companies. Indeed, the alleged Agreement would vest control over each Portfolio Company in Dantas and the Opportunity Group even if they owned as little as <u>one</u> share in that Portfolio Company. With a term of up to 15 years (i.e., until September 2018), the alleged Agreement would enable Dantas and the Opportunity Group to control the CVC Fund's investments well beyond defendants' termination by IEII as general partner in March 2005. Accordingly, it is an improper entrenchment device and a breach of defendants' fiduciary duties.

68.    IEII never agreed to waive its right to remove Opportunity as general partner. Nor did IEII or the Advisory Committee ever consent to the voting restrictions in the alleged Umbrella Agreement. The voting restrictions in the alleged Umbrella Agreement are utterly incompatible with IEII's interests and eviscerate the value of its investments in the CVC Fund.

69.    As soon as IEII appreciated the implications of the alleged Umbrella Agreement, which defendants alone signed in the name of the CVC Fund, IEII and defendants engaged in protracted discussions and negotiations regarding the alleged Agreement and IEII's objections to it. Although IEII demanded that defendants terminate the Umbrella Agreement (which IEII believes is void <u>ab initio</u>) in its entirety, defendants eventually executed a written waiver of various purported rights, including their alleged voting rights, with regard to the CVC Fund. However, defendants continue to insist that the Umbrella Agreement is enforceable against the Onshore Fund (with whom they are involved in pending litigation in Brazil concerning the same issue).

(v)    <u>The Dantas Trust</u>

70.    Since 2001, Brasil Telecom has had claims pending against Telecom Italia, including one pending in a Brazilian litigation.

15

71.     In September 2003 Dantas, taking advantage of his position, and without the knowledge or consent of IEII, arranged for Brasil Telecom's claim against Telecom Italia, and certain other claims belonging to Brasil Telecom, to be removed from Brasil Telecom's control and placed in a trust (the "Dantas Trust"). Dantas appointed his legal advisor to serve as trustee of the Dantas Trust, and the terms of the trust instrument originally provided that only a Dantas-controlled entity may remove the trustee.

72.     The creation of the Dantas Trust and placement of its control in the hands of Dantas affiliates enables Dantas to effectively control the management of material Brasil Telecom litigations even if neither he nor the Opportunity Group holds a single share, or any other interest, in Brasil Telecom.

73.     Dantas' transfer of assets owned by Brasil Telecom into the Dantas Trust is a breach of defendants' contractual and fiduciary duties and forces plaintiffs to sell their investments at a depressed price. Moreover, as Dantas intended, the creation of the Dantas Trust has had a chilling effect on the possibility of consummating any transaction in which plaintiffs might sell their indirect interest in Brasil Telecom to Telecom Italia – a potentially interested purchaser.

(vi)    The Solpart Conversion Rights

74.     Plaintiffs maintain their indirect holdings in Brasil Telecom through a series of holding entities. At present, the CVC Fund and the Onshore Fund own approximately 44% and 45% respectively of the outstanding common voting stock of Opportunity Zain ("Zain"), for a total of approximately 89% of Zain's common stock. The Opportunity Fund, by contrast, has a much smaller interest in Zain, owning just below 10% of its outstanding common voting stock.

16

75.     Zain owns a controlling interest in Invitel, S.A. ("Invitel"), which owns a controlling interest in Techold Participacoes S.A. ("Techold"). Techold, in turn, owns an interest in Solpart Participacoes S.A. ("Solpart"), which owns a majority of the outstanding voting common stock of Brasil Telecom. Currently, Techold and Telecom Italia each own 19% of the voting shares in Solpart, while Timepart Participações S.A. ("Timepart"), which Dantas controls through Opportunity Group companies, owns 62%.

76.     While Techold and Telecom Italia each currently own a relatively small amount of non-voting preferred stock in Solpart, each has the unqualified right at any time to convert its non-voting preferred Solpart stock into a majority of voting common stock. If Techold were to convert its non-voting preferred stock into voting common stock, Timepart's share of Solpart voting common stock would plummet to .03% (if Telecom Italia also converted) or .05% (if Telecom Italia did not convert).

77.     Despite repeated requests from IEII this year, and in breach of their contractual and fiduciary duties, defendants refused to take the necessary steps to cause Techold to convert its preferred Solpart stock into voting common stock. By so refusing, defendants enabled Timepart (an entity that they and their affiliates control) to continue to hold a majority of outstanding voting shares in Solpart, even though it holds an almost negligible amount of the total equity in Solpart.

78.     Defendants also ignored IEII's repeated requests that they at least confirm in writing that Techold's conversion right is unqualified and can be exercised at any time, and that Timepart will not interfere with any future exercise of that conversion right.

(vii)   The Santos Transaction

79.     Plaintiffs have invested in Santos Brasil S.A. ("Santos"), owner and operator of a large shipping container terminal.

17

80.    In December 1998, Santos authorized the sale of 110,000 debentures, each of which was convertible at the discretion of the holder into 500 voting shares of Santos. In January 1999, defendants caused plaintiffs to purchase 5,320 of the debentures for a total price of approximately R$5.6 million (around US$2.2 million at current exchange rates).

81.    The CVC Fund sold 1,895 of the debentures back to Santos in June 2001. Then, on May 23, 2003 Dantas and Opportunity caused the CVC Fund to sell its 3,425 remaining debentures to a vehicle managed by an Opportunity affiliate for a total price that was at least $400,000 below their fair value (including the value of their conversion option). Under Article 6.5 of the Limited Partnership Agreement, defendants should have obtained the prior approval of the Advisory Committee before engaging in this transaction, yet they never did so.

82.    In violation of their fiduciary duties, defendants appear to have caused the CVC Fund to enter into the May 23, 2003 transaction in order to make it easier for the Opportunity Group and its allies to consolidate their control over Santos and relegate the CVC Fund to permanent minority shareholder status.

83.    Currently, the CVC Fund, the Onshore Fund and PREVI (a Brazilian pension fund) collectively own 35.04% of the voting interests in Santos. SISTEL, another pension fund, controls 15%. Opportunity Leste S.A., a company controlled by Dantas, holds approximately 39.96% of the voting shares in Santos, and two other shareholders aligned with Dantas (Transporte Fink and Multiterminais) together hold 10%. Upon information and belief, Transporte Fink and Multiterminais are under the control of an individual, Richard Klien, who in his capacity as a Santos shareholder acts in concert with Dantas. Therefore, the Opportunity Group and its allies collectively control 49.96% of the voting shares in Santos.

84.    In view of the fact that control of Santos is closely contested, defendants' execution of the May 23, 2003 sale of Santos debentures on behalf of the CVC Fund has given

18

various Opportunity Group members the option of exercising the conversion rights in the Santos debentures and thus modifying the delicate balance of voting shares in favor of the Opportunity Group.

