UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
INTERNATIONAL EQUITY INVESTMENTS, INC.
and CITIGROUP VENTURE CAPITAL
INTERNATIONAL BRAZIL, LLC, on behalf of itself
and Citigroup Venture Capital International Brazil, L.P.
(f.k.a. CVC/Opportunity Equity Partners, L.P.),

            Plaintiffs,

            -against-                            05 Civ. 2745 (LAK)

OPPORTUNITY EQUITY PARTNERS, LTD.
(f.k.a. CVC/Opportunity Equity Partners, Ltd.) and
DANIEL VALENTE DANTAS,

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MEMORANDUM OPINION

Appearances:

> Howard S. Zelbo
> Carmine D. Boccuzzi
> Daniel M. Hibshoosh
> CLEARY GOTTLIEB STEEN & HAMILTON LLP
> *Attorneys for Plaintiffs*
>
> Philip C. Korologos
> George F. Carpinello
> BOIES, SCHILLER & FLEXNER LLP
> *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge*.

       In the late 1990s, Citibank, N.A. ("Citibank") agreed to make an entity controlled by

Daniel Valente Dantas, a Brazilian banker, the sole general partner of an investment vehicle to which

Citibank contributed the entire $728 million in capital. The vehicle now owns, through an elaborate

holding company structure, a very substantial interest in Brasil Telecom S.A. ("Brasil Telecom"),

a provider of fixed-line and cellular telephone services in Brazil. Although Citibank recently removed Dantas as general partner of its investment vehicle, Dantas continues to control Brasil Telecom because he installed individuals loyal to him as directors of the companies at each level of the holding company structure.

Dantas now proposes to use that control, notwithstanding his removal as general partner, to push through – against the wishes of Citibank – transactions involving his own entities, Brasil Telecom, and Telecom Italia International N.V. and its affiliates (collectively "Telecom Italia") pursuant to which, among other things, (1) Dantas will sell his interests in the Brasil Telecom family to Telecom Italia for amounts that appear to be hundreds of millions of dollars in excess of their actual value, and (2) Brasil Telecom will transfer its cellular telephone business to Telecom Italia for allegedly inadequate consideration.

Plaintiffs contend that Dantas may not use his control over the holding company structure, which was a function of Citibank's having entrusted him with its investments, to effectuate the transactions involving Brasil Telecom. To do so, they say, would breach his fiduciary duty. They seek an injunction barring these transactions pending trial. The case thus requires the Court to consider the post-removal obligations of a fiduciary to his beneficiaries.

*Background*

The motion challenges the Dantas-Telecom Italia-Brasil Telecom agreements of April 28, 2005. Understanding those agreements requires some familiarity with the turbulent history of investments in Brazil's telecommunications sector involving Citibank, the Brazilian pension funds, Telecom Italia, and the group of entities founded and controlled by Dantas, which will be referred

to collectively as "Opportunity."

*A.    Citibank and the Pension Funds Invest with Opportunity*

    *1.    The CVC Fund and the Onshore Fund*

In the late 1990's, Dantas and Opportunity organized (1) a group of Brazilian pension funds and (2) Citibank to invest together with (3) Opportunity on a "side-by-side" basis in telecommunications assets being privatized by the Brazilian government. Each of the three was to invest under Opportunity's common management on the same terms in the same classes of securities, with the amount of capital that each investor put into each asset a function of that investor's percentage contribution to the three investors' total commitment.[1] The investments of Citibank and the pension funds each dwarfed that of Opportunity.

The vehicle for the pension funds' investment was CVC/Opportunity Equity Partners Fundo Mútuo de Investimento em Ações – Carteira Livre, now named Investidores Institucionais Fundo de Investimento em Ações, an investment fund organized under the laws of Brazil and known as the Onshore Fund. Opportunity was the manager of the fund.[2]

The vehicle for Citibank's investment was CVC/Opportunity Equity Partners, L.P., now named Citigroup Venture Capital International Brazil, L.P. (the "CVC Fund"), a private equity investment fund registered as a Cayman Islands exempted limited partnership. Until recently the CVC Fund's sole general partner, which contributed no capital, was defendant CVC/Opportunity Equity Partners, Ltd., now known as Opportunity Equity Partners, Ltd. ("Opportunity Equity"), a

---

[1]    *See* de Carvalho Decl. ¶ 24; Boccuzzi Aff. Ex. O at 1-2, art. 5.02.

[2]    Boccuzzi Aff. Ex. O at 1-2; Guth Decl. ¶ 1.

member of the Opportunity family. The sole limited partner is plaintiff International Equity Investments, Inc. ("IEII"), a wholly-owned subsidiary of Citibank that contributed all of the CVC Fund's $728 million in capital.[3]

The CVC Fund is governed by a Limited Partnership Agreement (the "LPA") pursuant to which the general partner was responsible for "the management, control, operation and policy" of the fund and acknowledged its status as a fiduciary for the limited partner.[4] The LPA provides that "[t]his Agreement, including its existence, validity, construction and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the Cayman Islands without regard to otherwise governing principles of conflicts of law"[5] and that:

> "[e]ach of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any New York state court or federal court of the United States sitting in the Borough of Manhattan in New York City . . . in any action or proceeding arising out of or relating to this Agreement . . . and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in any such [court]."[6]

For the first few years, relations between Dantas and the Onshore Fund and Citibank appear to have been at least satisfactory.[7] The funds acquired, among other assets, indirect

---

[3]     Caldeira Decl. ¶¶ 1, 3, 5.

[4]     Caldeira Decl. Ex. A. (the "LPA") arts. 6.1.1, 6.1.5.

[5]     *Id*. art. 13.7.

[6]     *Id*. art. 13.18(a).

[7]     *See* de Carvalho Decl. ¶ 40, Ex. D.

controlling interests in two new Brazilian wireless telecommunications companies, Telemig Celular

S.A. ("Telemig") and Amazonia Celular S.A. ("Amazonia").[8]

2.    *The Opportunity Investors Join Forces with Telecom Italia To Purchase Brasil Telecom*

In 1998, Citibank, the Onshore Fund, and Dantas formed a consortium with Telecom

Italia to bid on the fixed-line telephone assets that became Brasil Telecom. The vehicle for the

successful bid was a holding company named Solpart Participações S.A. ("Solpart") which today

has majority control of Brasil Telecom Participações S.A. ("BTP"), the direct parent of Brasil

Telecom. Solpart's three shareholders are Telecom Italia, a Dantas affiliate named Timepart

Participações Ltda. ("Timepart"), and Techold Participações S.A. ("Techold"), one of the holding

companies created by Opportunity and owned by it, Citibank, and the pension funds.[9] Under the

1998 agreement among these three shareholders (the "Solpart Shareholders Agreement"), Telecom

Italia gained a 38 percent stake in Solpart and certain unique veto powers.[10] These gave Telecom

Italia substantial ability to influence Brasil Telecom.

3.    *Current Corporate Structure*

Brasil Telecom is controlled by a holding company structure, the relevant part of

which is depicted in the following chart:

---

[8]
    De Carvalho Decl. ¶ 25; Caldeira Decl. ¶ 4.

[9]
    De Carvalho Decl. ¶ 29; De Carvalho Sur-reply Decl. ¶ 19; Hibshoosh Supp. Decl. Ex. A ¶¶ 35-41 ("First De Carvalho Witness Statement").

[10]
    *See* Hibshoosh 2d Supp. Decl. Ex. C §§ 5.2, 5.3, 5.4; De Carvalho Decl. ¶ 29; First De Carvalho Witness Statement ¶¶ 39, 43.

# Relevant Corporate Structure

(percentages of voting shares)



At the top of the chain is Opportunity Zain S.A. ("Zain"), a key entity because – at least in theory – control of Zain yields indirect control of Brasil Telecom. Zain is owned 44.20 percent by the CVC Fund,[11] 45.45 percent by the Onshore Fund, and 9.75 percent by Opportunity.

Zain holds 67.82 percent of the voting shares in Invitel S.A. ("Invitel"), which in turn holds 99.99% of the voting shares in Techold, which owns 61.98 percent of the voting shares in Solpart. Of the remaining voting shares in Solpart, 38 percent are held by Telecom Italia and .02 percent by Timepart. Solpart holds 51 percent of the voting shares in BTP, and BTP, the preferred and common shares of which are traded publicly in Brazil, holds 99.07 percent of the voting shares in Brasil Telecom.

Until now, Dantas' close associates have sat on the boards of many or all of these companies. The seven-member board of Brasil Telecom, at least until recently,[12] included four individuals affiliated with Opportunity. BTP's six-member board includes (1) Veronica Valente Dantas, Dantas's sister, (2) Arthur Joaquim de Carvalho, Dantas' brother-in-law, (3) Dantas' former brother-in-law, and (4) Luis Octavio Carvalho de Motta Veiga, a lawyer for Opportunity. The three-person boards of Invitel, Techold, and Zain[13] each include Veronica Valente Dantas and Maria

---

[11]

Some of the CVC Fund's interest is held by an affiliate of the CVC Fund, *see* Pl. Br. App., but the distinction is immaterial here.

[12]

At oral argument, defense counsel stated that the Brasil Telecom board has been disinterested since April 30, 2005. Tr. (5/9/05) 29-30. Apart from counsel's statement, there is no such evidence in the record. In any case, defense counsel claimed that the board became disinterested because Brasil Telecom elected new and allegedly independent directors. Counsel, however, acknowledged that Dantas and his allies, who continue to control the BTP board, selected a number of the new and supposedly independent Brasil Telecom directors. *See id*. at 30, 42-43.

[13]

The membership of the Zain board changed on May 18, as discussed below.

Amália Delfim de Melo Coutrim, an employee of Opportunity.[14]

B.      *Clashes Between Telecom Italia and Brasil Telecom*

Within a few years after the Brasil Telecom acquisition, Telecom Italia and Brasil Telecom found themselves competing for Brazilian government licenses to operate cellular telephone services. By 2002, Telecom Italia had obtained several such licenses and invested heavily in infrastructure that was ready to be deployed. Under Brazilian law, however, Telecom Italia was prohibited from operating the new services because it was considered – on account of its investment and veto rights under the Solpart Shareholders Agreement – to be an affiliate of Brasil Telecom, and Brasil Telecom was precluded from offering cellular services until it had met certain government targets for extending access to its fixed-line services.[15]

Anxious to begin operating its cellular service, Telecom Italia decided to reduce its position of influence in Solpart in order to satisfy regulators that it was sufficiently unrelated to Brasil Telecom. In intense negotiations, Telecom Italia tried to secure from Techold and Timepart (a) a commitment that Brasil Telecom would not operate any cellular services, and (b) a right to regain its position in Solpart once Brasil Telecom had satisfied the relevant regulatory requirements. The resulting amendment to the Solpart Shareholders Agreement diminished Telecom Italia's stake in Solpart, eliminated its special veto powers, and removed provisions that allowed each shareholder to call the others' shares or put its own to them if certain triggering conditions occurred.

---

[14]    Spinelli Decl. ¶¶ 3, 5-8.

[15]    First De Carvalho Witness Statement ¶¶ 70-98; De Carvalho Decl. ¶¶ 30-31; Hibshoosh Supp. Decl. Ex. C. ¶¶ 48-50 ("First Cico Witness Statement").

This satisfied Brazilian regulators that Telecom Italia and Brasil Telecom were sufficiently independent of each other, and Telecom Italia was permitted to launch its cellular operations. There was, however, no agreement that Brasil Telecom would not enter the cellular business.[16]

Brasil Telecom then obtained a cellular license of its own. From 2002 to 2004 both it and Telecom Italia each expanded its cellular and long-distance operations. Under Brazilian law, however, affiliates may not own overlapping cellular licenses. The emergence of Brasil Telecom as a competitor in the cellular business therefore prevented Telecom Italia from reassuming the interest and veto rights that it previously had held in Solpart, even though Brasil Telecom had met the government access targets by January 1, 2004.