(viii).   The Alcatel Transaction

85.     Upon information and belief, Alcatel, a supplier of telecommunications equipment to Brasil Telecom, is a significant investor in the Opportunity Fund. Alcatel's investment relates principally to Brasil Telecom and Telemar and is apparently segregated from all other investments in the Opportunity Fund.

86.     On January 14, 2005, Opportunity Fund informed IEII that, in exchange for Alcatel's commitment to extend the term of its investment in the Opportunity Fund, the Opportunity Fund had granted Alcatel the right to put back its investment to the Opportunity Fund, thereby providing a guaranteed floor for the value of Alcatel's investment.

87.     Upon information and belief, the put value was set at a price that would enable Alcatel to recover significantly less than its initial investment and Alcatel granted the Opportunity Fund the right to increasing success fees if Alcatel's interest is sold above certain thresholds. Thus, the Opportunity Fund not only may be able to buy back Alcatel's investment at a significant discount but also is entitled to receive all or part of any gain that Alcatel may realize upon the sale of its interest in the Opportunity Fund.

88.     The put/success fee arrangement with Alcatel effectively grants the Opportunity Fund an additional interest in Brasil Telecom and Telemar that lies outside the initial investment by the Funds and is not made available to the other Funds – a situation prohibited by the "side-by-side" investment requirements in Article 5.2 of the Operating Agreement and Article 2.5 of the Limited Partnership Agreement. In addition, the arrangement with Alcatel constitutes a conflict of interest transaction for which approval should have been

19

sought from the Advisory Committee pursuant to Article 6.4 of the Limited Partnership

Agreement. Finally, the inherent conflict of interest created by Dantas' arrangement with

Alcatel made it impossible for Opportunity and Dantas to have fulfilled their unequivocal duties

of loyalty and good faith to IEII and the CVC Fund.

       (ix)    Defendants Misappropriate CVC Fund
              Assets And Otherwise Enrich Themselves Unjustly

       89.      Defendants further breached their contractual and fiduciary duties by

misappropriating IEII and CVC Fund assets and engaging in other transactions through which

these assets were transferred to their defendants' affiliates.

       90.      During the period that defendants were supposed to be managing each of

the Funds' assets in the Portfolio Companies on a side-by-side basis, they often engaged in

litigation and other legal proceedings. Upon information and belief, defendants allocated to the

CVC Fund a disproportionate share of the expenses associated with such legal proceedings, with

the goal of benefiting the Opportunity Fund and its affiliates. This misallocation of legal

expenses was a violation of Dantas' fiduciary duties, as well as the side-by-side requirements in

the Limited Partnership Agreement and Operating Agreement.

       91.      Separately, Dantas often engaged in litigation and other legal proceedings,

which had no connection to IEII or the CVC Fund. Upon information and belief, Dantas

consistently used funds belonging to the CVC Fund to pay these legal expenses as well, in

violation of both his fiduciary duties and the terms of Article 6.7.1 of the Limited Partnership

Agreement.

       92.      Further, defendants arranged for various Portfolio Companies, including

Zain, Futuretel and Invitel, to pay improper underwriting fees to Banco Opportunity S.A.

("Banco Opportunity"), a member of the Opportunity Group. In several transactions through

20

which Zain, Futuretel and Invitel issued securities to their shareholders, defendants caused Banco Opportunity to receive significant payments (at standard market rates) for alleged underwriting services. However, the "underwriting services" at issue were not in fact underwriting services, as the transactions at issue were private capital calls. The Onshore Fund has successfully litigated this issue against various Opportunity Group entities in Brazil.

93.     Defendants' arrangement of significant payments to their Banco Opportunity affiliate even though Banco Opportunity was not entitled to such payments was a breach of their contractual and fiduciary duties, and has reduced the value of the plaintiffs' investments.

(x)     Defendants' Efforts To Obstruct Their Removal As General Partner

94.     The misdeeds outlined above are part of a course of conduct by defendants designed to entrench defendants in control of the assets of IEII and the CVC Fund, to extort money from plaintiffs in violation of defendants' contractual and fiduciary duties, to divert funds to defendants and their affiliates, and to misappropriate to defendants and their affiliates a disproportionate share of any proceeds (including any control premium) realized as a result of a sale of control of the Portfolio Companies to a third party.

95.     From September 2004 until March 9, 2005, IEII engaged in negotiations with defendants in an effort to understand the nature and extent of their misconduct, and to protect plaintiffs' rights. Throughout those negotiations, IEII signaled to defendants that it was seriously considering removing Opportunity as general partner of the CVC Fund.

96.     In addition to the misconduct described above, fearing Opportunity's removal, defendants undertook a variety of actions to entrench themselves and to make it even more difficult for IEII to replace them, and to entrench themselves in control of the CVC Fund's investments even if they were removed as the general partner of the Fund.

21

(1)     Shifting Custodial Responsibilities

97.     For example, in early 2005, defendants withdrew all custodial responsibilities for the share register books relating to stock owned by the CVC Fund in the Portfolio Companies from Banco Itau S.A. ("Banco Itau") and transferred them to Banco Opportunity. Under Brazilian law and practice, the share register books are the governing evidence for share ownership. Banco Itau is the leading bank for custodial services in Brazil while Banco Opportunity does not provide such services to any other company outside the Opportunity Group. Opportunity moved these custodial responsibilities without consulting IEII, and refused to withdraw them from Banco Opportunity despite repeated requests from IEII, as well as IEII's repeatedly expressed concerns about the bank's clear conflict of interest.

(2)     Obstruction Of Audit And Denial Of Access To Books And Records

98.     In addition, defendants refused to disclose to IEII basic information about the CVC Fund's business affairs. Article 8.2 of the Limited Partnership Agreement requires Opportunity periodically to permit the inspection and copying of all books and records of the CVC Fund. Article 8.2 also requires Opportunity to permit IEII to conduct an annual audit of the books and records of Opportunity and the CVC Fund.

99.     On January 19, 2005, in accordance with the requirements of Article 8.2 of the Limited Partnership Agreement, IEII notified Opportunity that it would be conducting a comprehensive audit of the books and records of both Opportunity and the CVC Fund.

100.    On February 14, 2005, IEII's representatives tried to commence the audit. However, notwithstanding repeated requests, Opportunity refused to provide IEII's audit team with full access to the books and records of the CVC Fund and the general partner. Though IEII repeatedly brought these deficiencies to Opportunity's attention, Opportunity took no effective action to provide IEII's audit team with adequate access (and, indeed, unilaterally suspended the

22

audit at one point). Among the items defendants concealed from IEII's representatives were the contracts to which the CVC Fund is a party, or allegedly is a party, as well as most electronic and hard-copy correspondence and all litigation-related documents.