This problem led to discussions between Telecom Italia and Brasil Telecom about somehow combining their cellular and long-distance businesses.[17] The talks, however, failed. Moreover, a dispute developed over whether the 2002 amendment to the Solpart Shareholders Agreement that had satisfied regulators' concerns about Brasil Telecom's independence of Telecom Italia had given Telecom Italia the right to regain its former influence over Brasil Telecom once the government access targets had been met. Telecom Italia asserted such a right, and it petitioned the Brazilian national telecommunications agency, Agência Nacional de Telecomunicações ("Anatel"),

---

[16]

      *See* Hibshoosh 2d Supp. Decl. Ex. B §§ 2.1, 3.1(iv)-(vii); De Carvalho Sur-reply Decl. ¶ 20; First De Carvalho Witness Statement ¶¶ 97, 100-117; De Carvalho Decl. ¶ 31; First Cico Witness Statement ¶¶ 57-67.

[17]

      First De Carvalho Witness Statement ¶¶ 118-129; Hibshoosh Supp. Decl. Ex. B ¶ 19 ("Second De Carvalho Witness Statement"); De Carvalho Decl. ¶¶ 33-34; De Carvalho Sur-reply Decl. ¶ 21; First Cico Witness Statement ¶¶ 48, 68-85.

to require Brasil Telecom to divest its mobile and long-distance licenses.[18] Litigation ensued in Brazil.[19]

Techold, along with the Dantas-dominated Timepart, resisted Telecom Italia's attempts to reassert itself in Brasil Telecom and cause its assets to be stripped. They commenced an arbitration in London against Telecom Italia to prevent it from returning to its position of influence over Brasil Telecom before the regulatory issues are resolved.[20] Opportunity's de Carvalho there testified that no commitment had been made to Telecom Italia in 2002 that would allow it to resume its position of influence upon resolution of the regulatory issues: "At no stage did [Techold and Timepart] ever give any guarantee that [Telecom Italia] would be able to return to the controlling group of Brasil Telecom."[21] To skip ahead for a moment, now that Dantas and Telecom Italia have made a deal highly advantageous to Dantas, de Carvalho takes a very different position:

> "The parties agreed . . . that Telecom Italia would be allowed to reassert its rights and shareholding in Solpart on or before January 1, 2004 if certain conditions were met. . . . According to the terms of the 2002 agreement, Techold and Timepart were required to allow Telecom Italia to reassume its control of Brasil Telecom if the

---

[18]

De Carvalho Decl. ¶ 34; De Carvalho Sur-reply Decl. ¶ 21.

[19]

Marriott Decl. ¶¶ 5, 8.

[20]

De Carvalho Decl. ¶ 36; De Carvalho Sur-reply Decl. ¶ 23; *see also* Marriott Decl. ¶¶ 2-11.

[21]

Second De Carvalho Witness Statement ¶ 5; *accord* First De Carvalho Witness Statement ¶ 115 ("The chance that Telecom Italia would be unable to return was real."); *see also* First De Carvalho Witness Statement ¶¶ 97-117; Second De Carvalho Witness Statement ¶¶ 5-16.

overlapping license issue was resolved."[22]

In January 2004, Anatel decided that Telecom Italia could return to its former position in Brasil Telecom provided that the license overlaps are resolved by mid-July 2005.[23] The parties here dispute whether Anatel is likely to extend that deadline and the likely consequences if the deadline is not met.[24]

C.      *The Onshore Fund and Citibank Fall Out with Dantas*

1.      *The Onshore Fund Removes Opportunity*

On October 6, 2003, the Onshore Fund removed Opportunity for cause from management of the fund.[25] It has alleged that Opportunity "began to perform a number of acts contrary to the interests of the Brazilian investors who had entrusted their funds to its management,"[26] but the record does not contain significant detail about the reasons for the removal.

Removal from the manager position of the Onshore Fund allegedly required a 90

---

[22]

De Carvalho Decl. ¶¶ 32, 34; *accord* de Carvalho Sur-reply Decl. ¶ 21 ("Pursuant to that 2002 Agreement, Telecom Italia had a contractual right to return of its shares and its control rights, on or before January 1, 2004").

[23]

Neto Decl. ¶ 5.

[24]

*See id*. ¶¶ 7-12; De Carvalho Decl. ¶ 35; De Carvalho Sur-reply Decl. ¶ 22; Sundfeld Decl.

[25]

Guth Decl. ¶ 2; Rosa Decl. ¶ 4.

[26]

Guth Decl. Ex. A at 2-3; *see also* Rosa Decl. ¶ 8 (statement by representative of largest pension fund that "[t]here is no question that if reinstated as manager of the Onshore Fund, Dantas will run the Onshore Fund for his own interests at the expense of the pension funds to whom he is supposed to have owed a fiduciary duty.").

percent vote.[27] In this case, removal was approved by investors holding approximately 80 percent of the shares in the fund. The other investors found that the Brasil Telecom pension fund, one of the entities that made up the Onshore Fund, was conflicted – by virtue of its connection to Dantas – and prohibited it from voting.[28] The Brasil Telecom pension fund has been challenging the removal in litigation since January 2004.[29]

A week after the removal, the plaintiffs allege, it came to light that Opportunity had caused the agreement among the three major shareholders in Zain to be amended to provide that if either the CVC Fund or the Onshore Fund removed Opportunity as general partner or manager, that fund would lose its voting rights in Zain.[30] Opportunity waived its right to enforce this amendment, which is known as the Umbrella Agreement, against the CVC Fund[31] but takes the position that the Umbrella Agreement permits it to vote the Onshore Fund's shares in Zain.[32] The Onshore Fund has disputed this in litigation in Brazil. The Brazilian equivalent of the Securities and Exchange Commission filed a brief that described the Umbrella Agreement as a breach of fiduciary duty and

---

[27] See de Carvalho Sur-reply Decl. ¶ 14(a); see also Tr. (5/9/05) 34; Tr. (5/19/05) 25.

[28] Rosa Decl. ¶ 4.

[29] Spinelli 2d Supp. Decl. ¶ 4; Rosa Decl. ¶ 5.

[30] Guth Decl. Ex. A at 27; see also Am. Cpt. ¶ 67.

The Court infers that Opportunity used its positions as general partner of the CVC Fund and manager of the Onshore Fund to agree to the amendment on their behalf.

[31] Hibshoosh Decl. Ex. D; Spinelli Supp. Decl. Ex. A at 13.

[32] See Guth Decl. ¶ 6; Opice Op. ¶ 14.

argued that it must be annulled.[33] On May 11, after this motion was filed, a Brazilian court issued a preliminary injunction suspending the effect of the Umbrella Agreement.[34]

   2.   *Citibank Removes Opportunity*

The relationship between Citibank and Opportunity also soured. The plaintiffs allege that evidence of extensive misconduct has come to light over the past year – misconduct through which the defendants attempted to benefit themselves at Citibank's expense.[35] Examples of the allegations follow.

•   Dantas and his affiliates, using their position as general partner of the CVC Fund, allegedly signed an agreement without IEII's knowledge between the CVC Fund and Opportunity providing that the CVC Fund may not sell five percent or more of its interest in Zain unless the buyer purchases all of the BTP shares held by certain Opportunity entities. The assertion is that this agreement, which supposedly remains effective until 2028, would reduce the price that a prospective purchaser would pay for the CVC Fund's stake in Zain and thus would divert proceeds from the CVC Fund to Opportunity.[36]

•   In September 2003, Dantas allegedly arranged, without IEII's knowledge or consent,

---

[33]
   Guth Decl. Ex. A.

[34]
   *See* Spinelli Supp. Decl. Ex. A at 38.

[35]
   *See* Am. Cpt. ¶¶ 23-101.

[36]
   *Id*. ¶¶ 55-66.

for certain of Brasil Telecom's claims against Telecom Italia to be removed from Brasil Telecom's control and placed in a trust of which the trustee is Dantas' legal advisor. This maneuver allegedly allows Dantas to control Brasil Telecom's litigation against Telecom Italia and discourages Telecom Italia from purchasing the CVC Fund's interests in Brasil Telecom.[37]

• The defendants allegedly used the CVC Fund to pay a disproportionate share of litigation expenses in connection with the side-by-side investments, in addition to legal expenses having no connection at all to the CVC Fund.[38]

From September 2004 until March 2005, IEII allegedly engaged in discussions with Dantas to understand what he had done. During this period, Opportunity allegedly transferred custody of share registers relating to shares owned by the CVC Fund from a bank recognized for custodial services to an Opportunity entity. Opportunity allegedly refused as well to disclose basic information about the CVC Fund's affairs or to provide auditors with full access to its records.[39]

• Finally, on March 4 of this year, the defendants, without IEII's knowledge or approval, commenced an attempt to auction off simultaneously (a) equity in the holding company with indirect control over Telemig and Amazonia and (b) equity

---

[37] *Id.* ¶¶ 70-73.

[38] *Id.* ¶¶ 90-91.

[39] *Id.* ¶¶ 95-101.

in a holding company with a non-controlling interest in Telemig and Amazonia.[40]
The first company is controlled by the CVC Fund and owned nearly entirely by it
and the Onshore Fund, whereas the second company allegedly is affiliated with
Opportunity. The plaintiffs allege that the auction was a gambit by Opportunity to
reap for itself a portion of a control premium that rightfully belonged to the CVC
Fund.[41]

On March 9, 2005, IEII exercised its contractual right under the LPA to remove
Opportunity Equity as the CVC Fund's general partner and appointed plaintiff Citigroup Venture
Capital International Brazil, LLC ("CVC Brazil") as the new general partner.[42]

D.      The Present Action

On March 10, 2005, plaintiffs brought this action and moved for a preliminary
injunction. They sought to compel the defendants to register the change of the general partner of
the CVC Fund from Opportunity Equity to CVC Brazil – required under Cayman law to make the
change of partner effective[43] – and to prevent the auction of the indirect interests in Telemig and
Amazonia, as well as any other transactions involving the CVC Fund. The Court granted a
preliminary injunction on March 17 (the "March 17 Order"). In relevant part, it compelled

---

[40]     Caldeira Decl. ¶¶ 12-14, 16-17, Exs. C, D, G, H.

[41]     Am. Cpt. ¶ 52, Caldeira Decl. ¶ 18.

[42]     Caldeira Decl. ¶ 10, Ex. B; LPA arts. 7.3, 7.4.

[43]     *See* Brougham (3/9/05) Decl. ¶ 18.

registration of the change of general partner and enjoined defendants from:

> "5.     taking any action that would impair the value of the CVC Fund or its assets or interfere with plaintiff[s'] control over those assets;
>
> *   *   *
>
> "7.     Interfering with the authority and power of [CVC Brazil], the newly appointed general partner of the CVC Fund, over the assets, investments and management of the CVC Fund . . . ."[44]

E.     *The April 28 Agreements*

On April 28, 2005, Telecom Italia entered into agreements with Brasil Telecom and Opportunity pursuant to which Telecom Italia would acquire Brasil Telecom's cellular assets and Opportunity would be paid hundreds of millions of dollars. In addition, Telecom Italia, Brasil Telecom, and several of its Dantas-controlled holding companies entered into an agreement amending the Solpart Shareholders Agreement to reinstate the Telecom Italia rights in Solpart that previously had been suspended, thus restoring Telecom Italia to an influential role in Brasil Telecom. These proposed transactions now are the focus of this second preliminary injunction motion, as plaintiffs contend that they breach fiduciary duties owed to the CVC Fund.[45]

1.     *Agreement Between Telecom Italia and Brasil Telecom*

The April 28 transactions include three involving Telecom Italia and Brasil Telecom.

---

[44]     March 17 Order, docket item 10.