101.    Defendants' conduct in blocking the audit process is part and parcel of their past and ongoing efforts to hide their misdeeds from plaintiffs. As noted below, defendants' obstructions and failure to provide pertinent documents and information to plaintiffs concerning the CVC Fund continues to this day.

**D.    IEII Removes Opportunity But Defendants Seek To Obstruct That Removal**

(i)    IEII Removes Opportunity As General Partner But Opportunity Refuses To Go

102.    For numerous reasons, including many of those outlined above, on March 9, 2005 IEII exercised its right, pursuant to Article 7.3 of the Limited Partnership Agreement, to remove Opportunity for Cause (as defined in Appendix I of the Limited Partnership Agreement). In the termination notice, IEII also expressly invoked its unconditional right under Article 7.4 of the Agreement to remove Opportunity without Cause.

103.    On March 9, 2005 IEII appointed CVC Brazil as the new general partner of the CVC Fund. IEII requested that Opportunity register the change of general partner with the Cayman Islands Registrar of Exempted Limited Partnerships (the "Cayman Registrar"), as required under Cayman law.

104.    Defendants, on a variety of pretexts, refused to register the change of general partner. Defendants also persisted in trying to arrange an auction of the CVC Fund's indirect interests in the wireless telecommunications companies, Telemig and Amazonia, and in refusing to grant IEII access to the CVC Fund's books and records.

23

(ii)     IEII Successfully Seeks Judicial Intervention

105.     Upon petition by IEII, on March 11, 2005 this Court issued a temporary restraining order, requiring defendants to stop the auction of Telemig and Amazonia.

106.     Notwithstanding the temporary restraining order issued by this Court, defendants failed immediately to make any public statement that they would not proceed with the auction, as would have been required by Brazilian securities laws had defendants complied with this Court's order and stopped the auction.  Rather, after a five-day delay and after receiving inquiries from the CVM (the Brazilian telecommunications regulatory authority), defendants caused the Portfolio Companies affected by the auction to announce merely that they were "aware" of a prior notice given to the public by IEII (which notice had stated that the auction had been suspended by a New York court).

107.     On March 17, 2005 this Court issued a Preliminary Injunction stopping defendants from causing or allowing their proposed auction of Telemig and Amazonia to proceed.  The Court further prohibited defendants from denying IEII access to the CVC Fund's books and records (including the records of Opportunity as general partner) and ordered defendants to register the change of general partner with the Cayman Registrar.

(iii)    Defendants Defy The Court's Preliminary Injunction

108.     Although defendants did register the change of general partner with the Cayman Registrar, they purported to do so effective March 18, 2005 and not effective March 9, 2005 (the date on which they were actually removed).

109.     Defendants only caused the affected Portfolio Companies to announce publicly the suspension of the auction on March 23, 2005 – some six days after this Court issued its preliminary injunction – when upon information and belief, they were pressured to do so by the CVM.

24

110. In addition, defendants imposed a variety of irregular and unreasonable conditions for granting IEII access to the CVC Fund's (and Opportunity's) books and records (for example, requiring plaintiffs' representatives to initial each and every page of the non-public documents being turned over) which had the effect of unreasonably blocking and delaying IEII's access to such books and records in violation of the Preliminary Injunction.

111. At the same time, in violation of the Preliminary Injunction, defendants have to date still failed to grant IEII complete access to all of the books and records of the CVC Fund and the former general partner.

**E.     Defendants Belatedly Provide More Alleged**
**"Agreements" Purporting To Bind And Harm The CVC Fund**

112. Approximately two weeks after the Court issued its Preliminary Injunction and six weeks after IEII commenced an audit of the CVC Fund and Opportunity pursuant to its rights under the Limited Partnership Agreement, defendants came forward with several previously undisclosed "agreements," supposedly binding the CVC Fund, about which plaintiffs had no prior knowledge.

113. These alleged agreements suddenly appeared despite the fact that defendants at all times owed a duty to plaintiffs to disclose, and obtain approval for, any such agreements prior to their execution. Defendants had previously repeatedly represented to members of IEII's audit team that the CVC Fund was not a party to any such contracts. Moreover, with the exception of the Tele Norte Tag-Along Agreement, neither Dantas nor other Opportunity representatives once mentioned any of these alleged agreements during numerous meetings and communications over the past year with IEII representatives, despite the fact that the precise issues addressed in these agreements were extensively discussed between the parties during that time.

25

114.    IEII reasonably relied on defendants, its fiduciaries, to disclose the

existence of any material agreement relating to the CVC Fund. Defendants' concealment of each

of the alleged agreements first disclosed after the Court's issuance of its Preliminary Injunction

harmed plaintiffs because it prevented them from contesting the alleged agreements. Neither the

Advisory Committee nor IEII had ever approved any of these alleged agreements, which are

plainly designed to benefit defendants at IEII's and the CVC Fund's expense. Among the newly

provided "agreements" are the following:

(i)    The Alleged Highlake Tag-Along Agreement

115.    The Instrumento Particular para Alienacao em Conjunto de Participacoes

Acionarias, dated "as of" February 15, 2005 (the "Highlake Tag-Along Agreement") was first

disclosed to plaintiffs on March 29, 2005. Although the alleged Highlake Tag-Along Agreement

purports to be dated on February 15, 2005 it was not notarized until March 7, 2005.

116.    The alleged Highlake Tag-Along Agreement purports to grant Highlake

tag-along rights for an indefinite period in the event of any future sale of the CVC Fund's

indirect controlling interests in Telemig and Amazonia. The parties to this alleged Agreement

are the CVC Fund, Futuretel, Highlake and two Opportunity Funds.

117.    Defendants executed the alleged Highlake Tag-Along Agreement without

IEII or Advisory Committee approval and without disclosing its existence to IEII.

118.    To the contrary, defendants executed the Highlake Tag-Along Agreement

with the full knowledge that they had no authority to do so and that IEII did not consent to

granting these tag-along rights to defendants.

119.    During the fall of 2004, during negotiations with IEII on behalf of various

Opportunity Group entities, Dantas sought to trade the termination of the Umbrella Agreement

requested by IEII for a grant of tag-along rights to Highlake. IEII specifically refused to grant

26

tag-along rights to Highlake, yet Dantas subsequently agreed to waive the voting provisions of the Umbrella Agreement with respect to the Offshore Fund. Moreover, tag-along rights relating to Highlake, together with other issues, were further considered in subsequent intensive negotiations, but the parties were unable to reach agreement.