[45]     As so often happens in cases of this nature, the motion practice is now ahead of the pleadings. The Court deems the pleadings conformed to the proof pursuant to Rule 15(b) of the Federal Rules of Civil Procedure.

### a. The Cellular Acquisition Agreement

The first of the Brasil Telecom – Telecom Italia transactions is the merger of 14 Brasil Telecom Celular S.A. ("BTC"), the Brasil Telecom subsidiary that operates Brasil Telecom's cellular business, into a subsidiary of Telecom Italia in exchange for a very small percentage interest in that subsidiary (the "Cellular Acquisition Agreement"). The parties contemplate as well, although it is not part of the agreement, that Telecom Italia will transfer its Brazilian long-distance business to Brasil Telecom.[46] On May 5, a Brazilian court preliminarily enjoined the Cellular Acquisition Agreement from taking effect pending a hearing on May 24.[47]

### b. The Solpart and Settlement Agreements

Two of the critical pieces of the April 28 transactions involving Brasil Telecom and Telecom Italia are agreements involving Solpart and Techold, entities that are majority owned by Citibank and the pension funds but that remain controlled by Dantas.[48]

The first is the Solpart Master Agreement ("SMA"), which purports to amend the Solpart Shareholders Agreement to undo the 2002 amendment that reduced Telecom Italia's interest

---

[46]

Hibshoosh Decl. Ex. A at 1-2, 25-26.

[47]

Guth Decl. ¶ 8.

The Court is not aware of whatever occurred relating to this hearing on and after May 24.

[48]

The defendants have submitted an opinion from their expert on Brazilian law stating that "[o]nce inaugurated, [a] Director or Officer may only resign in case he voluntarily does so or if he is removed from Office due to a decision taken by those legally competent as far as such decision is concerned." Eizirik Op. at 4. The Court has no doubt that this is correct as a matter of formality. Nonetheless, the Court infers that the directors of the relevant holding companies would resign if Dantas desired it.

in and control over Brasil Telecom. The SMA restores Telecom Italia's veto rights and the shares it had transferred to the other Solpart shareholders. Furthermore, it restores the Solpart Shareholders Agreement provision under which an event of default occurs if Telecom Italia, Techold, or Timepart sells its interest in Solpart to a competitor of Telecom Italia or such a competitor acquires a significant interest in either Techold or Timepart. Such an event of default would give the non-defaulting party or parties the right to buy all of the defaulting party's Solpart shares at less than fair market value or sell all of its own shares to the defaulting party at greater than fair market value.[49] On May 11, a Brazilian court preliminarily enjoined the amendment to the Solpart Shareholders Agreement from taking effect pending a hearing on May 30.[50]

The second is a set of agreements to settle the arbitration that Techold and Timepart commenced against Telecom Italia,[51] as well as the related litigation in Brazil.[52]

## 2. *Agreements Between Telecom Italia and Opportunity*

The second set of agreements would result in payment of approximately $443 million by Telecom Italia to Opportunity. In particular, Opportunity has agreed to: (1) sell to Telecom Italia, for $80.484 million, its 9.75 percent stake in Zain (the "Zain Stock Purchase

---

[49]

Hibshoosh 2d Supp. Decl. Ex. A §§ 2.2, 2.3, Ex. C §§ 5.3, 5.4, 6.

[50]

Spinelli Supp. Decl. Ex. C.

The Court is not aware of anything that occurred in regard to the hearing on or after May 30.

[51]

Hibshoosh Decl. Ex. F.

[52]

Hibshoosh 2d Supp. Decl. Exs. D, E.

Agreement"), (2) sell to Telecom Italia, for $297.844 million, shares in BTP that Opportunity

acquired on the open market (the "BTP Shares") and that had a market value of approximately $100

million on April 27[53] (the "BTP Shares Agreement"), and (3) settle unspecified claims against

Telecom Italia in exchange for $65 million.[54] Payment under the Zain Stock Purchase Agreement

and the BTP Shares Agreement is conditioned on, among other things, the board of directors of

Brasil Telecom approving the Cellular Acquisition Agreement.[55]

F.      *Shareholder Meeting Maneuvers*

On April 19, the CVC Fund, at that point under the management of its new general

partner, called a Zain shareholders' meeting for May 18 to remove and replace the directors.[56] At

the time this motion was filed, the CVC Fund and the Onshore Fund, which together hold 89.65

percent of the voting shares in Zain, intended to act in concert to replace Veronica Valente Dantas

and Maria Amália Delfim de Melo Coutrim and thus begin the process of gaining control from

Dantas and his affiliates over the holding companies that ultimately control Brasil Telecom.[57]

Indeed, the CVC Fund and the Onshore Fund have an agreement to vote together in the selection

of the Zain board, among other matters (the "CVC Fund-Onshore Fund Block Voting

---

[53]     The plaintiffs did not submit evidence of the trading price, but both parties agreed to this number at the May 9 argument. *See* Tr. (5/9/05) 22-23.

[54]     Hibshoosh Decl. Ex. B at 1-2, Ex. C at 1-2, Ex. E at 1-2, 6.

[55]     Hibshoosh Decl. Ex. B § 5.3.1(c), Ex. C § 5.3.1(c).

[56]     Boccuzzi Aff. Ex. J.

[57]     Guth Decl. ¶ 5; Spinelli Decl. ¶ 10.

Agreement").[58]

Dantas has resisted at every step. Defendants initially took the position that Opportunity had the power under the Umbrella Agreement to vote the Onshore Fund's shares in Zain and, in consequence, that it was not certain that the CVC Fund and the Onshore Fund could or would act to remove the defendants' people from the Zain board.[59] On May 11, however, the preliminary injunction suspending the effect of the Umbrella Agreement was issued in Brazil.[60]

Meanwhile, on May 2, Luis Octavio Carvalho de Motta Veiga, an Opportunity lawyer on the boards of BTP and Brasil Telecom, called meetings of the boards of directors of those companies for May 12 to consider the Cellular Acquisition Agreement.[61] Also on May 2, Zain (at that point still under the control of the defendants) called a meeting of the shareholders of Invitel for May 11 in order to instruct the Invitel-affiliated directors of BTP and Brasil Telecom how to vote at their board meetings to take place the next day.[62] The boards of BTP and Brasil Telecom cannot approve the Cellular Acquisition Agreement without the approval of shareholders with 72

---

[58]

    *See* Carpinello Decl. Ex. A arts. 3.08, 3.09, 4.01(a).

    The Court will address below the defendants' arguments concerning this agreement.

[59]

    De Carvalho Decl. ¶¶ 15-16; Guth Decl. ¶ 6; Opice Op. ¶ 14; Tr. (5/9/05) 34-35.

[60]

    *See* Spinelli Supp. Decl. Ex. A at 38.

[61]

    Boccuzzi Aff. Ex. T.

[62]

    Boccuzzi Aff. Ex. S.

percent of the voting shares in Invitel.[63] On May 10, a Brazilian court preliminarily enjoined the meetings of the Invitel shareholders and of the boards of BTP and Brasil Telecom from taking place pending a hearing on May 25.[64]

The Zain meeting held on May 18 did not proceed as expected. The day before the meeting, the Brasil Telecom pension fund, which has been contesting the removal of Opportunity from management of the Onshore Fund, obtained an *ex parte* injunction from a Brazilian appellate court that would have allowed Opportunity to vote both its own and the Onshore Fund's shares at the Zain shareholders meeting.[65] Just before the meeting, however, the Superior Court of Justice – Brazil's highest court for non-constitutional matters – stayed that injunction.[66] The Opportunity-affiliated individuals nevertheless voted both their own and the Onshore Fund's shares and thereby

---

[63] Under an agreement that governs the management of Invitel and its controlled companies and to which the CVC Fund, the Onshore Fund, Zain, members of the Opportunity group, and others are parties (the "Invitel Shareholders Agreement"), all board members of Techold, Solpart, BTP, and Brasil Telecom nominated by the parties to the agreement must vote as a block. The Invitel Shareholders Agreement provides as well that a transaction with respect to Invitel or a company controlled by it and involving the sale of significant assets, a merger, or the modification of a shareholders' agreement, among other things, must be approved by shareholders who hold 72 percent of the voting shares in Invitel. Opice Op. ¶¶ 4-5. Furthermore, under Brazilian law, the chairman of a board of directors may not count a vote cast in violation of a duly-filed shareholder agreement. *Id*. ¶ 5.

[64] Spinelli Supp. Decl. Ex. B.

On May 16, one of the pension funds called an Invitel shareholders meeting, which is scheduled for June 23, 2005. *See* Carpinello Decl. Ex. C at 6-7. The agenda for this meeting is not in the record, and, again, the Court has not been informed of what if anything occurred on or after May 25, 2005 with respect to the Brazilian court's hearing.

[65] Spinelli 2d Supp. Decl. ¶ 4; Rosa Decl. ¶ 6; Cunha Decl. ¶ 3; Filho Decl. ¶ 3; Müssnich Decl. ¶ 3; Coutrim Decl. ¶ 4.

[66] Spinelli 2d Supp. Decl. ¶ 8, Ex. A; Rosa Decl. ¶ 7; Cunha Decl. ¶ 26.

were able to elect two of Zain's three directors.[67]

The parties hotly dispute what went on at that meeting, including whether Opportunity's people learned of the Superior Court ruling before they voted the Onshore Fund's Zain shares.[68] For present purposes, however, these factual disputes are immaterial because the Superior Court, in addition to ordering Opportunity and Zain to show cause why they should not be held in contempt, has declared the meeting a nullity. The CVC Fund has called a new meeting, which is to take place on June 15 or June 23.[69]

## G.     The Present Motion

The week after the April 28 agreements were announced, the plaintiffs made the present motion. They seek to enjoin the transactions between Telecom Italia and Brasil Telecom and prevent any action in furtherance of those transactions. The parties have submitted several rounds of evidence.[70] The Court issued a temporary restraining order[71] and heard oral argument on

---

[67]

Spinelli 2d Supp. Decl. ¶¶ 12-13; Cunha Decl. ¶ 16.

[68]

*See* Spinelli 2d Supp. Decl.; Cunha Decl.; Filho Decl.; Müssnich Decl.; Coutrim Decl.; Filho Supp. Decl.

[69]

*See* Letter from George F. Carpinello to the Court (May 23, 2005); Letter from Howard S. Zelbo to the Court (May 31, 2005); Carpinello Decl. Ex. C at 6.

[70]

The defendants initially requested an evidentiary hearing on this motion, *see* Tr. (5/9/05) 55-82, but withdrew that request and expressly consented to the Court making findings on the documentary record. *See* Letter from George F. Carpinello to the Court (May 18, 2005) (docket item 79); Tr. (5/19/05) 1.

[71]

The order provides in relevant part:

"[D]efendants Opportunity Equity Partners, Ltd. and Daniel Valente Dantas, the

May 9 and 19.

*Discussion*[72]

A.     *Standard for Granting a Preliminary Injunction*

"A party seeking a preliminary injunction in this Circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."[73]

---

officers, agents, servants, employees, and attorneys of each of them, and those persons in active concert or participation with either of them who receive actual notice of this order by personal service or otherwise, be and they hereby are restrained from (1) executing, enforcing or performing any obligation under [certain agreements dated April 28 and referenced in press releases submitted with the plaintiffs' moving papers], or any other transaction, that impairs the value of any assets directly or indirectly held by the CVC Fund or involves or results in the transfer of any assets of [BTP] or [Brasil Telecom], and (2) entering into any transaction involving any entity in which the CVC Fund has a direct or indirect interest that is not in the ordinary course of business[.]" May 10 Order (docket item 60) (modifying Judge Griesa's order of May 4 (docket item 51)).