120. Later, on March 7, 2005 – the very day that the alleged Agreement was notarized, and just two days before Opportunity's removal as general partner – Dantas participated in a meeting in New York with IEII representatives. At that meeting, Dantas stated that he would stop his announced auction of Telemig and Amazonia only if IEII agreed to provide to Highlake "tag-along" rights in the event the CVC Fund should sell its indirect controlling interests in Telemig and Amazonia. These tag-along rights would prohibit the CVC Fund from selling its indirect controlling interests in Telemig and Amazonia unless the buyer agreed to buy simultaneously Highlake's minority interest in these companies at the equivalent price per share. IEII refused to agree to Dantas' proposal. Dantas then said he would suspend the auction and provide IEII information regarding the auction process, but only if IEII committed at the meeting to later resume the combined auction of Futuretel's and Highlake's interests in Telemig and Amazonia. Because this proposal effectively replicated the prior proposal that IEII grant tag-along rights to Highlake, IEII rejected it. At no time during these discussions did defendants mention that Opportunity had already created and signed the Highlake Tag-Along Agreement, supposedly on behalf of the CVC Fund.

121. IEII further stated to Dantas that because his behavior in various matters was not consistent with that of a fiduciary, IEII had no choice but to remove defendants as general partner of the CVC Fund. Dantas acknowledged that IEII had the right to remove him, but nonetheless threatened to enter into "agreements" before his removal to "document" various rights he claimed IEII or the CVC Fund owed to him and his Opportunity Group affiliates.

27

122.    Sure enough, on that very same day, March 7, 2005, but unbeknownst to plaintiffs, defendants had the alleged Highlake Tag-Along Agreement notarized, and thus unilaterally granted to themselves the Highlake tag-along rights that IEII had just refused to provide to defendants during their negotiations.

123.    The alleged Highlake Tag-Along Agreement is void ab initio and unenforceable, and its purported execution was yet another flagrant breach of defendants' contractual and fiduciary duties to IEII and the CVC Fund.

124.    If given effect, the alleged Agreement would, as defendants intended, materially impede the ability of IEII and the CVC Fund to sell their indirect controlling interests in Telemig and Amazonia while at the same time unjustly enrich defendants and their affiliates by allocating to them a disproportionate share of any control premium realized upon any sale of IEII's and the CVC Fund's indirect holdings in Telemig and Amazonia.

(ii)    Purported "Amendments" To The Alleged BrT Tag-Along Agreement

125.    Defendants also disclosed to IEII – for the first time, and well after the removal of the general partner – two purported "amendments" to the alleged BrT Tag-Along Agreement allegedly dated as of February 7, 2002 and December 20, 2004 respectively. Although IEII had previously spent many months after first learning of the alleged BrT Tag-Along Agreement trying to negotiate with defendants a possible settlement of its objections to that alleged Agreement, defendants did not once previously disclose, or even mention the existence of, either of these supposed "amendments."

126.    Each of the alleged "amendments" to the BrT Tag-Along Agreement is void ab initio and unenforceable and their purported execution was a breach of defendants' contractual and fiduciary duties to IEII and the CVC Fund.

28

(iii)    Alleged Tele Norte Tag-Along Agreement

127.    The alleged Agreement between the CVC Fund and the Opportunity Fund purportedly dated June 30, 1999 (the "Tele Norte Tag-Along Agreement") was likewise not disclosed to plaintiffs until weeks after Opportunity's removal as general partner.

128.    The alleged Tele Norte Tag-Along Agreement purports to grant the Opportunity Fund tag-along rights in the event of any sale by the CVC Fund of its indirect interests in Tele Norte Leste Participacoes S.A. ("Tele Norte"), the holding company for Telemar Norte Leste S.A. ("Telemar," which is one of the Portfolio Companies in which the CVC Fund has invested).

129.    The alleged Tele-Norte Tag-Along Agreement is void ab initio and unenforceable, and its execution was a clear breach of defendants' contractual and fiduciary duties to IEII and the CVC Fund.

(iv)    Alleged Zain Tag-Along Agreement

130.    The alleged Agreement between the CVC Fund and the Opportunity Fund purportedly dated March 2, 1999 (the "Zain Tag-Along Agreement") was likewise not disclosed to plaintiffs until weeks after Opportunity's removal as general partner.

131.    The alleged Zain Tag-Along Agreement purports to grant the Opportunity Fund tag-along rights in the event of any sale by the CVC Fund of its indirect interests in Tele Centro Sul Participacoes S.A. ("Tele Centro Sul"), the predecessor to Brasil Telecom as direct holding company for Brasil Telecom, S.A.

132.    Defendants executed the Zain Tag-Along Agreement with the full knowledge that they had no authority to do so and that IEII did not consent to granting these tag-along rights to defendants. During various meetings with IEII representatives in late 2004 and

29

early 2005, Dantas asked IEII to grant his affiliates tag-along rights similar to those that he later granted to them in the Zain Tag-Along Agreement, but IEII refused to grant them.

133.    The alleged Zain Tag-Along Agreement is void ab initio and unenforceable, and its execution was a clear breach of defendants' contractual and fiduciary duties to IEII and the CVC Fund.

(v)    Alleged AFAC Agreement

134.    The alleged Agreement for Regulating the Capitalization of Advances Toward Future Capital Increases – AFAC ("AFAC Agreement") was supposedly executed by the CVC Fund, Futuretel, the Opportunity Fund and Tele Fundo de Investimentos em Acoes ("Tele FIA," an investment fund comprised almost exclusively of IEII capital but managed by a member of the Opportunity Group). Although the alleged Agreement is purportedly dated January 4, 2005, it was not disclosed to plaintiffs until weeks after Opportunity's removal as general partner.

135.    Upon information and belief, defendants caused the CVC Fund to make approximately $9 million in capital advances to Futuretel. Defendants caused these advances to be made in AFACs, a particular type of debt security under Brazilian law, which are in certain cases not interest bearing and which are generally convertible into equity at the issuer's option. Defendants' use of $9 million worth of CVC Fund money to purchase non-interest bearing AFACs was a breach of defendants' contractual and fiduciary duties.

136.    The alleged AFAC Agreement, moreover, compounds defendants' wrongdoing because it provides that the CVC Fund's AFACs in Futuretel can only be converted into non-voting preferred stock. Moreover, the alleged AFAC Agreement provides that no conversion into voting common stock can take place unless it is endorsed by both Tele FIA and the Opportunity Fund (both controlled by defendants and their affiliates). In effect, the alleged

30

AFAC Agreement gives the Opportunity Fund (which owns .01% of the voting shares in

Futuretel) a veto in perpetuity over whether the CVC Fund may convert its AFACs into voting

shares of Futuretel stock.

137.    The execution of the alleged AFAC Agreement provided no benefit to IEII

or the CVC Fund, and was solely intended to benefit defendants and their affiliates. The alleged

AFAC Agreement is void <u>ab initio</u> and unenforceable, and its execution was a clear breach of

defendants' contractual and fiduciary duties to IEII and the CVC Fund.