[72]

When the action was filed, subject matter jurisdiction existed under 28 U.S.C. § 1332(a)(2), as the only plaintiff, IEII, is a citizen of Delaware and both defendants are citizens of a foreign state. The amended complaint added CVC Brazil which, as a limited liability company, is a citizen of every state of which any of its members is a citizen. *Handelsman v. Bedford Village Assocs. Ltd. P'ship*, 213 F.3d 48, 52 (2d Cir. 2000); *Krause v. Forex Exch. Market, Inc.*, 356 F. Supp.2d 332, 336 (S.D.N.Y. 2005). In response to the Court's inquiry, plaintiffs assert that the sole member of CVC Brazil is IIEI. Thus, both plaintiffs appear to be citizens of Delaware, and subject matter jurisdiction therefore appears to exist. Plaintiffs of course will have the burden of proving the existence of subject matter jurisdiction at trial.

[73]

*Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002) (quoting *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002)); *accord Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004).

*B.*      *Irreparable Harm*

       The plaintiffs allege that the defendants' actions threaten to impair their indirect voting and control rights in Brasil Telecom.

       The Second Circuit has observed that "the denial of a controlling ownership interest in a corporation," as well as "[c]onduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company" each may constitute irreparable harm.[74] Other cases have found irreparable injury in "[t]he dilution of a party's stake in, or a party's loss of control of, a business."[75]

       As will be outlined more fully below, Opportunity appears to be using positions of control over Brasil Telecom – positions that Opportunity largely holds for the benefit of the plaintiffs and that in an important sense belong to them – to cause Brasil Telecom to part with its cellular business, to dilute the plaintiffs' control over Brasil Telecom by restoring Telecom Italia's veto rights in Solpart, and to reinstate the provision in the Solpart Shareholders Agreement that would allow each shareholder to call the others' shares in certain circumstances. This is more than sufficient to satisfy the irreparable injury requirement.

       The defendants do not deny these principles or dispute that the alleged impairments in voting and control rights would constitute irreparable injury. They merely state that no such impairment is occurring because the Umbrella Agreement authorized Opportunity to vote the

---

[74]

       *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114-15 (2d Cir. 2003).

[75]

       *Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, No. 03 Civ. 4148 (WHP), 2003 WL 22909149, at *4 (S.D.N.Y. Dec. 10, 2003); *accord Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1988).

Onshore Fund's shares in Zain and hence control the entire Brasil Telecom structure even over the CVC Fund's dissent.[76]

 The defendants' unstated premise is that the ability to vote the Onshore Fund's shares in Zain would give defendants license to disregard the interests of both the Onshore Fund and Citibank. As defendants, as shown below, are fiduciaries to both, this premise is incorrect. Thus, even assuming that defendants had the legal right to vote the Onshore Fund's Zain shares, its intention to vote them against the interests of its *cestuis que trustent* is a threat of irreparable injury. Moreover, for the moment, at least, any right of defendants to vote the Onshore Fund's Zain shares under the Umbrella Agreement has been suspended by a Brazilian court. Accordingly, the plaintiffs have made the requisite showing of irreparable injury.[77]

---

[76]

 *See* Def. Br. 19-20.

 The defendants have argued as well that a recently-disclosed agreement between Citibank and the pension funds that gives Citibank the option to put its interest in Zain after November 2007 to the pension funds for approximately $425 million at current exchange rates plus interest and adjusted for inflation (the "CVC Fund-Onshore Fund Put Option") means that Citibank would suffer no irreparable harm from the Brasil Telecom transactions. *See* Letter from George F. Carpinello to the Court (June 1, 2005); Carpinello Decl. Ex. B.

 This argument is utterly meritless. The fact that the put establishes a floor under the value of Citibank's investment does not address the irreparable injury that threatens to diminish Citibank's up-side potential. The law is clear: the dilution or frustration of control over a company is irreparable injury for purposes of the preliminary injunction standard. The existence of the put does not alter the reality that the defendants appear to be frustrating the ability of the CVC Fund and the Onshore Fund to assert themselves within the Brasil Telecom structure.

[77]

 As discussed below, the defendants propose to sell their BTP and Zain shares to Telecom Italia at an enormous premium – a premium that almost certainly is the *quid pro quo* for the use of Dantas' influence over the Brasil Telecom holding company structure to gain approval of the Brasil Telecom-Telecom Italia transactions. Thus, Dantas and Opportunity are seeking to obtain a benefit for themselves by using positions of influence and control that in equity belong to the plaintiffs. In ordinary circumstances, such a breach of duty might

A final word. The Court is entirely mindful that decisions by Brazilian courts may doom these transactions and thus eliminate any risk of irreparable injury to plaintiffs. But the question here is whether plaintiffs are *threatened* with irreparable injury, and that very real threat will remain as long as there is any possibility that the transactions will go forward. Moreover, the fact that Brazil has an interest in the fate of Brasil Telecom and that there is extensive litigation in its courts could not justify this Court's shirking its responsibilities in this case. This Court has great respect for the sovereignty and judiciary of the Federative Republic of Brazil. Nevertheless, these parties agreed to the exclusive jurisdiction of state and federal courts in New York over any action or proceeding relating to the LPA. No one disputes that this is such an action. In consequence, this Court is bound to decide it.[78]

---

find an adequate remedy in the form of an action for damages. The adequacy of a damage action for this breach of duty, however, is questionable in this case. The allocation of the consideration flowing to Opportunity as between the value of the shares to be sold to Telecom Italia and the value of the use of Dantas' positions of influence could be difficult. Difficulty of determining damages often leads courts to find the damage remedy inadequate. *E.g.*, *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 584-85 (1952); *Register.Com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 68-69 (2d Cir. 1999); Douglas Laycock, *The Death of the Irreparable Injury Rule,* 103 HARV. L. REV. 687, 711-14 (1990); *see also Brock v. Wilamowsky,* 833 F.2d 11, 20 (2d Cir. 1987). Moreover, the enforceability of a judgment for damages in this case would be uncertain given Dantas' presence in Brazil and the parties' use of offshore vehicles to hold assets, which is another factor supporting a finding of irreparable injury. As the plaintiffs do not here seek to enjoin the consummation of the agreements between Opportunity and Telecom Italia insofar as they provide for the sale of Opportunity's interests – no doubt because Telecom Italia's obligation to proceed is conditioned upon the closing of certain of the Brasil Telecom agreements – it is unnecessary to come to a definite conclusion on this point.

[78]

*See, e.g.*, *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976) (noting "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them"); *Gregory v. Daly*, 243 F.3d 687, 702 (2d Cir. 2001).

C.      *Likelihood of Success on the Merits*

The plaintiffs' position is that the defendants and their affiliates are using the vestiges of their position with the CVC Fund – the directorships and management positions with Brasil Telecom and its holding companies – (1) to cause Brasil Telecom to enter into transactions that will result in a windfall to Opportunity and detriment to Citibank, and (2) to deprive the plaintiffs of their right to approve or disapprove of those transactions. They argue that this behavior is a breach of fiduciary duty.[79]

1.      *Fiduciary Duty*

The LPA provides that the CVC Fund's general partner is a fiduciary to the limited partner.[80] This is consistent with Cayman Islands law, which governs the LPA and the rights of the parties to it[81] and provides that a general partner in an exempted limited partnership owes its limited partners "a duty of honesty and good faith," which usually is described as a "fiduciary" duty.[82] The

---

[79]
  Plaintiffs argue also that these actions violate the March 17 Order, which prohibited the defendants from "taking any action that would impair the value of the CVC Fund or its assets or interfere with plaintiff[s'] control over those assets." The Court will address this issue in a later ruling.

  In addition, the plaintiffs claim, and the defendants dispute, that they are in breach of the Operating Agreement for the CVC Fund, which contemplated that the CVC Fund and Opportunity would invest and divest on a "side-by-side" basis. The Court finds it unnecessary to address this claim as well.

[80]
  LPA § 6.1.5 ("The General Partner acknowledges . . . that it is a fiduciary to the Limited Partners.").

[81]
  LPA § 13.7.

[82]
  *See* Brougham (5/3/05) Decl. ¶ 1; Oliver Decl. ¶ 3.

English Privy Council – the highest authority for purposes of Cayman law[83] – has explained:

> "The obligation not to profit [from] a position of trust, or, as it is sometimes relevant to put it, not to allow a conflict to arise between duty and interest, is one of strictness. . . . It retains its vigour in all jurisdictions where the principles of equity are applied. Naturally it has different applications in different contexts. It applies, in principle, whether the case is one of a trust, express or implied, of partnership, of directorship of a limited company, of principal and agent, or master and servant . . . ."[84]

Defendants agree in principle albeit not in application. Their expert on English law, which is persuasive authority in the Caymans,[85] notes:

> "[A] trustee or other fiduciary is [not] required to put his own assets (or those in respect of which he may be a trustee or fiduciary for third parties) at risk for the benefit of those to whom he owes his duties. The basic rule, albeit strictly enforced, is that he simply cannot benefit from the fiduciary nature of his position without the full, free and informed consent of those to whom the fiduciary duty is owed. . . . [The fiduciary duties] may be described or curtailed by a commercial context . . . . A consciousness and understanding on the part of the beneficiary of the duty of the commercial context in which a fiduciary duty is undertaken will be of the greatest importance therefore to a proper understanding of the scope of the duty itself."[86]

The fiduciary duties owed by a general partner in a Cayman exempted limited partnership persist after the general partner has been removed.[87] As the plaintiffs' expert on Cayman and English law explains without contradiction from defendants:

---

[83]

Oliver Decl. ¶ 4(i).

[84]

*Kelly v. Cooper*, [1992] 3 W.L.R. 936 (P.C. 1992) (quoting *New Zealand Netherlands Society 'Oranje' Inc. v. Kuys*, [1973] 2 All E.R. 1222, 1225, [1973] 1 W.L.R. 1126, 1129 (P.C. 1973)).

[85]

Brougham (5/3/05) Decl. ¶ 4; Oliver Decl. ¶ 4(i).

[86]

Oliver Decl. ¶ 4(iii).

[87]

Brougham (5/3/05) Decl. ¶ 5.

"[w]hile a former general partner . . . is not precluded from competing with the partnership, it must do so fairly and in good faith and must not take dishonest advantage of information or commercial contacts acquired, or transactions entered into, as a former general partner."[88]

It follows that, while Opportunity is not precluded from competing with Citibank in the Brazilian telecommunications wars, it may not use its former position as general partner of the CVC Fund (or, for that matter, as manager of the Onshore Funds) to obtain a benefit for itself or to harm its *cestuis que trustent* absent their informed consent. In other words, as the plaintiffs' expert said, again without dispute:

"A removed general partner would be in breach of its duty of honesty and good faith if, having before removal appointed persons closely connected with it to be directors of companies owned directly or indirectly by the [exempted limited partnership], it directed those persons, or otherwise sought to influence them, to act against the interests of the limited partners or the [exempted limited partnership]."[89]

This conclusion accords with the well-settled principle that a general partner of a limited

---

[88]

*Id.* ¶ 6.

American trust law draws the same distinction. According to the Restatement (Second) of Trusts:

"The trustee can properly purchase trust property after the termination of the trust or after he has otherwise ceased to be trustee if he does not take advantage of the beneficiary by the use of information acquired by him as trustee or otherwise take advantage of his former position as trustee."

RESTATEMENT (SECOND) OF TRUSTS § 170 cmt. g; *see also* RESTATEMENT (SECOND) OF AGENCY § 387 cmt. b ("The agent's duty is not only to act solely for the benefit of the principal in matters entrusted to him, but also to take no unfair advantage of his position in the use of information or things acquired by him because of his position as agent or because of the opportunities which his position affords. . . . His duties of loyalty to the interests of his principal are the same as those of a trustee to his beneficiaries." (citations omitted)).