138.    The alleged agreements described above in paragraphs 113-137 – which

defendants first provided to IEII well after their removal as general partner and which were

signed only by defendants or their representatives supposedly on behalf of the CVC Fund –

benefit solely defendants or other Opportunity Group affiliates and are intended by defendants to

interfere, and do interfere, with CVC Brazil's ability to manage and sell the CVC Fund's

investments after Opportunity's removal as general partner.

139.    Defendants' creation of these alleged agreements was a clear violation of

defendants' contractual and fiduciary duties to plaintiffs under the Limited Partnership

Agreement. Should defendants seek to enforce these patently unenforceable agreements,

plaintiffs will suffer incalculable harm because their ability to sell their investments in the

Portfolio Companies will be materially impeded.

*       *       *       *       *

140.    Defendants' repeated tortious acts were committed wantonly and

maliciously. Defendants' conduct was morally culpable, prompted by evil motives and

outrageous.

31

## CLAIMS

### FIRST CLAIM – IEII
### BREACH OF CONTRACT
### (LIMITED PARTNERSHIP AGREEMENT)

141.   Plaintiffs repeat and re-allege paragraphs 1 through 140 above as if fully set forth herein.

142.   Opportunity and IEII are parties to the Limited Partnership Agreement. Dantas, as a Principal of Opportunity, is also a signatory to the Limited Partnership Agreement.

## A.   LPA Article 6.1.5 (Obligations as Fiduciary)

143.   Article 6.1.5 of the Limited Partnership Agreement provides: "Acknowledgment of Status as Fiduciary.  The General Partner acknowledges, and each Principal by its execution of this Agreement acknowledges, that it is a fiduciary to the Limited Partners."  Thus, both Opportunity and Dantas were contractually bound to act as fiduciaries to IEII.

144.   Pursuant to their fiduciary duties, defendants were obliged to manage the CVC Fund in the best interests of IEII and the CVC Fund.

145.   Defendants failed to manage the CVC Fund in the best interests of IEII and the CVC Fund, including by failing to devise and implement appropriate strategies for divestment from the Portfolio Companies that maximized IEII's and the CVC Fund's returns.  In particular, although the CVC Fund was supposed to exit its investments in the Portfolio Companies by September 2005 at the latest, defendants only proposed exit strategies that were designed to entrench their and their affiliates' control of those companies, rather than to maximize plaintiffs' benefits.

146.   Defendants also failed to manage the CVC Fund in IEII's and the CVC Fund's best interests by entering into numerous transactions and alleged agreements purportedly

32

on behalf of the CVC Fund that served no purpose other than to entrench defendants in control of the Portfolio Companies in which the CVC Fund invested and to provide substantial benefits to defendants at IEII's and the CVC Fund's expense.

147.    Defendants breached Article 6.1.5 of the Limited Partnership Agreement by engaging in self-dealing with respect to the Highlake transaction. IEII contributed to the CVC Fund $22 million, which the CVC Fund subsequently contributed to Highlake for the purchase of TPSA. Yet rather than allocating to the CVC Fund its pro rata share of Highlake's equity as they promised, defendants gave the CVC Fund a Note from Highlake that has never been paid and that contains terms that are highly favorable to defendants.

148.    Defendants further breached Article 6.1.5 of the Limited Partnership Agreement by failing to cause Techold to convert its non-voting preferred stock in Solpart into voting common stock. By so acting, defendants sought to entrench themselves and their Opportunity Group affiliates in control of Brasil Telecom at the expense of IEII and the CVC Fund.

149.    Defendants further breached Article 6.1.5 of the Limited Partnership Agreement by arranging the sale of 3,425 convertible Santos debentures from the CVC Fund to an Opportunity Group affiliate for a total price that was approximately $400,000 below their fair value. In addition to money damages, the May 23, 2003 sale of Santos debentures threatens to irreparably harm IEII and the CVC Fund if it enables defendants, with their affiliates and allies, to gain a majority of voting shares in Santos by exercising the conversion rights associated with the debentures.

150.    Defendants further breached Article 6.1.5 of the Limited Partnership Agreement by misappropriating CVC Fund assets to pay legal expenses not properly allocable to

33

IEII or the CVC Fund, and by causing various Portfolio Companies to pay improper

underwriting fees to Banco Opportunity, an affiliate of defendants.

151.    Defendants further breached Article 6.1.5 of the Limited Partnership

Agreement by secretly entering into a put/success fee arrangement with Alcatel without giving

IEII or the CVC Fund an opportunity to participate in that transaction.

152.    Defendants further breached Article 6.1.5 of the Limited Partnership

Agreement by wrongfully obstructing IEII's exercise of its contractual right to remove

Opportunity as general partner of the CVC Fund by (i) transferring custodial responsibility for

the share register books associated with the CVC Fund's investments in the Portfolio Companies

from Banco Itau to Banco Opportunity without consulting IEII and refusing to comply with

IEII's request to reverse such transfer; (ii) denying IEII complete access to the CVC Fund's, and

Opportunity's, books and records; (iii) failing to register immediately the appointment of CVC

Brazil as the new general partner of the CVC Fund with the Cayman Islands Registrar of

Exempted Limited Partnerships; and (iv) trying to commence an auction of the CVC Fund's

indirect controlling interests in Telemig and Amazonia against IEII's expressed wishes, and then

persisting in its attempt even after Opportunity's removal as general partner.

153.    Defendants further breached Article 6.1.5 of the Limited Partnership

Agreement by starting an auction through Futuretel of the CVC Fund's indirect controlling

interests in Telemig and Amazonia, which stands to benefit defendants and their affiliates in the

Opportunity Group at the expense of plaintiffs. Continuation of the auction in the face of IEII's

removal of defendants would have irreparably deprived IEII of its right to have its newly

appointed general partner manage the assets defendants would sell.

154.    Defendants further breached Article 6.1.5 of the Limited Partnership

Agreement by purporting to execute each of the alleged agreements first disclosed to plaintiffs

34

after IEII removed defendants as the general partner of the CVC Fund. Defendants' purported

execution of these agreements, as intended by defendants, materially impedes IEII's chosen

general partner's ability to exercise its contractual rights and responsibilities with respect to the

CVC Fund and dramatically reduces the value of the CVC Fund's investments in the Portfolio

Companies, including by materially impeding plaintiffs' ability to sell those investments and to

maximize IEII's and the CVC Fund's return on those investments.

**B.    LPA Articles 7.3 and 7.4 (IEII's Right to Remove General Partner)**

155.    Article 7.3 of the Limited Partnership Agreement provides, in relevant

part: "<u>REMOVAL OF GENERAL PARTNER FOR CAUSE</u>. The Limited Partners may with

Cause remove the General Partner and appoint a new General Partner . . . ." Appendix I to the

Agreement broadly defines "Cause" to include, <u>inter alia</u>, the commission of fraud,

embezzlement, or similar crimes, the cessation by an Opportunity Group company from

managing the Onshore Fund, the general partner's failure to perform or observe any material

provision of the Limited Partnership Agreement, or the material failure of the general partner to

adhere to the terms of the Operating Agreement.