[89]

Brougham (5/3/05) Decl. ¶ 6.

partnership may not use assets of the partnership for the general partner's individual purposes.[90]

In this case, Opportunity has control over Zain and therefore the entire Brasil Telecom structure largely by reason of its former position as manager of the CVC Fund, the vehicle for Citibank's investment. The CVC Fund and the Onshore Fund hold interests in Zain for the precise purpose of controlling Brasil Telecom. In entrusting their investments to Opportunity, they necessarily entrusted Opportunity with control over the holding company structure that confers control over Brasil Telecom. Opportunity therefore may not use its control over Brasil Telecom – control it would not have but for its former position as general partner of the CVC Fund – in ways detrimental to the CVC Fund, or for the purpose of securing a benefit for itself.

The treatment of voting or control rights as something that exists for the benefit of the partnership and that therefore may not be used for personal gain finds support in *Drucker v. Mige Associates II*.[91] There the Appellate Division upheld a finding that a general partner in a limited partnership had breached his fiduciary duties to the other partners when the general partner:

> "effectively derailed the profitable conversion of the partnership's building into a cooperative apartment through his unwarranted demands that, if met, would have resulted in him receiving an amount of money in excess of what the other general partners were going to obtain and would have reduced the amount that was left over

---

[90]

See *Friedman v. Dalmazio*, 228 A.D.2d 549, 644 N.Y.S.2d 548 (2d Dep't 1996); IV BROMBERG AND RIBSTEIN ON PARTNERSHIP § 16.07(c).

[91]

225 A.D.2d 427, 639 N.Y.S.2d 365 (1st Dep't 1996).

The Court relies on New York and other American authorities for several reasons. First, in the absence of proof to the contrary, foreign law may be presumed the same as local law. See *Fairmont Shipping Corp. v. Chevron Int'l Oil Co.*, 511 F.2d 1252, 1261 n.16 (2d Cir. 1975); *Bartsch v. Metro-Goldwyn-Mayer, Inc.*, 391 F.2d 150, 155 n.3 (2d Cir. 1968). Second, while there would appear to be no significant difference between the relevant principles in New York and Cayman Islands law, New York law appears to include more cases factually analogous to the present one.

for the limited partners. [The general partner's] conduct was neither economically nor otherwise justified *and can only fairly be viewed as an attempt to use the voting provisions of the partnership agreement for personal gain . . . .*"[92]

## 2.    Conflicts of Interest

Plaintiffs allege also that the defendants and their affiliates have a conflict of interest with respect to the April 28 agreements. They point out that the Opportunity-affiliated directors and officers of the intermediate holding companies have a strong interest in approving the Cellular Acquisition Agreement because Opportunity will receive $378 million – the payment for its BTP and Zain shares – only if that agreement is approved. Opportunity, however, has been in a position to negotiate and approve (or direct the negotiation and approval of) the transactions at issue here only because of its fiduciary relationship to the CVC Fund.

The legal standards governing self-dealing by corporate directors are instructive here. If "a prima facie showing is made that directors have a self-interest in a particular corporate transaction, the burden shifts to them to demonstrate that the transaction is fair and serves the best interests of the corporation and its shareholders."[93] The duties owed by a director of a corporation to the corporation's shareholders are akin to those owed by a general partner to the limited partners

---

[92]     225 A.D.2d at 428, 639 N.Y.S.2d at 366 (emphasis added).

[93]     *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989) (quoting *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 264 (2d Cir. 1984)); *accord Pepper v. Litton*, 308 U.S. 295, 306 (1939); *In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995) ("It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply," which means that "the burden falls upon the board to demonstrate that its actions were reasonable and/or fair."); *Limmer v. Medallion Group, Inc.*, 75 A.D.2d 299, 303, 428 N.Y.S.2d 961, 963 (1st Dep't 1980); *see also Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 570, 483 N.Y.S.2d 667, 675 (1984) (in the merger context, "when there is an inherent conflict of interest, the burden shifts to the interested directors or shareholders to prove good faith and the entire fairness of the merger").

of a limited partnership because investors entrust the fiduciary with the management of a business in each case.[94] Thus, when a general partner in a limited partnership has an interest in a transaction, the analysis is the same as for a corporate director – the burden is on the general partner to demonstrate that the transaction is fair and serves the best interests of the limited partners.[95]

There is little doubt here that Opportunity has a conflict between its duties to the CVC Fund and its own interests. The burden, then, is on the defendants to show that the transactions at issue are fair to the CVC Fund.

The New York and Delaware courts have elaborated on the concept of fairness, most notably in the context of transactions in which a corporation's controlling shareholders stand on both sides of a transaction. The Delaware Supreme Court has explained as follows:

> "The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors . . . . However, the test for fairness is not a bifurcated one as between fair dealing and fair price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."[96]

---

[94]

*Lichtyger v. Franchard Corp.*, 18 N.Y.2d 528, 536, 277 N.Y.S.2d 377, 383 (1966) ("There is no basis or warrant for distinguishing the fiduciary relationship of corporate director and shareholder from that of general partner and limited partner. The principle is the same–those in control of a business must deal fairly with the interests of the other investors . . . ."); *accord Tucker Anthony Realty Corp.*, 888 F.2d at 973; *Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del. Ch. 1981); *cf. People v. Zinke*, 76 N.Y.2d 8, 14, 556 N.Y.S.2d 11, 15 (1990).

[95]

*Tucker Anthony Realty Corp.*, 888 F.2d at 973; *cf. Zoren v. Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch. 2003).

[96]

*Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983); *accord Kahn v. Tremont Corp.*, 694 A.2d 422, 430-31 (Del. 1997); *Kahn v. Lynch Communications Sys, Inc.*, 669 A.2d 79,

The law is substantially the same in New York, which indeed relies upon the relevant Delaware precedent.[97] The concern in the context of transactions involving a controlling shareholder is that the controlling shareholder will privilege its own interests above those of the minority investors. Those concerns apply here, but are even more compelling because Opportunity, the entity that currently controls Zain and therefore Brasil Telecom, is in fact a small *minority* stakeholder in Zain.

The Court therefore will examine the transactions to determine whether the defendants have met their burden of establishing entire fairness with respect to the CVC Fund. At the same time the Court will bear in mind the crucial and undisputed point that a former general partner breaches its fiduciary duties if it directs individuals whom it appointed to run companies controlled by the limited partnership to act against the interests of the limited partners.

3.     *The Approval Process*

The plaintiffs contend that the defendants and their affiliates are excluding them from the process of approving or disapproving the agreements between Telecom Italia and Brasil Telecom.

a.     *The Cellular Acquisition Agreement*

The plaintiffs point out that the announced – but temporarily enjoined – meetings of the Invitel shareholders and the meetings of the BTP and Brasil Telecom boards would result in approval of the Cellular Acquisition Agreement before the plaintiffs and the Onshore Funds can

---

84 (Del. 1995).

[97]
     *See Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 570-71, 483 N.Y.S.2d 667, 675 (1984) (citing *Weinberger*).

take control of Zain, whose shareholders were expected to elect a new board on May 18, and

prevent the transactions.

The plaintiffs argue that this alleged attempt to bypass them is a violation of the Zain

by-laws, Article 22 of which provides in pertinent part:[98]

> "The General Meeting of Shareholders . . . is responsible for . . . effectively
> exercis[ing] direct and indirect control of [Zain] and of the companies it controls,
> . . . . especially with regard to: decisions on policy or business, commercial,
> administrative, investment and financial strategy; voting instructions for the
> representatives of [Zain] in the Regular General Meetings of Shareholders of
> controlled or affiliated companies; selecting directors of controlled or affiliated
> companies . . . engaging in any actions as a partner or shareholder of the companies
> in which it participates, such as subscribing capital stock and any other actions for
> the sale, for any reason, or encumbrance of rights of a partner or holdings owned by
> [Zain] directly or indirectly; . . . actions that may prevent [Zain] from exercising the
> authority and performing the legal duties of controlling entity of [Solpart, BTP, and
> Brasil Telecom]; and approval of the signing or termination of any long-term
> agreements or agreements which entail an amount in excess of [one million
> Brazilian reals]."[99]

The plaintiffs' Brazilian counsel opines that this provision prevents any representative of Zain from

approving:

> "any matter that is under consideration by the Invitel shareholders (including those
> matters that require supermajority approval under the Invitel Shareholders
> Agreement such as sales of material assets, mergers, related party transactions, the
> renunciation of rights and the modification of shareholders agreements relating to
> [Techold, Solpart, BTP, and Brasil Telecom]) unless the matter has been considered
> and approved by a vote at a duly constituted shareholders meeting of Zain."[100]

He concludes that the failure of the Dantas-affiliated Zain board to call a Zain shareholders' meeting

---

[98] This excerpt has been translated from the Portuguese.

[99] Opice Op. Ex. C.

[100] Opice Op. ¶ 9.

to vote on the BTC acquisition violates the Zain by-laws and that approval of that transaction at the Invitel meeting or otherwise would violate the rights of the Zain shareholders.[101]

The defendants deny that they are deliberately bypassing a Zain meeting. Rather, they say that these transactions will solve the regulatory problem created by Anatel's order whereas the results could be catastrophic if the problem is not resolved by some time in July.[102]

Brazilian law, the defendants say, requires a notice period of 15 to 30 days before shareholder meetings of Zain, Invitel, Techold, BTP, and Brasil Telecom can be held, unless there is full shareholder participation, which would be difficult to obtain. Furthermore, the by-laws of some of the companies require a notice period before a board of directors meeting can be held, although that requirement can be circumvented by agreement of the board of directors. In consequence, they argue, it could take weeks or months for all of the entities in the corporate chain to come under the full control of the CVC Fund and the Onshore Fund.[103]

---

[101]

*Id.* ¶¶ 9, 11.

The defendants argue as well that Opportunity would be prohibited under Brazilian law from voting on the Cellular Acquisition Agreement at the Zain shareholder meeting because Opportunity faces a conflict of interest. *See* Opice Op. ¶¶ 12-13; Opice Supp. Op. ¶¶ 7-14. The defendants' expert argues that this is not necessarily true. *See* Eizirik Supp. Op. ¶¶ 13-25. This issue would be material only if Opportunity regains the ability to vote the Onshore Fund's shares in Zain, which so far it has not done. More importantly, even if Opportunity does become so positioned, it will have fiduciary obligations to the Onshore Fund and the CVC Fund, as discussed throughout this opinion.

[102]

De Carvalho Decl. ¶¶ 18, 35, 59; De Carvalho Sur-reply Decl. ¶ 5; Tr. (5/9/05) 46-47.

[103]

Eizirik 2d Supp. Op. 2-4.

At the first argument, defense counsel contended that the reason for convening Invitel, BTP, and Brasil Telecom meetings on May 11 and 12 was that the April 28 agreements called for such approvals within ten business days from the signing of the agreement. Tr. (5/9/05) 42. The Court could not find any such provision in the Cellular Acquisition

In addition, the defendants' expert now says, or at least implies, that the Zain by-laws do not in fact require a Zain meeting before an Invitel meeting to give instructions on major transactions.[104]

The Court finds a substantial likelihood that the defendants will fail to establish that the process by which the defendants negotiated the agreements in question, as well as the measures they are attempting to use to win approval of the Cellular Acquisition Agreement, were fair to the CVC Fund. Opportunity excluded the plaintiffs entirely from the negotiations of all of the transactions. The plaintiffs learned of them only from the press. The defendants now are doing everything possible to prevent IEII and the pension funds from having a say over whether the Cellular Acquisition Agreement will be approved. Opportunity thus is trying to use its position of control over Brasil Telecom's parents, a position that it enjoys only by virtue of its fiduciary relationship to IEII, to approve a transaction that is a precondition to a payment to itself of hundreds of millions of dollars and that the beneficiaries of the fiduciary relationship plainly oppose.

The defendants' arguments that they are in compliance with the requirements of

---

Agreement, the only agreement that was to be considered at the disputed meetings, and the defendants have not made this argument in any of their subsequent appearances or submissions.