156.    In addition to the right to remove the general partner "for Cause" under

Article 7.3 of the Limited Partnership Agreement, IEII has the right to remove the general

partner without cause under Article 7.4.

157.    Defendants breached Articles 7.3 and 7.4 of the Limited Partnership

Agreement by seeking to entrench themselves as general partner. Defendants' actions in

furtherance of such entrenchment include, <u>inter alia</u>, (i) transferring custodial responsibility for

the share register books associated with the CVC Fund's investments in the Portfolio Companies

from Banco Itau to Banco Opportunity without consulting IEII and over IEII's objections; (ii)

denying IEII access to the CVC Fund's, and Opportunity's, books and records; (iii) failing to

register immediately the appointment of CVC Brazil as the new general partner of the CVC Fund

with the Cayman Islands Registrar of Exempted Limited Partnerships; and (iv) trying to

commence an auction of the CVC Fund's indirect controlling interests in Telemig and Amazonia

against IEII's expressed wishes, and then persisting in its attempt even after Opportunity's

removal as general partner.

## C.    LPA Article 6.4 (Advisory Committee)

158.    Article 6.4 of the Limited Partnership Agreement provides that "[t]he

Partnership shall maintain an advisory committee . . . that . . . shall be authorized to approve or

reject . . . (ii) any action for which the Advisory Committee's approval is permitted or required

under this Agreement; [and] (iii) any exceptions to the investment policy of the Fund (including

the limitations contained in Article 2." The Limited Partnership Agreement also requires that the

members of the Advisory Committee be IEII and Citibank members or representatives.

159.    Defendants breached these requirements when they failed to obtain the

Advisory Committee's consent for transactions covered by Article 6.5 of the Limited Partnership

Agreement, which transactions included, inter alia, (i) the execution of each of the alleged

agreements disclosed by defendants after Opportunity's removal as general partner; (ii) the

execution of the alleged BrT Tag-Along Agreement; (iii) the failure to arrange for Highlake's

issuance of a Note, convertible at the CVC Fund's discretion, into a pro rata share of Highlake's

equity; (iv) the commencement of the auction, through Futuretel, of the CVC Fund's indirect

interests in Telemig and Amazonia without Advisory Committee approval and against IEII's

expressed wishes; and (v) the sale of 3,425 convertible Santos debentures by the CVC Fund to an

Opportunity Group affiliate for less than fair value.

                    *        *        *        *        *

36

160.   Defendants' breaches of their contractual duties have harmed IEII by (i) eviscerating IEII's bargained-for contractual right to appoint a general partner to manage its assets in its best interests; (ii) denying IEII its right, through the Advisory Committee, to advise and consent with respect to conflict of interest transactions; (iii) obstructing IEII's ability to exercise general oversight over its investments by refusing to provide it with complete access to the books and records of Opportunity and the CVC Fund; and (iv) entrenching themselves in control of companies owned by the CVC Fund and making it harder for plaintiffs to exit their investments in the Portfolio Companies through a sale to a third party. Defendants' breaches of their contractual duties have also caused significant monetary damages to IEII and the CVC Fund.

## SECOND CLAIM – ALL PLAINTIFFS
## BREACH OF FIDUCIARY DUTY

161.   Plaintiffs repeat and re-allege paragraphs 1 through 160 above as if fully set forth herein.

162.   Defendants owe fiduciary duties to IEII and the CVC Fund, pursuant to which they are required to act openly, in the best interests of IEII and the CVC Fund, and not to exploit their positions to benefit themselves, their affiliates or anyone else at the expense of IEII or the CVC Fund.

163.   Defendants expressly acknowledged the existence of these duties (which independently exist under governing Cayman law) in Article 6.1.5 of the Limited Partnership Agreement: "Acknowledgment of Status as Fiduciary. The General Partner acknowledges, and each Principal by its execution of this Agreement acknowledges, that it is a fiduciary to the Limited Partners." (Emphasis in original.)

164.    As alleged specifically in paragraphs 141-160 above, defendants breached their fiduciary duties when they, inter alia, (i) commenced an auction, through Futuretel, of IEII's and the CVC Fund's indirect interests in Telemig and Amazonia, without Advisory Committee approval, despite a clear conflict of interest; (ii) failed to arrange for Highlake's issuance of a Note, convertible at the CVC Fund's discretion, into a pro rata share of Highlake's equity; (iii) executed the alleged agreements first disclosed by defendants after Opportunity's removal as general partner, which individually and collectively benefited defendants and their affiliates at the expense of IEII and the CVC Fund while providing no consideration to IEII or the CVC Fund; (iv) executed an alleged BrT Tag-Along Agreement that benefited their affiliates at IEII's and the CVC Fund's expense while providing no consideration to IEII or the CVC Fund; (v) failed to convert Techold's shares of preferred Solpart stock into voting common stock; (vi) arranged the May 23, 2003 sale, by the CVC Fund, of 3,425 convertible Santos debentures to an Opportunity Group affiliate for $400,000 less than fair value; (vii) misappropriated CVC Fund assets to pay legal expenses not properly allocable to IEII or the CVC Fund and caused various Portfolio Companies to pay improper underwriting fees to Banco Opportunity; (viii) entered into a put/success fee arrangement with Alcatel in secret and without giving IEII or the CVC Fund an opportunity to participate; and (ix) interfered with IEII's exercise of its contractual right to remove Opportunity as general partner of the CVC Fund.

165.    All of these actions by defendants have harmed plaintiffs by (i) causing IEII and the CVC Fund to suffer significant monetary damages; (ii) eviscerating IEII's bargained-for contractual right to appoint a general partner to manage its assets in its best interests; (iii) denying IEII its right, through the Advisory Committee, to advise and consent with respect to conflict of interest transactions; (iv) obstructing IEII's ability to exercise general oversight over its investments by refusing to provide it with complete access to the books and

38

records of Opportunity and the CVC Fund; and (v) entrenching defendants and their affiliates in control of companies owned by the CVC Fund and making it harder for plaintiffs to exit their investments in the Portfolio Companies through a sale to a third party.

## THIRD CLAIM — IEII
## FRAUD

166. Plaintiffs repeat and reallege paragraphs 1 through 165 above as if fully set forth herein.

167. Defendants owed a fiduciary duty of honesty and candor to IEII. Defendants had an affirmative duty to disclose to IEII anything material to the limited partnership's business and were prohibited from misrepresenting or misleading their partners.