[104]

Eizirik 2d Supp. Op. 5-6.

The Court has considered this evidence but gives it little weight. This expert had an earlier opportunity to respond to the plaintiffs' conclusion regarding the Zain by-laws, *see* Tr. (5/9/05) 91, which was a major part of the plaintiffs' argument on this motion. Mr. Eizirik, however, studiously avoided the issue by refusing to analyze the Zain by-laws and assuming the correctness of the plaintiffs' conclusions about them. *See* Eizirik Supp. Op. ¶¶ 4-5. It was only after the Court granted the defendants leave at the second argument to submit evidence on an entirely different issue, *see* Tr. (5/19/05) 25, that the defendants abused the opportunity to propound a different view of the Zain by-laws.

Brazilian law and the Zain by-laws, even if correct, miss the mark. As the New York Court of Appeals has explained, "Actions that may accord with statutory requirements are still subject to the limitation that such conduct may not be for the aggrandizement or undue advantage of the fiduciary to the exclusion or detriment of the stockholders."[105] Indeed, the Delaware Supreme Court has applied this principle to facts quite similar to the present ones. In *Schnell v. Chris-Craft Industries, Inc.*,[106] a corporation's management had amended the corporation's by-laws to move up the date of a shareholder meeting for the purpose of entrenching itself. Management defended on the grounds that it had complied strictly with the Delaware General Corporation Law. The Delaware Supreme Court responded: "The answer to that contention, of course, is that inequitable action does not become permissible simply because it is legally possible."[107] Thus, Opportunity's compliance with the formal requirements of Brazilian corporate law does not mean that the defendants have discharged their duties to the plaintiffs.

The defendants' arguments about the Anatel deadline also fail. For one thing, the defendants have not even asked for an extension,[108] which suggests to the Court that the threat is not as real as the defendants insist. But putting that aside, and assuming for the sake of argument

---

[105]

*Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 569, 483 N.Y.S.2d 667, 674 (1984).

[106]

285 A.2d 437 (Del. 1971).

[107]

*Id.* at 439; *accord MM Companies, Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1132 (Del. 2003) (applying *Schnell* to invalidate an expansion of the board of directors of a target corporation designed to prevent a potential acquirer from gaining control; the "primary purpose of the Director Defendants' action was to interfere with and impede the effective exercise of the stockholder franchise").

[108]

Tr. (5/19/05) 38-39.

that the defendants are correct about the amount of time it would take to replace the BTP and Brasil Telecom boards, the defendants would not have established that their actions are equitable. Even on those assumptions, it still would have been possible – indeed, it still is possible – for those in control of the Brasil Telecom machinery to negotiate a solution to the asserted regulatory problem while taking into the account the interests of the parties to whom the defendants owe continuing fiduciary duties.

### b.    The Solpart Agreement

The plaintiffs claim as well that the new amendment to the Solpart Shareholders Agreement also should have been submitted to the Zain shareholders. Under the new amendment, any sale by Techold to a competitor of Telecom Italia would trigger buy-out and sale rights. Furthermore, the plaintiffs point out, the Dantas-affiliated Timepart need only sell its tiny interest in Solpart, and Techold could lose to Telecom Italia, at a below market price, its entire investment in Solpart. Thus, plaintiffs claim that the amendment encumbers Zain's indirect stake in Solpart and impairs its value, which means that it implicates the shareholder meeting provisions of the Zain by-laws.[109]

The defendants dispute that the new amendment impairs the value of the CVC Fund's and Zain's indirect stake in Solpart. They point out that the amendment restores the situation that existed until an amendment in 2002. In other words, they argue, Citibank previously agreed to precisely the provisions at issue.

The defendants' point is irrelevant. For good or ill, the relationships among the

---

[109] Opice Supp. Op. ¶¶ 18-20; Tr. (5/9/05) 15-17.

parties have changed within the past few years. In present circumstances, the value of the CVC Fund's and Zain's indirect interests in Solpart will be impaired if they are subject to forcible divesture at any time as a result, among other things, of the sale of Timepart's tiny interest in Solpart. Thus, whether the Zain by-laws required Zain shareholder approval of the latest amendment to the Solpart Shareholders Agreement in the final analysis is immaterial. For the reasons discussed above, the defendants and their affiliates had a duty not to use their position of control to the detriment of the CVC Fund. The Court finds a substantial likelihood that the plaintiffs will succeed in establishing that Opportunity breached that duty in negotiating for, and agreeing to, the new amendment to the Solpart Shareholders Agreement.

c.    *The Defendants' Argument that the CVC Fund Does Not Have a Controlling Interest in Zain*

The defendants have argued that it is wrong to speak of the CVC Fund as having a right to control the Brasil Telecom structure because the CVC Fund, a 44.20 percent shareholder of Zain, cannot alone control Zain. Rather, any two of the major shareholders are needed to control Zain and thus ultimately Brasil Telecom. As Opportunity argues that it has the right to vote the Onshore Fund's shares, it takes the position that Zain therefore is Opportunity's, not the CVC Fund's, to control.[110] The argument has three major defects.

---

[110]

Defense counsel, for example, stated at argument:

"[O]ur position has consistently been that [the Opportunity-affiliated directors of the intermediate holding companies] should not all resign because they [i.e. the plaintiffs] don't have control. If they had control, if they had 51 percent control, and they said, 'You are out. We are going to exercise our rights,' I think the scenario you laid out [in which the Dantas affiliates resign because Opportunity no longer has control over the chain] would be perfectly appropriate. They don't have 51 percent. It is our position, and we are litigating this in Brazil, that we have over

The first and most obvious is that the Brazilian courts until now have rejected Opportunity's claims to control the Onshore Fund's shares in Zain.

The second problem is that while the CVC Fund's shares may not be *sufficient* to gain control of Zain going forward, those shares certainly were *necessary* for Opportunity to maintain the control it has enjoyed until now. Once Opportunity was ejected, rightly or wrongly, from management of the Onshore Fund, it could not have kept control over the holding company structure without its fiduciary position at the CVC Fund. Because Opportunity owes its current control in whole or in large part to that position, Opportunity is obligated not to take advantage of that position at the expense of the CVC Fund.

The final problem with the defendants' argument is its dual assumptions that (1) the ability to control the Onshore Fund's assets – here, voting rights in Zain – would give the defendants license to use that ability in a way detrimental to the Onshore Fund, and (2) if such a thing were to occur, the CVC Fund would have no cause for complaint.[111] Both premises are wrong.

The first assumption is wrong because if Opportunity were restored to management of the Onshore Fund, it would be an investment manager for the pension funds and therefore would

---

50 percent. We still control this chain. We have Opportunity, and we have the Onshore Fund. . . . [W]e are exercising the voting rights that we believe we have under Brazilian law." Tr. (5/19/05) 34-35.

[111] The following excerpt from defense counsel's argument illustrates these assumptions:

"[T]he whole issue with regard to the injunction [of the Brazilian appeals court reinstating Opportunity as manager of the Onshore Fund] was over the vote of the Onshore Fund, not the vote of the CVC. . . . So if we were frustrating any rights yesterday [at the May 18 Zain shareholders meeting], it was the rights of the Onshore Fund, not the CVC Fund's rights." Tr. (5/19/05) 36.

owe them fiduciary duties. This is as true in Brazil as it is in New York.[112] Thus, even if

Opportunity somehow did regain the ability to vote the Onshore Fund's shares in Zain, it would be

obligated to use that ability for the benefit of the Onshore Fund, not simply itself.

The second premise is refuted by the commercial context in which the fiduciary

relationship with IEII arose. Citibank first invested with Opportunity in reliance on the fact that

Dantas would be managing the pension funds' investments in addition to its own. In fact, the 1997

Operating Agreement between Citibank and Opportunity that set forth the planned "side-by-side"

---

[112] The Court makes this determination based on materials submitted by the parties pursuant to Rule 44.1 of the Federal Rules of Civil Procedure. The record includes a brief from the CVM, the Brazilian equivalent of the Securities and Exchange Commission, submitted in the litigation in Brazil over the Umbrella Agreement and challenging that agreement as a breach of fiduciary duty by Opportunity. Among other things, the CVM's brief (as translated from the Portuguese) states that:

> "[T]he manager's relationship with the quota holders of a fund is, in essence, a fiduciary relationship, given the trust vested in the manager by the quota holders to manage their funds, and the manager, in turn, must act with unconditional and permanent diligence and loyalty to defend the interests of the fund's quota holders under his management. In this regard, please see article 14 of CVM Instruction no. 306 relative to the rules of conduct applicable to investment fund managers, to wit:
>
>> "Art. 14 The natural person or legal entity responsible for managing a portfolio of securities must comply with the following rules of conduct:
>>
>> "I – to perform his duties in such a way as to meet the investment objectives of the owner(s) of the portfolio;
>> "II – to utilize in the exercise of his activity the care and diligence every active and honest man is accustomed to dispensing in the management of his own business . . .
>> "( . . . )
>> "IV – to avoid practices that might violate the fiduciary relationship maintained with his clients;" Guth Decl. Ex. A at 10.

Furthermore, the ruling suspending the Umbrella Agreement describes Opportunity as having neglected "its fiduciary obligations" and "tak[en] advantage of the fiduciary trust it is vested with, to act exclusively in its own interest and contrary to the interests of the represented parties . . . ." Spinelli Supp. Decl. Ex. A at 33.

investment strategy expressly contemplated that Citibank could enforce the agreement against Opportunity but not the reverse.[113]

Citibank's interests and those of the Onshore Fund were aligned in 1997, and they are aligned now. Indeed, the CVC Fund and the Onshore Fund for weeks have been acting in concert in an effort to gain control of Zain and thwart the challenged transactions. There is every indication that they will continue to do so. Given that alignment, defendants' actions plainly are detrimental to Citibank. In any case, defendants' use of the corporate machinery to line their pockets at the likely expense of their *cestuis que trustent* makes it extremely unlikely that they can establish procedural fairness.[114]

4.      *The Substance of the Transactions*

Plaintiffs assert that the April 28 agreements would confer economic benefit on Opportunity to the detriment of Brasil Telecom and Citibank. The plaintiffs note that the BTP Shares are worth one-third the price Telecom Italia has agreed to pay for them, assuming that they are valued at the April 27 closing price. Furthermore, they say, no litigation presently exists between Telecom Italia and Opportunity, and a two-page report appraising the value of potential defamation

---

[113]

The pertinent language is as follows:

"[T]he Parties hereby acknowledge that Citibank, or an affiliate of Citibank, will invest as a Limited Partner in reliance on this Agreement, <u>provided</u> that neither Citibank nor any affiliate of Citibank will have any obligation to any Party hereto under this Agreement. Citibank, or an affiliate of Citibank in its capacity as a Limited Partner, shall have the specific right to enforce this Agreement on behalf of the Partnership or itself . . . ." *Id.* § 7.07.

[114]

Plaintiffs would be likely to prevail even if the burden were on them to establish procedural unfairness.

claims that Opportunity has against Telecom Italia, which is what the defendants use to justify the settlement agreement between Telecom Italia and Opportunity,[115] could not credibly have been the basis for a decision to settle those unfiled claims for $65 million. Therefore, the plaintiffs argue, the extra $198 million for the BTP Shares and the $65 million for the settlement must be disguising some other benefit that Telecom Italia is receiving from Opportunity.

The plaintiffs reason that Telecom Italia is willing to pay premiums to Opportunity for two reasons. First, Telecom Italia is getting, from Opportunity, the benefit of delivery of Brasil Telecom board approval of the sale of the cellular business as well as the amendment to the Solpart Shareholders Agreement. That, according to the plaintiffs, explains why consummation of the Zain Stock Purchase Agreement and the BTP Shares Agreement is conditioned on, among other things, Brasil Telecom board approval of the BTC merger. In the plaintiffs' view, the relationship between these groups of transactions explain why Opportunity is rushing to have the boards of BTP and Brasil Telecom approve the BTC merger in violation of the plaintiffs' voting rights.