168. Defendants purposefully misrepresented the nature of the Highlake transaction. Defendants knew that, in light of the CVC Fund's nature as a private equity fund, IEII's agreement to participate in the capitalization of Highlake and the acquisition of TPSA would be conditioned upon their receipt of a pro rata share of Highlake's equity. As a result, Dantas falsely represented to Mary Lynn Putney that, in exchange for its $22 million contribution to the purchase of TPSA, the CVC Fund would receive a debt interest convertible into a pro rata share of Highlake's equity. Dantas made these misrepresentations with knowledge of their falsity or, at the very least, recklessly.

169. IEII reasonably and justifiably relied on defendants' misrepresentations about the Highlake transaction. However, upon completion of the transaction, defendants refused to give anything other than, at most, nominal equity to the CVC Fund and instead causing Highlake to execute a $22 million Note, with unusual and highly unfavorable terms, in favor of the CVC Fund. In addition, defendants twice extended unilaterally the date on which the Note is payable to the CVC Fund without consulting IEII or the Advisory Committee.

39

170.   As a result, IEII has suffered significant financial harm and has been deprived of the return on its investment that would have been obtained had defendants' representations about the nature of the Highlake investment been true and correct.

## FOURTH CLAIM – IEII
## NEGLIGENT MISREPRESENTATION

171.   Plaintiffs repeat and re-allege paragraphs 1 through 170 above as if fully set forth herein.

172.   As stated above, defendants owed fiduciary duties to IEII, pursuant to which they were required to act openly, in IEII's best interests, and not to exploit their positions to benefit themselves, their affiliates or anyone else at IEII's expense.

173.   At the time defendants embarked upon their effort to acquire Highlake, they knew that IEII's agreement to participate would be conditional upon its receipt of accurate information regarding the nature of the asset to be acquired, and the interest the CVC Fund was to receive in such asset. Defendants further understood that IEII was reasonably relying on them as fiduciaries to represent accurately the prospective Highlake transaction and that IEII would be injured if they were grossly negligent or reckless in the provision of such representations.

174.   During the summer of 2002, defendants falsely represented to Mary Lynn Putney that, in exchange for its $22 million contribution to the purchase of TPSA, the CVC Fund would receive a debt interest convertible into a pro rata share of Highlake's equity. IEII reasonably relied on this representation in deciding to contribute $22 million towards Highlake's acquisition of TPSA.

175.   As a direct result of defendants' representations, IEII agreed to participate in the acquisition of Highlake. However, once they acquired Highlake defendants refused to

assign anything other than a nominal amount of equity to the CVC Fund. Instead, defendants

gave the CVC Fund a $22 million Note with unusual and highly unfavorable terms.

176.    Defendants' conduct has caused significant financial harm to IEII, which

would have enjoyed a much higher return on its $22 million investment had defendants'

representations been true and correct.

## FIFTH CLAIM – ALL PLAINTIFFS
## PROFESSIONAL MALPRACTICE

177.    Plaintiffs repeat and re-allege paragraphs 1 through 176 above as if fully

set forth herein.

178.    Article 6.6.1 of the Limited Partnership Agreement provides that each of

the defendants "shall exercise the standard of care of a professional investment advisor."

179.    Defendants failed to exercise the standard of care of a professional

investment advisor. Rather, defendants were at least grossly negligent when they, inter alia, (i)

commenced an auction, through Futuretel, of IEII's and the CVC Fund's indirect interests in

Telemig and Amazonia, without Advisory Committee approval, despite a clear conflict of

interest; (ii) failed to arrange for Highlake's issuance of a Note, convertible at the CVC Fund's

discretion, into a pro rata share of Highlake's equity; (iii) executed the alleged agreements first

disclosed by defendants after Opportunity's removal as general partner, which individually and

collectively benefited defendants and their affiliates at the expense of IEII and the CVC Fund

while providing no consideration to IEII or the CVC Fund; (iv) executed an alleged BrT Tag-

Along Agreement that benefited their affiliates at IEII's and the CVC Fund's expense while

providing no consideration to IEII or the CVC Fund; (v) failed to convert Techold's shares of

preferred Solpart stock into voting common stock; (vi) arranged the May 23, 2003 sale, by the

CVC Fund, of 3,425 convertible Santos debentures to an Opportunity Group affiliate for

41

$400,000 less than fair value; (vii) misappropriated CVC Fund assets to pay legal expenses not properly allocable to IEII or the CVC Fund and caused various Portfolio Companies to pay improper underwriting fees to Banco Opportunity; (viii) entered into a put/success fee arrangement with Alcatel in secret and without giving IEII or the CVC Fund an opportunity to participate; and (ix) interfered with IEII's exercise of its contractual right to remove Opportunity as general partner of the CVC Fund.

180.    Moreover, defendants were at least grossly negligent when they failed to manage the CVC Fund in its own and IEII's best interests, including by failing to devise and implement appropriate strategies for divestment from the Portfolio Companies in the best interests of IEII and the CVC Fund and by allegedly executing agreements on behalf of the CVC Fund that materially harm plaintiffs' interests and benefit solely the defendants.

## SIXTH CLAIM – ALL PLAINTIFFS
## DECLARATORY JUDGMENT

181.    Plaintiffs repeat and re-allege paragraphs 1 through 180 above as if fully set forth herein.

182.    Defendants lacked authority to execute the alleged BrT Tag-Along Agreement and each of the alleged agreements disclosed after Opportunity's removal as general partner, because defendants' agency was expressly and impliedly limited by prior agreements, including the Limited Partnership Agreement and the Operating Agreement. Defendants' authority on behalf of the CVC Fund was also constrained by their fiduciary duties.

183.    All parties to these alleged agreements – i.e., defendants and their affiliates – knew before the purported execution of each agreement that defendants lacked the authority to sign such agreements on behalf of the CVC Fund.

42

184.    Neither IEII nor the CVC Fund received any consideration in exchange for allegedly agreeing to these agreements.

185.    These alleged agreements were each executed in breach of defendants' fiduciary duties, are contrary to the interests of IEII and the CVC Fund and were fraudulently concealed from IEII.

186.    Accordingly, these alleged agreements are void ab initio or, in the alternative, voidable by IEII and the CVC Fund or, in the alternative, unenforceable against IEII and the CVC Fund.

**SEVENTH CLAIM – ALL PLAINTIFFS**
**BREACH OF CONTRACT**
**(LIMITED PARTNERSHIP AGREEMENT AND OPERATING AGREEMENT)**

187.    Plaintiffs repeat and re-allege paragraphs 1 through 186 above as if fully set forth herein.

188.    Opportunity, Dantas and Citibank are parties to the Operating Agreement.

189.    Article 7.07 of the Operating Agreement empowers IEII to enforce the Operating Agreement "on behalf of the Partnership or [IEII], in its capacity as a Limited Partner."