The other reason for the premiums to Opportunity, according to the plaintiffs, is that BTC and control rights in Brasil Telecom will be sold cheap. In effect, they say, Telecom Italia is paying Opportunity to deliver assets of and rights in Brasil Telecom at a favorable price.[116]

Mindful that it is the defendants' burden in light of their conflict of interest to establish the fairness to the CVC Fund of the Cellular Acquisition Agreement and related transactions, the Court proceeds to examine their substantive terms.

---

[115]

See de Carvalho Decl. ¶ 54, Ex. F.

[116]

See Tr. (5/19/05) 19-21.

### a. *Agreements Between Telecom Italia and Opportunity*

It is undisputed that Opportunity would reap a vast premium if these transactions go forward. Even based on the Opportunity-Telecom Italia allocation of the $443 million aggregate consideration to Opportunity, the BTP Shares are being sold for $198 million more than their market value. Furthermore, defense counsel acknowledged that Telecom Italia would have preferred to pay $443 million for the BTP Shares and the stake in Zain, and zero dollars for the settlement.[117]

At argument, counsel could not explain clearly what all the money was for.[118] On sur-reply, de Carvalho, Dantas' brother-in-law, explained that Telecom Italia is:

> "acquiring much more than the market value of [the BTP Shares]. In order to acquire majority control of Zain, all Telecom Italia needs to do is to acquire the interests of two of the three funds. Once it acquires Opportunity's interest, it may acquire a majority interest by only purchasing either the Onshore Fund's interest or the CVC Fund's interest. Obviously, on a per share basis, Telecom Italia is willing to pay a much higher price for a 9.75% interest, as opposed to purchasing either the Onshore Fund's 45.45% interest or the CVC Fund's 42.10% interest. By acquiring Opportunity's interest first, it is no longer obligated to negotiate with both Citibank and the Onshore Fund."[119]

De Carvalho states that this reality is reflected in the Zain Stock Purchase Agreement and the BTP Shares Agreement, under which Telecom Italia is not obligated to purchase the stake in Zain and the BTP Shares until the earlier of (1) two years, and (2) Telecom Italia gaining the CVC Fund's

---

[117]

Tr. (5/9/05) 48.

[118]

*See id.* at 23, 48-55.

[119]

De Carvalho Sur-reply Decl. ¶ 12.

or the Onshore Fund's direct or indirect interests in Zain, Invitel, Techold, Solpart, BTP, or Brasil Telecom.[120]

      This explanation is unpersuasive. The stake in Zain to which de Carvalho refers is the subject of its own agreement, the Zain Stock Purchase Agreement. This agreement is separate from the agreement pursuant to which Telecom Italia will pay $298 million for Opportunity's BTP shares and from the settlement agreement pursuant to which Telecom Italia will pay $65 million. The latter two contain a combined premium above the market value of the BTP Shares of $262 million, the sum of $198 million – the mark-up on the BTP Shares – and $65 million, the amount that Telecom Italia was willing to pay but preferred not to allocate to a settlement.

      Furthermore, Opportunity's 9.75 percent stake in Zain is tiny in comparison to the stakes owned by the Onshore Fund and the CVC Fund. De Carvalho's point that Opportunity's interest in Zain is strategically more valuable to Telecom Italia than the CVC Fund's interest[121] may be accurate,[122] but it is not material. The question is why Telecom Italia would be willing to pay so much for a tiny interest, and de Carvalho's enumeration of the various risk factors regarding the potential for Opportunity once again to control the Onshore Fund or its voting rights in Zain[123] all seem like reasons why, if anything, Telecom Italia should want to pay less, not more, for Opportunity's stake in Zain. Nor are these payments truly conditioned on Telecom Italia gaining

---

[120]

      *Id.* ¶ 13; Hibshoosh Decl. Ex. B §§ 1.1, 5.1; Ex. C. §§ 1.1, 5.1; *see also* Tr. (5/9/05) 54.

[121]

      De Carvalho Sur-reply Decl. ¶ 14.

[122]

      The Court expresses no view.

[123]

      *Id.*

the additional control contemplated by the agreements; if those conditions are not met, Opportunity still would receive the payments for the Zain stake and the BTP Shares, albeit after a two-year wait.

De Carvalho points out as well that Opportunity offered in February 2005 to purchase Citibank's 2.76 percent interest in Brasil Telecom and related entities for $393.59 million, a price that he says "is not at significant variance from" the $378 million that Telecom Italia is offering for Opportunity's 2.71 percent interest.[124] The comparison is misleading, however, because the CVC Fund's and Opportunity's interests in Brasil Telecom are structured quite differently. The CVC Fund has much greater control through its interest in Zain, whereas Opportunity owns many more direct shares in BTP. The deal between Telecom Italia and Opportunity, if the settlement agreement is put aside, includes $278.5 million beyond the market value of the BTP Shares, which amounts to $28.6 million per percentage point of ownership in Zain. By contrast, the deal that Opportunity offered Citibank involved direct shares with a market value of $20.7 million. That leaves $372.89 million beyond the market value, or $8.44 million per percentage point of ownership in Zain.[125]

In the final analysis, the agreements between Telecom Italia and Opportunity were

---

[124]

De Carvalho Sur-reply Decl. ¶¶ 9-10.

[125]

See id. Ex. A; Sosa Decl. ¶¶ 17-18.

A similar analysis disposes of the defendants' meritless point that the CVC Fund-Onshore Fund Put Option, see footnote 76 above, gives Citibank a higher markup on the current market price of its shares than Opportunity would receive from Telecom Italia. See Letter from George F. Carpinello to the Court 3 & n.2 (June 1, 2005). Unlike the Telecom Italia-Opportunity agreements, the CVC Fund-Onshore Fund Put Option pertains not to BTP but to Zain shares. The approximately $425 million strike price amounts to only $9.6 million for each of the CVC Fund's percentage points of ownership in Zain, which is still a small fraction of the $28.6 million that Opportunity effectively would receive from Telecom Italia for each of its own percentage points of Zain ownership.

signed on the same day as the agreements between Telecom Italia and Brasil Telecom and its parents. Of the money Opportunity stands to receive from its own agreements with Telecom Italia, $378 million of it is conditioned on the Solpart Shareholder Agreement being amended and the Brasil Telecom board approving the Cellular Acquisition Agreement. The Court believes that it is not simply likely, but in fact quite obvious, that Telecom Italia is paying Opportunity an enormous premium because it is receiving from Opportunity, in addition to Opportunity's small direct stake in Brasil Telecom, delivery of the amendment to the Solpart Shareholders Agreement and Brasil Telecom board approval of the Cellular Acquisition Agreement. In other words, Dantas is being paid a substantial premium to deliver Brasil Telecom's acquiescence in transactions that would eliminate Telecom Italia's regulatory problems, restore it to a position of influence over Brasil Telecom, and give it the cellular business of Brasil Telecom.

Nor does the Court find much significance in certain arguments Opportunity has made in defense of the $65 million settlement payment.[126] Even assuming that Telecom Italia had legitimate reasons to pay $65 million – although, by defense counsel's own admission, it did not think that it did – that would not alter the reality that the remaining $378 million is conditioned on approval of the BTC merger and that Opportunity would receive, in the other agreements, at least $198 million and very likely more in premiums for which the defendants to date have failed to offer a convincing account.

---

[126] Opportunity received an evaluation from an American litigation consulting firm to the effect that its damages from an alleged defamatory campaign by Telecom Italia and others could be in the hundreds of millions of dollars. De Carvalho Decl. ¶ 54, Ex. F. The defendants note as well, albeit for the first time in their sur-reply papers, that representatives of Citibank had suggested to Dantas and to a representative of Telecom Italia in October 2004 that Telecom Italia and Opportunity arbitrate Opportunity's claims against Telecom Italia. De Carvalho Sur-reply Decl. ¶ 11, Ex. B.

Of course, Opportunity is free to do as it wishes with its own BTP shares and its own stake in Zain. The transactions between Telecom Italia and Brasil Telecom and its parents, transactions that Opportunity has been in a position to negotiate and approve only because of its fiduciary relationship to the CVC Fund, are quite another matter.

### b. Agreement Between Telecom Italia and Brasil Telecom

The defendants nowhere argue that the agreements between Telecom Italia and Brasil Telecom take the CVC Fund's interests into account.[127] They all but concede that these agreements are detrimental to the CVC Fund. The burden is on the defendants to establish that these transactions are fair to the CVC Fund, and they have failed to meet it. The Court nonetheless examines the transactions.

### (i) The Cellular Acquisition Agreement

The defendants' consultant concludes that the Cellular Acquisition Agreement, as well as the settlement of the disputes between Telecom Italia and Techold and Timepart, "are beneficial for" Brasil Telecom.[128] This conclusion, however, would be meaningless even if it were correct. The consultant does not say that the agreements are in the best interests of or fair to Brasil Telecom – let alone to the CVC Fund – or that these terms are the best that could have been obtained for the assets in question.

According to the consultant, the net present value to Brasil Telecom of BTC is

---

[127]

The Court will address below the defendants' argument that the transactions are in the best interests of Brasil Telecom's shareholders.

[128]

Santelli Decl. ¶ 12.

approximately $970 million.[129] The Cellular Acquisition Agreement calls for Brasil Telecom to receive equity in TIM Brasil Serviços E Participações ("TIMB"), a Telecom Italia subsidiary that operates mobile services in Brazil, in exchange for merging BTC into TIMB. Although the precise amount of the interest in TIMB that will pass to Brasil Telecom would depend upon an appraisal by Merrill Lynch, the agreement contains an estimate of the result of that appraisal process, which is that Brasil Telecom would get 0.7 percent of the shares in TIMB.[130] In other words, it could give up a business worth $970 million for an illiquid 0.7 percent interest in a company that is dominated by Telecom Italia and of which the controlling shareholder is a Telecom Italia entity.

Defendants contend that this view is too narrow. The agreement, they point out, contemplates that Brasil Telecom will gain Telecom Italia's long-distance operations,[131] which the consultant estimates would be worth approximately $140 million to Brasil Telecom.[132] But the agreement does not actually obligate Telecom Italia to give Brasil Telecom its long distance business. It contemplates only that the parties will negotiate for the long-distance business on an arm's length basis.[133] At the end of the day, however, even a gratuitous transfer of the $140 million

---

[129]

*Id.* Ex. A at 20.

[130]

*See* Hibshoosh Decl. Ex. A Annex 1 §§ 3-6.

[131]

*See id.* § 1.5.

[132]

Santelli Decl. ¶ 9, Ex. A at 23.

[133]

The Cellular Acquisition Agreement states:

"Concurrently with the merger of [BTC] into [Telecom Italia] . . . , it is envisaged that Brasil Telecom and [Telecom Italia] . . . will . . . enter into a Long Distance services agreement, pursuant to which Brasil Telecom will provide such services

long distance business and a 0.7 percent interest in TIMB would be unlikely to compensate Brasil Telecom – and therefore the CVC Fund insofar as it has an indirect interest in Brasil Telecom – fairly for the sale of its cellular business.[134]

The defendants argue that much of the value of the agreements is in the stability and certainty they would create by finally resolving the license clash and disputes between Telecom Italia and Brasil Telecom and therefore the potential for adverse regulatory action. De Carvalho points out that the arbitration of Techold and Timepart's claims against Telecom Italia could have resulted in a decision at any time.[135] But this too is unpersuasive. First, the fact that there might be some benefit to the parties from a resolution of the license overlap does not mean that the terms they have negotiated are fair to the CVC Fund. Second, from a regulatory standpoint, Brasil Telecom could achieve the same effect, and in all likelihood a much higher price,[136] by selling BTC in a competitive bidding process and then negotiating with Telecom Italia for a return to control and the purchase of Telecom Italia's long distance business.