190.    Article 5.02 of the Operating Agreement provides that "Each of the Managers to the extent deemed practicable . . . shall cause, or . . . use its best efforts to cause, each Fund to make an investment as a side-by-side investment in each prospective investment . . . and to divest from such Side-by-Side Investment in" a side-by-side manner and on a pro rata basis in accordance with the parties' pre-existing investments.

191.    If the BrT Tag-Along Agreement or any of the alleged agreements disclosed after Opportunity's removal as general partner are not void ab initio then they are

unenforceable as a violation of the Limited Partnership Agreement and the Operating
Agreement.

## EIGHTH CLAIM – ALL PLAINTIFFS
## CONVERSION

192.    Plaintiffs repeat and re-allege paragraphs 1 through 191 above as if fully
set forth herein.

193.    IEII held an ownership interest in 100% of the equity in the CVC Fund
during the relevant period, and was the sole and exclusive owner of all assets in the CVC Fund.

194.    Opportunity, as general partner, had actual possession of all assets in the
CVC Fund, and under Cayman law was responsible for the day-to-day management of those
assets.

195.    Defendants caused the CVC Fund to pay a disproportionate share of the
Funds' collective legal expenses during a series of litigations.

196.    Defendants also misappropriated, or caused to be misappropriated, various
assets of the CVC Fund to pay legal expenses incurred by Opportunity affiliates, which had
nothing to do with the CVC Fund's interests.

197.    Defendants also caused various Portfolio Companies to pay improper
underwriting fees to Banco Opportunity.

198.    Defendants' misappropriation of the CVC Fund's assets to pay legal and
other expenses properly borne by their affiliates has caused IEII and the CVC Fund substantial
harm by reducing the value of the CVC Fund.

## NINTH CLAIM – ALL PLAINTIFFS
## UNJUST ENRICHMENT

199.    Plaintiffs repeat and re-allege paragraphs 1 through 198 above as if fully
set forth herein.

200.    In reliance on defendants' representations, IEII contributed $22 million to the CVC Fund in good faith and in the expectation that this money would be used to fund Highlake's purchase of TPSA.

201.    Defendants accepted the $22 million paid by plaintiffs and used it to fund a significant part of the purchase price that Highlake paid TIW for TPSA.

202.    In exchange for their $22 million contribution, plaintiffs had a reasonable expectation that they would receive a pro rata share of Highlake's equity or, at a minimum, a Note convertible at their discretion into a pro rata share of Highlake's equity.

203.    Upon information and belief, had plaintiffs been granted a pro rata share of Highlake's equity (or a note convertible at their discretion into a pro rata share of Highlake's equity) their investment in Highlake would be worth well over $80 million. Defendants have thus diverted to themselves significant value, thereby unjustly enriching themselves at plaintiffs' expense.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request judgment against defendants as follows:

Awarding to plaintiffs damages in an amount to be determined at trial, but in any event not less than $300 million, plus punitive damages;

Declaring that (i) the alleged BrT Tag-Along Agreement is void ab initio or, in the alternative, voidable by the CVC Fund and IEII or, in the alternative, unenforceable against the CVC Fund and IEII; (ii) each of the newly disclosed agreements is void ab initio or, in the alternative, voidable by the CVC Fund and IEII or, in the alternative, unenforceable against the CVC Fund and IEII; and (iii) the CVC Fund holds a $22 million Highlake note, convertible at the CVC Fund's sole discretion into a one-third equity interest in Highlake;

Enjoining defendants, the Opportunity Group and any affiliate of those entities from (i) further interfering with IEII's removal of Opportunity as general partner of the CVC Fund; (ii) proceeding with the auction, through Futuretel, of the CVC Fund's indirect interests in Telemig and Amazonia; (iii) undertaking any transaction or entering into any agreement on behalf of the CVC Fund; (iv) refusing to cause their affiliates or subsidiaries to take all actions within their power to convert Techold's non-voting preferred shares in Solpart into voting common shares, or taking any action (or causing or allowing any other person to take any action) to impede the conversion by Techold of its non-voting shares in Solpart into voting common shares; (v) refusing to take all action within their power to cause their affiliates or subsidiaries not to convert into voting shares the 3,425 Santos debentures sold by the CVC Fund to an Opportunity Group affiliate on May 23, 2003; and (vi) enforcing or seeking to enforce the alleged BrT Tag-Along Agreement, the alleged Highlake Tag-Along Agreement, the alleged Tele Norte Tag-Along Agreement, the alleged Zain Tag-Along Agreement, the alleged AFAC Agreement or either of the alleged Amendments to the BrT Tag-Along Agreement;

Ordering that the Preliminary Injunction issued by the Court on March 17, 2005 be made permanent; and

46

Awarding to plaintiffs costs, as well as such other relief, whether in law or in equity, as the Court may deem just and proper.

Dated:    New York, New York
           April 12, 2005

                    Respectfully submitted,

By: _____
       Howard S. Zelbo (HZ-3227)
       Carmine D. Boccuzzi (CB-2177)
       CLEARY GOTTLIEB STEEN & HAMILTON LLP
       One Liberty Plaza
       New York, NY 10006
       (212) 225-2000

       Attorneys for Plaintiffs
       International Equity Investments, Inc. and Citigroup
       Venture Capital International Brazil, LLC, on behalf of
       itself and Citigroup Venture Capital International
       Brazil, L.P.

Of Counsel:

    Daniel M. Hibshoosh (DH-8959)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

INTERNATIONAL EQUITY INVESTMENTS, INC., and
CITIGROUP VENTURE CAPITAL INTERNATIONAL
BRAZIL, LLC, ON BEHALF OF ITSELF AND
CITIGROUP VENTURE CAPITAL INTERNATIONAL
BRAZIL, L.P. (f.k.a. CVC/OPPORTUNITY EQUITY
PARTNERS, L.P.),

                                    Plaintiffs,

                          v.

OPPORTUNITY EQUITY PARTNERS LTD. (f.k.a.
CVC/OPPORTUNITY EQUITY PARTNERS LTD.) and
DANIEL VALENTE DANTAS,

                                    Defendants.

05 Civ. 2745 (LAK)

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

CLEARY GOTTLIEB STEEN & HAMILTON LLP
ATTORNEYS FOR PLAINTIFFS INTERNATIONAL EQUITY
INVESTMENTS, INC  AND CITIGROUP VENTURE CAPITAL
INTERNATIONAL BRAZIL, LLC, ON BEHALF OD ITSELF AND
CITIGROUP VENTURE CAPITAL INTERNATIONAL BRAZIL, L.P

ONE LIBERTY PLAZA
BOROUGH OF MANHATTAN
NEW YORK, N Y. 10006
(212) 225-2000

COPY RECEIVED

THIS _____ DAY OF _____ 20 _____

_____

_____
_____