---

[134] to [Telecom Italia] . . . and into other operational agreements. . . . The specific terms and conditions of each of such new agreements . . . will be negotiated and agreed to by Brasil Telecom and [Telecom Italia] . . . on an arm's length conditions [*sic*] . . . ." Hibshoosh Decl. Ex. A at 26.

[135] Shares in TIMB are not publicly traded. A 0.7 percent stakeholder has no control rights and no ready market in which to sell its shares. The appraisal will not be subject to challenge, and the appraiser is not to disclose the financial data it acquires about either party to the other. *See* Hibshoosh Decl. Ex. A Annex § 4.1. Furthermore, the appraiser is to take into account the indebtedness of BTC, but not TIMB, thus possibly inflating the value of the latter relative to the former. *See id.*; Sosa Decl. ¶ 13.

[136] De Carvalho Decl. ¶ 38; De Carvalho Sur-reply Decl. ¶¶ 23-24.

[136] *See* Sosa Decl. ¶ 10.

De Carvalho contends as well that all of the players, including Citibank, contemplated in 2002 that Telecom Italia would regain the control it had over Brasil Telecom two or three years later.[137] The April 28 agreements between Telecom Italia and Brasil Telecom, he says, are even better than a deal that Brasil Telecom offered to Telecom Italia in 2002 because the new agreements would give Brasil Telecom the long-distance licenses of Telecom Italia.[138]

These arguments are without merit. What Brasil Telecom or even Citibank might have agreed to in 2002 – and there is practically no evidence that Citibank would have agreed to anything like this deal – are not synonymous with what is fair to the CVC Fund today. Brasil Telecom acquired its license to provide mobile service in December 2002. Since then, Brasil Telecom has invested $500 million in BTC,[139] Telecom Italia has fallen out with Brasil Telecom, and everyone (or so it seems) has fallen out with Dantas.

Nor is the Court convinced that the parties believed that Telecom Italia's eventual return to control over Brasil Telecom was a foregone conclusion. Certainly de Carvalho's statements in the arbitration against Telecom Italia conveyed a different message. Furthermore, as the plaintiffs point out, de Carvalho, Dantas, and Carla Cico, the chief executive of Brasil Telecom, emphasized in the arbitration the importance to Brasil Telecom of owning cellular operations.[140]

---

[137]

       *See* de Carvalho Decl. ¶¶ 31-34; De Carvalho Sur-reply Decl. ¶¶ 20-21, 25.

[138]

       De Carvalho Sur-reply Decl. ¶ 25.

[139]

       Sosa Decl. ¶ 14.

[140]

       *See* Hibshoosh Decl. Ex. I ¶¶ 50-51 (Dantas witness statement); First De Carvalho Witness Statement ¶¶ 61-83, 121; Second De Carvalho Witness Statement ¶¶ 7, 15, 35-41; First Cico Witness Statement ¶¶ 61-74; Hibshoosh Supp. Decl. Ex. D ¶¶ 8-12, 18-20 (second

This emphasis is consistent, according to the plaintiffs' expert, with global market trends, which "favor expanding wireless and integrated wireless and wireline businesses and moving away from traditional wireline only businesses," and with the ongoing growth of the wireless services market in Brazil.[141]

According to de Carvalho, there is no inconsistency between the present transactions and the statements in the arbitration.[142] He states:

> "Brasil Telecom is not losing its mobile assets; it is merging its mobile assets with [TIMB], Telecom Italia's mobile subsidiary . . . . In return for that merger, Brasil Telecom is receiving shares of stock of [TIMB] and therefore will benefit from the combination of Brasil Telecom's and Telecom Italia's mobile assets."[143]

This statement is unworthy of acceptance. It is perfectly obvious that (1) Telecom Italia is gaining Brasil Telecom's mobile operations, and (2) Brasil Telecom is losing them. If this is the best justification de Carvalho can offer for what would appear to be a sudden change in business strategy on the part of Brasil Telecom, the defendants are very far indeed from meeting their burden to show fairness.

### (ii) The Solpart Agreement

Also relevant to the fairness inquiry is the amendment to the Solpart Shareholder Agreement, which impairs the CVC Fund by returning control rights in Solpart to Telecom Italia.

---

Cico witness statement).

[141]

Sosa Decl. ¶ 11.

[142]

De Carvalho Sur-reply Decl. ¶ 29.

[143]

*Id.* ¶ 30.

The Court already has rejected the defendants' argument that the amendment does not impair the CVC Fund because it restores an earlier *status quo*.

For all of the preceding reasons, the defendants have failed to establish that the agreements are substantively fair to the CVC Fund. There simply is no reason to believe, and every reason not to believe, that the CVC Fund is being treated fairly.

5.      *The Defendants' Arguments*

The foregoing points are sufficient to decide the motion. The Court pauses, however, to address other arguments made by the defendants.

The defendants make much of the fact that the boards of BTP and Brasil Telecom owe fiduciary duties to the shareholders of those companies and argue that the transactions between Telecom Italia and Brasil Telecom are in the best interests of Brasil Telecom and its shareholders. This issue is immaterial to the present proceeding. The question for this Court is not whether Opportunity is maximizing Brasil Telecom shareholder value, although the Court has every reason to believe that it is not. Rather, the question is whether the defendants and their affiliates have breached a fiduciary duty owed to the CVC Fund. Fulfilling the former duty does not negate the existence or excuse the breach of the latter one.

The defendants furthermore argue that the CVC Fund and the Onshore Fund, assuming they control Zain, owe fiduciary duties to the minority shareholders of the companies they control indirectly.[144] Their expert on Brazilian law opines that:

---

[144]      Eizirik Supp. Op. ¶¶ 8-12.

> "even if the merger of [BTC] into [TIMB] has to be approved by Zain shareholders, they cannot fail to approve of such transaction in case it is evidenced that the transaction is favorable to [BTC] and its shareholders as a whole; otherwise they may be held liable for control power abuse and breach of their fiduciary duty towards the Company and other shareholders."[145]

This point, too, is immaterial. The question here is not whether the CVC Fund has an obligation to lend its support to the BTC merger and related transactions, but rather whether the transactions and the way in which Opportunity has negotiated them and is trying to gain their approval are fair to the CVC Fund. If CVC breaches any duty it owes to a minority shareholder, those beneficiaries have remedies through proceedings in Brazil or elsewhere.[146]

Another of the defendants' arguments is that the transactions are justified because Opportunity owes fiduciary duties to its own investors.[147] De Carvalho declares:

> "It is also important to emphasize that the consideration is being paid not only to Opportunity but also to investors to whom it owes a fiduciary duty. In exercising that fiduciary duty, Opportunity has an obligation to negotiate for the best possible price it could obtain for the shares that Opportunity has in Brasil Telecom. These managers are not obligated (indeed, they are not allowed) to accept a price lower than that which Telecom Italia is willing to pay."[148]

It is true of course that Opportunity can dispose as it wishes of its own assets, but the existence of fiduciary duties toward its own investors does not mean that Opportunity may disregard its duties to the CVC Fund. An argument to the contrary is no more persuasive than –

---

[145] *Id.* ¶ 12.

[146] *See* Eizirik Op.; Tr. (5/9/05) 43.

[147] *See* Tr. (4/28/05) 4; De Carvalho Sur-reply Decl. ¶ 17.

[148] De Carvalho Sur-reply Decl. ¶ 17.

indeed, for present purposes is analytically identical to – an argument that a mutual fund advisor has a right and even an obligation to embezzle the assets of the investors in its advised funds because the directors of the adviser owe fiduciary duties to the adviser's shareholders to maximize profits.

Finally, the defendants challenge Citibank's own actions and motives. They characterize the alliance between the CVC Fund and the Onshore Fund, and in particular the CVC Fund-Onshore Fund Block Voting Agreement,[149] as a breach of fiduciary duty to Opportunity in its capacity as Citibank's co-venturer and a violation of the side-by-side investment arrangements memorialized in the Operating Agreement.[150]

This contention is easily disposed of. Nowhere in the record is there any indication that Citibank owed fiduciary duties to Opportunity. On the contrary, the Operating Agreement expressly provided that Citibank would have no obligations to Opportunity. The parties of course contemplated side-by-side investment, but the Operating Agreement makes it absolutely clear that liability under that agreement can run in one direction only. These points, however, are not even material. If Dantas is aggrieved that Citibank and the Onshore Fund have joined forces and cut him out, he is at liberty to counterclaim, but the defendants have not explained why such a grievance should affect the present application for a preliminary injunction.

The defendants represent as well that Citibank has been negotiating to sell its own interest in Brasil Telecom to Telecom Italia and argue that this motion is merely a tactic to extract

---

[149]

    *See* text accompanying footnote 58 above.

[150]

    *See* Letter from George F. Carpinello to the Court 1 (June 1, 2005).

a better deal for itself.[151] The recently disclosed CVC Fund-Onshore Fund Block Voting Agreement and CVC Fund-Onshore Fund Put Option strengthen this inference, according to the defendants' eleventh-hour filing.[152]

The short answer to this contention is that Citibank's motives are as irrelevant here as Dantas'. It would not matter if Opportunity were planning to turn the hundreds of millions of dollars it stands to receive from Telecom Italia over to charities. This is a corporate takeover battle or something very much like it. It is no secret that all of the players are maneuvering for advantage. They are doing so, however, within certain contractual and legal constraints. One such constraint is Dantas' ongoing fiduciary duty to the CVC Fund.

*Conclusion*

Despite the complexity of the facts here, the dispositive point is straightforward and, in important respects, undisputed. It strongly appears that Opportunity is attempting to use advantages that it enjoys purely because of a former fiduciary position – seats on the boards of the companies that control Brasil Telecom – to reap enormous gains for itself at the expense of those to whom it owes fiduciary duties. On the present record the Court finds that the plaintiffs have made

---

[151] *See* de Carvalho Decl. ¶¶ 11, 39, 43, 53; De Carvalho Sur-reply Decl. ¶¶ 7, 15.

[152] *See* Letter from George F. Carpinello to the Court 3 (June 1, 2005).

In addition, the defendants' June 1 letter repeats the suggestions that Citibank, in seeking to enjoin the challenged transactions, is risking the forfeiture of Brasil Telecom's licenses and therefore breaching its fiduciary duty to Brasil Telecom. The Court has addressed these arguments in substance above.

the necessary showing of threatened irreparable harm and likelihood of success on the merits. Plaintiffs' motion for a preliminary injunction is granted.

Defendants Daniel Valente Dantas and Opportunity Equity Partners, Ltd., the officers, agents, servants, employees, and attorneys of each of them, and those persons in active concert or participation with either of them who receive actual notice of this order by personal service or otherwise, are hereby enjoined and restrained, pending the determination of this action, from:

(1)     executing, enforcing, consummating, performing any obligation under, or otherwise giving effect to the Cellular Acquisition Agreement and accompanying protocol, the Second Amendment to the Solpart Shareholders Agreement, the Solpart Master Agreement, the settlement agreement between Telecom Italia, on the one hand, and Techold and Timepart, on the other, and the related Private Agreement Instrument and Transaction submitted in the original Portuguese as Exhibits H and I, respectively, of the May 17, 2005 Hibshoosh Declaration, and in English translation as Exhibits D and E, respectively, of the June 1, 2005 Hibshoosh Declaration,

(2)     entering into any transaction or any agreement that is not in the ordinary course of business (including any amendment to the Solpart Shareholders Agreement or any other shareholders' agreement) involving any entity in which the CVC Fund has a direct or indirect interest,

(3)      taking any action in furtherance of the foregoing.

The foregoing shall constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated: June 2, 2005
Issued at: 2:45 P. M.

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)