UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
INTERNATIONAL EQUITY INVESTMENTS,
INC. and CITIGROUP VENTURE CAPITAL
INTERNATIONAL BRAZIL, LLC, on behalf of
itself and Citigroup Venture Capital International
Brazil, L.P. (f.k.a. CVC/Opportunity Equity
Partners, L.P.),

                    Plaintiffs,

                  -against-                         05 Civ. 2745 (LAK)

OPPORTUNITY EQUITY PARTNERS, LTD.
(f.k.a. CVC/Opportunity Equity Partners, Ltd.)
and DANIEL VALENTE DANTAS,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

         Appearances:

                        Howard S. Zelbo
                        Carmine D. Boccuzzi
                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
                        *Attorneys for Plaintiffs*

                        Philip C. Korologos
                        George F. Carpinello
                        Howard L. Vickery
                        Eric Brenner
                        BOIES, SCHILLER & FLEXNER LLP
                        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        This matter again is before the Court on another motion by plaintiffs for a preliminary

injunction and on defendants' motion to modify those injunctions already in place. Finding again

that plaintiffs are likely to prevail on their claim that defendants are breaching their fiduciary duties to plaintiffs, their motion is granted. As defendants have not demonstrated that modification of the existing injunctions is appropriate, their motion is denied.

*Facts*[1]

A. *The Investment in Brasil Telecom*

Citigroup has been investing in private equity in Brazil since about 1990.[2] In the late 1990s, it decided to increase its Brazilian investments through a fund managed by a local partner who would invest a small amount of its own money as well.[3] It chose defendant Daniel Valente Dantas as its local partner. Dantas's entity, Opportunity Equity Partners, Ltd. ("Opportunity"), became the sole general partner of the Citigroup fund, then known as CVC/Opportunity Equity Partners, L.P. (the "CVC Fund").[4] Notably, Dantas and Opportunity agreed with Citigroup that any disputes between them in regard to the CVC Fund would be resolved exclusively by litigation in New York.[5]

---

[1] The history of this dispute to June 2005 was set forth exhaustively in *Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.,* 407 F. Supp. 2d 483 (S.D.N.Y. 2005) ("*IEII*"), familiarity with which is assumed. Capitalized terms used herein have the meanings as defined in *IEII*.

[2] De Caravalho Decl. [docket item 53], Ex. D.

[3] *Id.*

[4] The Fund now is known as Citigroup Venture Capital International Brazil, L.P. *Id.* Apr. 24, 2003 letter.

[5] *See IEII,* 407 F. Supp.2d at 498.

At about the same time, the Brazilian government began privatizing certain telecommunication assets. Citigroup was anxious to participate. Its subsidiary, Citibank, N.A. ("Citibank"), joined forces with a group of Brazilian pension funds (the "Pension Funds") to that end. The Pension Funds formed an investment vehicle (the "Onshore Fund") and appointed Opportunity as its manager. The CVC Fund, the Onshore Fund, and Dantas then formed a company called Opportunity Zain, S.A. ("Zain"), which ultimately acquired and, through a complex holding company structure, holds a majority of the stock of Brasil Telecom, S.A. ("Brasil Telecom").[6]

The CVC Fund and the Onshore Fund put up almost all of the money required for the Brasil Telecom acquisition. Each owns about 45 percent of Zain, while Opportunity owns less than 10 percent.

There is little direct evidence of the precise chain of events that led to Opportunity being designated manager of the Onshore Fund. But Citibank selected Dantas as its local partner when it decided to expand its Brazilian investments.[7] It joined forces with the Pension Funds to buy Brasil Telecom. The logical inference, and the inference drawn by the Court, is that the Dantas-Opportunity position as manager of the Onshore Fund was a product of the fact that Dantas had become Citibank's "man in Rio" and that Opportunity was the sole general partner of the CVC Fund.[8]

---

[6]

Brasil Telecom includes privatized assets and now is a provider of fixed-line and cellular telephone services.

[7]

De Carvalho Decl. [docket item 53] Ex. D, Sept. 4, 2000 letter.

[8]

Dantas portrays his position as that of an equal partner in what he refers to as "side-by-side" investments. This is not an entirely accurate characterization of the situation. Citigroup had "decided that working with a local partner to manage [its] investments" in Brazil was

As a direct result of these arrangements, Dantas had the power to control Zain, the holding companies through which Zain owned a majority of the shares of Brasil Telecom, and Brasil Telecom itself. He used that power to install individuals loyal to him at each level of the holding company structure. He thus exercised complete control of Brasil Telecom, although he did so as a fiduciary for the CVC Fund and the Onshore Fund. And, for a time, all went well.

B.     *The Umbrella Agreement*

In the summer of 2003, relations between Dantas and at least some elements in the Brazilian government allegedly were sour. Pressure is said to have been brought to bear on the Pension Funds to get rid of Dantas, and defendants feared that their control over the CVC and Onshore Funds might be in jeopardy.[9] Accordingly, Opportunity conceived of and drafted the so-called Umbrella Agreement, which provided in substance that "if either the CVC Fund or the Onshore Fund removed Opportunity as general partner or manager, that fund would lose its voting rights in Zain."[10]

---

the appropriate course. It picked Dantas. Dantas's vehicle, Opportunity, had an interest in Zain at least in major part because Citigroup wanted its chosen manager to invest some of its own money in the deal. *Id.* July 27, 2001 letter.

[9]

*See* Defendants' Mar. 22 Mem. [docket item 265] at 6-8; V. Dantas Decl. [docket item 268] ¶¶ 7, 10-15, 17-25 .

Defendants contend that Citibank shared this concern. *See* Defendants' Mar. 22 Mem. [docket item 265] at 6-8. Veronica Dantas, Daniel Dantas's sister, states that her brother told Citibank's representative that the Umbrella Agreement was intended to "preserv[e] the control of the Portfolio Companies and assure[] equitable treatment to all investors." V. Dantas Decl. [docket item 268] ¶ 18. This, however, is hearsay, as she claims no personal knowledge of any such communication.

[10]

*IEII*, 407 F. Supp. 2d at 490.

While defendants claim that "Opportunity and Citibank [] creat[ed] the Umbrella Agreement,"[11] they do not dispute that Opportunity alone drafted and executed the agreement. In fact, it executed the document not just on its own behalf, but also as the sole general partner of the CVC Fund and as the manager of the Onshore Fund.[12] Citibank did not review the Umbrella Agreement before Opportunity signed it on the CVC Fund's behalf.[13]

By late summer 2003, the Pension Funds appeared to be on the verge of removing Opportunity as manager of the Onshore Fund. On September 9, 2003, defendants sent a copy of the already-executed August 8, 2003 version of the Umbrella Agreement to Citibank for the first time.

On the following day, Opportunity and Citibank representatives met via video conference to discuss the Pension Funds' apparent intention to remove Opportunity as manager of the Onshore Fund.[14] Although the parties dispute the extent to which the August 8 version was

---

[11] Defendants' Mar. 22 Mem. [docket item 265] at 7.

[12] *See generally id.*; *see also* V. Dantas Decl. [docket item 268] ¶ 6; Kim Decl. [docket item 279] ¶ 7 .

[13] *See generally* Defendants' Mar. 22 Mem. [docket item 265]; *see also* V. Dantas Decl. ¶ 6 [docket item 268]; Kim Decl. ¶ 7 [docket item 279].

[14] *See* V. Dantas Decl. [docket item 268] ¶¶ 16, 18-20, Exs. H, J.

discussed at this meeting,[15] another version was executed on September 12, 2003, signed again solely by Opportunity in its multiple capacities.[16]

Paragraph 12 of the September 12, 2003 version of the Umbrella Agreement, which is at the heart of the current controversy, provides:

> "[F]ollowing the occurrence of a Change in the Management [the removal of Opportunity as the manager or general partner of the Onshore or CVC Fund, respectively], any votes on resolutions to be taken at the shareholders' meeting of the relevant Company [*i.e.*, the entity that has had the Change in the Management] shall be cast after consultation with the Non-Affected Shareholders [the companies which have not brought about a Change in Management], [] provided that in case of disagreement [], the voting instructions of the Non-Affected Shareholders shall prevail and shall be followed by the Affected Shareholder [with the Change in Management], provided that any absence or abstention of the latter shall allow the Non-Affected Shareholder to vote as attorney-in-fact."[17]

Thus, were the CVC Fund or the Onshore Fund to remove Opportunity as general partner or manager, respectively, Opportunity and the non-removing fund would have the right to vote that investor's shares in Zain.

---

[15]

    *Compare* V. Dantas Decl. [docket item 268] ¶ 25 (claiming that a Citibank attorney "recommended that the Umbrella Agreement be strengthened to make it clear that the Fund or Funds that had experienced the change in management would be bound by the vote of the other Funds at which no management changes had occurred") *with* Kim Decl. [docket item 279] ¶¶ 4-5, Caldeira Decl. [docket item 279] ¶ 5, Miranda Decl. [docket item 279] ¶ 5 (no Citibank representative suggested any changes or amendments).

[16]

    *See* V. Dantas Decl. [docket item 268] ¶ 25, Ex. K.

The Umbrella Agreement is governed by New York law in all pertinent respects. *Id.* ¶ 17.

[17]

    *Id.* ¶ 12 (emphasis in original).

Citibank did not see the executed September 12 version until October 2003, after the Onshore Fund removed Opportunity as its manager.[18]  Defendants contend that Citibank did not object to it for a full year.[19]  Plaintiffs counter that Citibank was unaware of defendants' intent to use the agreement against it.[20]  Citibank, moreover, either did not pay close attention because it trusted Dantas or assumed that the removal of Dantas by the Onshore Fund would have left Citibank and Dantas in voting control of the Onshore Fund's Zain stock.

In any case, in late 2004, perhaps as a result of its receipt of information allegedly suggesting that defendants had engaged in misconduct to benefit themselves at Citibank's expense,[21] Citibank objected to so much of the Umbrella Agreement as would have deprived it of the right to vote the CVC Fund's Zain shares if it removed Opportunity as general partner.  Dantas responded by executing an agreement pursuant to which his affiliates waived all of their rights under paragraphs 2 through 12  of the Umbrella Agreement against the CVC Fund.[22]

The bottom line is that the Umbrella Agreement purports to disenfranchise the Onshore Fund because it removed Opportunity and to confer its voting rights on Opportunity and

---

[18]

    *See* V. Dantas Decl. [docket item 268] ¶¶ 31-32, Ex. P.

[19]

    *Id.* ¶ 34.

[20]

    *See* Tr., Mar. 28, 2006, at 48:20-25.

[21]

    *See IEII,* 407 F. Supp. 2d at 491.

[22]

    V. Dantas Decl. [docket item 268] ¶ 41 & Ex. W.

    The waiver document, however, disclaimed any intention to grant the CVC Fund the right to direct or to participate in the direction of any portion of the votes of the Onshore Fund. *Id.*

the CVC Fund. Dantas goes even further, however. Defendants claim that Opportunity alone has the voting rights,[23] which is at least a debatable proposition in light of the language of paragraph 12.[24]

### D.    *Citibank Removes Opportunity as General Partner*

On March 9, 2005, Citibank exercised its right to remove Opportunity as the general partner of the CVC Fund and appointed Citigroup Venture Capital International Brasil, LLC ("CVC Brasil") as its replacement. But Dantas did not go quietly. He first resisted Opportunity's ouster by refusing to register its removal with appropriate authorities in the Cayman Islands. He then used his control over the entities in the holding company structure to cause Brasil Telecom to seek to auction off assets and take other actions that Citibank regarded as inimical to its interests.

IEII brought this action in March 2005 and obtained a preliminary injunction that compelled defendants to register the change of the general partner of the CVC Fund from

---

[23]

   *E.g.,* Korologos Apr. 18, 2006 letter, at 3 n.3.

[24]

   Defendants presumably rely on the following language in the waiver document: "The foregoing waiver does not in any way grant to the [CVC Fund] the right to direct or participate in the direction of any portion of the votes of the Onshore Fund." V. Dantas Decl. [docket item 268] Ex. W.

   The fact that the waiver document states that the waiver itself did not grant such rights is not necessarily controlling given the fact that the Umbrella Agreement expressly purports to give the right to vote the Onshore Fund's Zain shares to both Opportunity and the CVC Fund.

   The parties have not briefed this issue, and the Court in any case need not resolve it. It notes parenthetically, however, that the issue presumably is governed by New York law by virtue of the governing law clause of the Umbrella Agreement.

Opportunity to CVC Brazil and enjoined certain proposed Brasil Telecom asset sales (the "March 17 Injunction").[25]

E.      *The Telecom Italia Deal and the Second Preliminary Injunction*

        The removal of Opportunity as the general partner of the CVC Fund did not remove Dantas from control of Brasil Telecom, as the Dantas loyalists whom he had installed throughout the holding company structure extending downward from Zain to Brasil Telecom remained in place. So Dantas sought to cash in while he remained in control.

        As detailed in *IEII,* on April 28, 2005, Brasil Telecom, Telecom Italia, and Dantas affiliates entered into a series of agreements which, if consummated, would transfer Brasil Telecom's cellular assets to Telecom Italia International N.V. ("Telecom Italia") for low consideration, place Telecom Italia in an influential position over Brasil Telecom, and – not coincidentally – give Opportunity a windfall of hundreds of millions of dollars. Brasil Telecom's board at this time still was dominated by Opportunity and Dantas affiliates.[26]

        Citibank promptly sought relief. This Court concluded that plaintiffs were likely to prevail on their contention that defendants threatened to exploit for their own benefit board seats and other positions conferred upon them as fiduciaries and to act to the detriment of their *cestuis que trustent.* It enjoined the transactions (the "June 2 Injunction").[27] That injunction was modified

---

[25]
        Docket item 26. IEII subsequently amended the complaint to add CVC Brazil as a plaintiff.

[26]
        *See, e.g., IEII*, 407 F. Supp. 2d at 494-95.

[27]
        *See IEII*, 407 F. Supp. 2d at 514-15.

shortly thereafter to prevent Opportunity from, among other things, engaging in any transaction, absent prior approval of the Court, pursuant to which it would receive any consideration from Telecom Italia (the "June 7 Injunction").[28]  The agreements, however, apparently remain in place although, absent extension, they expire late this month.

## F.  Recent Developments in Brazil

Since Citibank removed Opportunity as general partner of the CVC Fund, it has moved down the holding company structure, replacing Dantas loyalists with directors and, in some cases, management more to its liking.  On September 30, 2005, four Opportunity appointees to the Brasil Telecom board were replaced by plaintiffs' nominees.[29]  A former Citibank counsel has been elected chairman of the board.[30]  The company's officers were replaced as well, thus giving plaintiffs complete control over Brasil Telecom.[31]

Meanwhile, separate litigation has been proceeding in Brazil.  Among other events, investors in the Onshore Fund in April 2004 challenged the validity of the Umbrella Agreement in the Brazilian courts, essentially as the product of a breach of duty owed by Dantas to the Onshore Fund.[32]  On May 11, 2005, the Brazilian court granted their request for a preliminary injunction

---

[28]

Docket item 104.

[29]

*See* Carpinello Decl. [docket item 266] ¶¶ 2-3, Exs. A, B.

[30]

*See id.*

[31]

*See id.* Exs. B, C.

[32]

*See* Bisneto Decl. [docket item 269] ¶ 3.

staying the effect of the agreement as between the Onshore Fund and Opportunity.[33]  This left the Onshore Fund with the ability to vote its Zain shares.

When the current motion was made and a temporary restraining order granted, all of Opportunity's appeals from the Brazilian injunction had been resolved against it save one application, filed on March 2, 2006, which remained pending.  On April 11, 2006, however, an intermediate appellate court in Brazil granted Opportunity's appeal and dismissed on statute of limitation grounds the Onshore Fund investors' petition for a declaration that the Umbrella Agreement is a nullity.  This ruling vacated the May 11 injunction.

It is far from clear whether it does anything else.  The decision notes, "[a]s a logical result of the dismissal of the original action, it is imperative for the parties to return to the *status quo ante* upon the reversal of the decision that granted anticipatory relief on merit, and the annulment of all acts and effects resulting therefrom."[34]  But the parties before this Court disagree as to the decision's effect, including whether it actually restores the *status quo ante*.  In any case, however, the ruling, which is being appealed, purported only to determine rights as between the Onshore Fund and Opportunity.  It did not address the questions before this Court, which turn on the duties of Dantas and Opportunity to the Citigroup plaintiffs.  Indeed, defendants themselves acknowledged this prior to the recent ruling.[35]

---

[33]

*See id.* ¶ 4.

[34]

Zelbo letter, Apr. 18, 2006, Ex. A, at 39.

[35]

*See* Def. Mar. 22 Mem. [docket item 265] at 3 ("the central issue in Brazil is the validity of the Umbrella Agreement as it applies to the Onshore Fund.  That issue is not before this Court.").

*Discussion*

*A.    Plaintiffs' Motion for a Preliminary Injunction*

Plaintiffs contend that defendants, now that the Brazilian injunction has been vacated, will use the Umbrella Agreement to retake control of Zain and its downstream entities, including Brasil Telecom, by voting the Onshore Fund's Zain shares.  Indeed, plaintiffs predict that defendants may attempt to complete their agreements with Telecom Italia.  Accordingly, plaintiffs seek an injunction preventing defendants from enforcing the Umbrella Agreement.

*1.    The Standard*

"A party seeking a preliminary injunction in this Circuit must show: (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."[36]  Defendants nevertheless argue that this motion is governed by the standard for an anti-suit injunction, which requires the moving party to demonstrate that "(A) the parties are the same in both matters, and (B) resolution of the case before the enjoining court is dispositive of the action to be enjoined."[37]

---

[36]    *Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002) (quoting *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002)); *accord Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004).

[37]    *LAIF X SPRL v. Axtel, S.A. De C.V.*, 390 F.3d 194, 199 (2d Cir. 2004).

This contention is without merit. To begin with, plaintiffs do not seek an order enjoining Opportunity from pursuing litigation in Brazil. They request only that defendants be enjoined from enforcing the terms of or giving effect to the Umbrella Agreement.[38]

More broadly, defendants' argument is based on an inaccurate view of the issues under consideration in the two cases. A determination that the Umbrella Agreement gives Opportunity a right under Brazilian law to vote the Onshore Fund's shares, if that is the ultimate outcome in Brazil, would not address the question of whether Opportunity's use of that right, at least its use in a manner detrimental to Citibank, would be a breach of its separate fiduciary duty to Citibank. Indeed, since "inequitable action does not become permissible simply because it is legally possible[,]"[39] Opportunity's procedural success in its dispute with the Onshore Fund's investors does not immunize its use of the Umbrella Agreement for all purposes, and it certainly does not deprive this Court of its ability to consider whether such use would violate Opportunity's equitable obligations to Citibank. The parties consented to have the latter question determined in this jurisdiction, not in Brazil, and the Brazilian courts' dismissal of the Onshore Fund investors' case cannot end this Court's inquiry. The Court accordingly applies the normal standard for preliminary injunctions.[40]

---

38

      *See, e.g.*, Plaintiffs' Mar. 16 Mem. [docket item 259] at 2 ("plaintiffs seek a preliminary injunction barring defendants from enforcing the Umbrella Agreement"), 9; Plaintiffs' Reply [docket item 280] at 10-11.

39

      *See IEII*, 407 F. Supp. 2d at 504 (internal citations and quotation marks omitted).

40

      Moreover, as the record amply indicates, victories in this multi-faceted litigation frequently become set-backs and *vice versa*. The ruling by the Brazilian appellate panel on defendants' appeal itself is being appealed. Thus, defendants' suggestion that, in light of the latest Brazilian decision, this Court should decline entirely to act further is

2.      *Threat of Irreparable Harm*

As noted in *IEII*,[41] "the denial of a controlling ownership interest in a corporation," as well as "[c]onduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company," may constitute irreparable harm.[42]  Further, irreparable injury has been found in "[t]he dilution of a party's stake in, or a party's loss of control of, a business."[43]

In *IEII*, the Court determined that plaintiffs were threatened with irreparable harm by Opportunity's use of its control over Brasil Telecom – control it then enjoyed by virtue of positions that Opportunity held largely for the benefit of the plaintiffs – to cause Brasil Telecom to part with its cellular business and to dilute the plaintiffs' control or influence over Brasil Telecom.[44]  "This [was] more than sufficient to satisfy the irreparable injury requirement."[45]

Even assuming that the recent Brazilian decision withstands appeal, the parties would be in precisely the same positions as before, with the same threat of irreparable injury to plaintiffs'

---

unpersuasive.

[41]

See 407 F. Supp. 2d at 496.

[42]

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114-15 (2d Cir. 2003).

[43]

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, No. 03 Civ. 4148 (WHP), 2003 WL 22909149, at *4 (S.D.N.Y. Dec. 10, 2003); *accord Street v. Vitti*, 685 F. Supp. 379, 384 (S.D.N.Y. 1988).

[44]

See 407 F. Supp. 2d at 496-98.

[45]

*Id.* at 497.

interests in Brasil Telecom and upstream entities. The irreparable injury requirement plainly is satisfied.[46]

3.      *Likelihood of Success on the Merits*

Two fundamental propositions provide the foundation of the analysis. First, Opportunity was the sole general partner of, and owed a fiduciary duty to, the CVC Fund when Dantas conceived of the Umbrella Agreement and executed it on behalf of all parties. Second, as the Court held in *IEII*, the removal of Opportunity as the sole general partner did not end defendants' fiduciary duties. To the extent that they enjoy rights, powers, and positions by virtue of their former position as fiduciaries for the CVC Fund, they may not use them to the detriment of that fund or for their personal benefit.[47]

We begin with the validity as between defendants and Citibank of the Umbrella Agreement. As the Umbrella Agreement's voting rights provision took effect only if either the Onshore Fund or the CVC Fund removed Opportunity as manager or general partner, respectively, it served to entrench Dantas in control of Zain and thus of Brasil Telecom, whatever else it might have been intended to accomplish. His self-interest is evident. So too its consequence. Where a fiduciary engages in a self-interested transaction, "the burden shifts to [the fiduciary] to demonstrate

---

[46]

  *See id.*

[47]

  *See IEII*, 407 F. Supp. 2d at 499-500.

that the transaction is fair and serves the best interests of [the beneficiary]."[48]  This requires proof

that the transaction is fair both procedurally and in substance.[49]

Defendants argue that the Umbrella Agreement was entered into "with Citibank's full

knowledge and support, and [that] Citibank knowingly obtained [its] benefits."[50]  But their evidence

is thin.  They rely principally upon a declaration of Veronica Dantas, Daniel Dantas's sister, who

claims that Citibank representatives discussed an earlier version of the agreement in depth during

the September 10, 2003 videoconference.[51]  The Citibank representatives on the September 10

videoconference, however, contradict Ms. Dantas, saying that the agreement was discussed cursorily

if at all and that they did not agree to its provisions.[52]  The most that can be said with confidence is

that Citibank focused on the Umbrella Agreement at least by December 2004 when it obtained the

waiver.

---

[48]
    407 F. Supp. 2d at 501 (internal citations omitted).

[49]
    *See id.* at 501-02.

[50]
    Def. Mar. 22 Mem. [docket item 265] at 14.

[51]
    *See* V. Dantas Decl. [docket item 268] ¶ 25.

[52]
    *See* Kim Decl. [docket item 279] ¶¶ 4-5; Caldeira Decl. [docket item 279] ¶ 5; Miranda
    Decl. [docket item 279] ¶ 5.

As defendants' Caymans law expert attests,[53] a beneficiary must give "full free and informed consent" for a fiduciary to engage in self-dealing.[54]  New York law is in accord that the beneficiary's "authorization to engage in self-dealing must be clear and explicit."[55]  Full and complete disclosure is essential.[56]

At the time Dantas conceived, drafted, and signed the Umbrella Agreement on behalf of all parties, the immediate object of the enterprise was to discourage the Pension Funds from removing Opportunity as manager of the Onshore Funds, a goal then shared by Dantas and Citibank.[57]  To whatever extent the agreement was explained to Citibank, it was portrayed in that

---

[53]

As the CVC Fund is a Cayman Islands partnership, Opportunity's duties to the CVC Fund are governed by Caymans law.  *See IEII*, 407 F. Supp. 2d at 485.

[54]

*See* Oliver Decl. [docket item 267] ¶ 4.

[55]

*Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 974 (2d Cir. 1989); *see also, e.g., S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 850-51 (2d Cir. 1987) ("[C]onsent to self-dealing by a fiduciary must be 'clearly proved' and 'made with a full knowledge of all the material particulars and circumstances.'") (quoting *Renz v. Beeman,* 589 F.2d 735, 744 (2d Cir.1978), *cert. denied,* 851 444 U.S. 834 (1979)); *Guice v. Charles Schwab & Co., Inc.,* 89 N.Y.2d 31, 44-45, 651 N.Y.S.2d 352, 359 (1996) ("'Disclosure indefinite and equivocal does not set the agent free to bargain for his own account . . . If dual interests are to be served, *the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance*'") (quoting *Wendt v. Fischer,* 243 N.Y. 439, 443 (Cardozo, J.)) (emphasis in original); *TPL Assocs. v. Helmsley-Spear, Inc.,* 146 A.D.2d 468, 470-71, 536 N.Y.S.2d 754, 756 (1st Dept. 1989) (agent may not engage in self-dealing unless principal is "fully informed of every fact material to [its] interests" and "freely consent[s] in the presence of such knowledge") (internal quotation marks omitted).

[56]

*See, e.g.*, *Tucker,* 888 F.2d at 974; *S & K Sales,* 816 F.2d at 850-51; *Guice,* 89 N.Y.2d at 44-45, 651 N.Y.S.2d at 359; *TPL Assocs.,* 146 A.D.2d at 470-71, 536 N.Y.S.2d at 756.

[57]

*See, e.g.*, V. Dantas Decl. [docket item 268] ¶¶ 7-9, 14-15.

context. But the agreement had the potential also to be used to Citibank's detriment, and there is not even the slightest suggestion by defendants that this ever was explained.

In order to demonstrate fairness, defendants are obliged to show that Opportunity "fully informed [Citibank] of every fact material to [its] interests" and that Citibank then "freely consented in the presence of such knowledge."[58] In ordinary circumstances, then, Citibank could not be deemed to have given informed consent.[59]

Still, Citibank is not a widow or an orphan. It was fully capable of reading and understanding the documents. At least to some degree, it belatedly did, as it extracted the waiver in December 2004.[60] But it is unnecessary to resolve the question whether defendants have carried their burden of establishing fairness with respect to the execution of the Umbrella Agreement, for the motion ultimately may be decided on another basis.

---

[58]
    *TPL Assocs.,* 146 A.D.2d at 470-71, 536 N.Y.S.2d at 756.

[59]
    *See, e.g.*, *Tucker,* 888 F.2d at 974; *S & K Sales,* 816 F.2d at 850-51; *Guice,* 89 N.Y.2d at 44-45, 651 N.Y.S.2d at 359; *TPL Assocs.,* 146 A.D.2d at 470-71, 536 N.Y.S.2d at 756.

[60]
    Defendants argue that this silence on Citibank's part demonstrates its consent. Plaintiffs do not dispute that they had access to the Umbrella Agreement after its online publication in late October 2003, yet there is no evidence that they objected to its terms until mid-2004, when they began negotiations and ultimately succeeded in obtaining Opportunity's agreement to waive its right to enforce the Umbrella Agreement against the CVC Fund. Although plaintiffs point out that during the fall of 2003 they were enjoined by a Cayman Islands court from removing Opportunity from its general partner position, they do not explain how this injunction prevented them from objecting to the terms of the Umbrella Agreement. *See* Goldsmith Mar. 24 Decl. [docket item 279] Ex. C. Nonetheless, this evidence is ambiguous and is insufficient to demonstrate consent made with "full knowledge of all the material particulars and circumstances." *S&K Sales Co.*, 816 F.2d at 850-51; *see also Guice*, 89 N.Y.2d at 44-45, 651 N.Y.S.2d at 359.

Opportunity never could have created the Umbrella Agreement – and thus, depending upon the ultimate outcome of the Brazilian litigation, perhaps found itself voting 55 percent of Zain's stock despite the fact that it owns less than 10 percent – had it not been the general partner of the CVC Fund. It appears to have become the manager of the Onshore Fund, and gained a position that enabled it to sign the Umbrella Agreement on its behalf, as a result of its relationship with Citibank. Indeed, defendants claim that the purpose of the agreement was to ensure that Citibank and its then-ally, Dantas, would vote *all* of the stock of Zain if the Onshore Fund removed Opportunity.[61] Thus, if defendants ultimately defeat the Onshore Fund's attacks in Brazil on the validity of the Umbrella Agreement as between the Onshore Fund and Opportunity, defendants nevertheless will owe their positions of influence over Zain and Brasil Telecom to the fact that Opportunity was the sole general partner of the CVC Fund. They may use those positions only in a manner consistent with the fiduciary duty they owe to it, which means that they may not use them to its detriment or to benefit themselves. That is precisely what defendants threaten to do.

It is no answer to say, as do defendants, that this risk was inherent in the Umbrella Agreement. Even if Citibank gave informed consent to the agreement itself, it did not thereby consent to Dantas's use against it of powers thus conferred. Its position would be no different in principle than that of a settlor of a trust who finds that a faithless trustee has used signature authority over a trust account to embezzle trust funds.

Accordingly, plaintiffs are likely to prevail on their claim that defendants' proposed use of the Umbrella Agreement to take control of Zain, the holding companies beneath it, and Brasil

---

[61] *See, e.g.,* V. Dantas Decl. [docket item 268] ¶¶ 7, 10-15, 17-25.

Telecom would breach their fiduciary duty to the CVC Fund.[62]

B.      *Defendants' Motion to Modify the March 17, June 2, and June 7 Injunctions*

1.      *The Standard*

A preliminary injunction may be modified if the moving party demonstrates that a material change in circumstances justifies the alteration.[63]  An injunction should be modified  only when the changed circumstances demonstrate that "continuance of the injunction is no longer justified and/or [] will work oppressively against the enjoined parties."[64]

2.      *Material Change in Circumstances*

Defendants move to modify this Court's prior preliminary injunctions.  They argue that plaintiffs have succeeded in removing Opportunity's representatives from all entities in the Brasil Telecom holding structure and, indeed, have displaced all of Opportunity's representatives

---

[62]

Defendants claim also that the Brazilian decision dooms plaintiffs' claim under the doctrine of former adjudication.  The argument is frivolous.  Among its obvious defects is that it is impossible to see how a determination that the Onshore Fund investors' suit against Opportunity, which sought a declaration that the Umbrella Agreement is void as it applies to the Onshore Fund, is time-barred has any conclusive effect here as against plaintiffs.  *See also* De Oliveira Decl. ¶¶ 2-5.

[63]

*See, e.g., System Federation No. 91 Railway Employees' Dep't v. Wright*, 364 U.S. 642, 647-48 (1961); *Helmer v. Briody*, 721 F. Supp. 498, 505 (S.D.N.Y. 1989).

[64]

*Am. Optical Co. v. Rayex Corp.*, 291 F. Supp. 502, 510 (S.D.N.Y. 1967).

from positions of power at Brasil Telecom itself. In consequence, they say, there no longer is any means for defendants to interfere with plaintiffs' rights in those entities.[65]

This argument is baseless. Defendants have fought relentlessly to regain control of Brasil Telecom. Indeed, defendants now contend that the recent Brazilian ruling gives Opportunity the right to regain control of Zain and thus Brasil Telecom. The further implication is that if Opportunity were to regain control of Brasil Telecom in such circumstances, it would not be obligated to exercise that control within the confines of its fiduciary duty to the CVC Fund.

Given defendants' vigorous attempts to regain control of Brasil Telecom, the need for the injunctions remains, particularly in light of defendants' recent release from the prior Brazilian injunction. The circumstances have not changed so materially as to justify modification.[66]

*Conclusion*

Defendants seek to portray plaintiffs' motion as an attempt to have this Court upset the Brazilian decision and suggest also that the Court should stay its hand out of comity. It is a tactic founded in the deference due to other courts, including courts of other nations dealing with matters properly before them. But it ultimately is misguided.

The Brasil Telecom investment and the Umbrella Agreement each involved two Brazilian parties and one American party. The relationship between Dantas and the Onshore Fund, which is the subject of the recent Brazilian decision, at the core involves only Brazilian parties.

---

[65]

*See generally* Defendants' Dec. 2 Mem. [docket item 200].

[66]

*See, e.g., Wright*, 364 U.S. at 647-48; *Helmer,* 721 F. Supp. at 505.

Brazil's interest in resolving the Dantas-Onshore Fund dispute is clear. If the recent decision means that the Umbrella Agreement stands as between the Dantas interests and the Onshore Fund, so be it.

The relationship between the Dantas and Citibank parties, is another matter. The CVC Fund limited partnership agreement specifically chose a New York forum for disputes between the parties. The Umbrella Agreement contains a New York choice of law clause. As Citibank is based in New York, the impact of any breach of the Dantas parties' duties arguably would be felt here as well. Thus, while this Court must afford appropriate deference to the courts and sovereign interests of Brazil,[67] comity is not an excuse for eschewing a task properly before it.

Defendants' motion to modify the March 17,[68] June 2,[69] and June 7[70] Injunctions [docket item 199] is denied. Plaintiffs' motion for a preliminary injunction [docket item 256] is granted. The final form of that injunction, however, remains to be determined.

At the outset of the current proceedings, the Court granted plaintiffs' application for a temporary restraining order barring defendants from enforcing or otherwise giving effect to any

---

[67] Thus, the Court disregards entirely such matters as *defendants'* claim that "the vagaries of the Brazilian judiciary" include the fact "that decisions are at least occasionally rendered based on improper influence rather than the merits." Korologos Apr. 18, 2006 letter, at 2, 3.

[68] Docket item 26.

[69] Docket item 92.

[70] Docket item 104.

provision of the Umbrella Agreement or taking any action in furtherance thereof.[71]  Plaintiffs seek a preliminary injunction in the same terms, but the parties did not address the form of relief in the event the Court were to determine that relief is appropriate.

The Court has determined that plaintiffs are likely to prevail on their claim that the use by defendants of the Umbrella Agreement or any of its provisions to attempt to regain influence or control over Zain, the holding companies, or Brasil Telecom would breach their fiduciary duties. It perhaps is arguable that the terms of the preliminary injunction are broader than warranted by this conclusion.  The Court therefore converts the temporary restraining order into a preliminary injunction with the understanding that it will consider a more enduring form of order after giving the parties an opportunity to be heard.

Accordingly, defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and hereby are enjoined and restrained, pending the final determination of this action, from enforcing or otherwise giving effect to any provision of the Amendment to the Amended and Restated Shareholders' Agreement dated as of September 12, 2003[72] or taking any action in furtherance thereof.  The parties shall submit any proposed alternative forms of order no later than April 27, 2006 and shall respond to their respective submissions no later than May 2, 2006.

---

[71]

The temporary restraining order expires later today.

[72]

This is the formal title of the Umbrella Agreement.

The foregoing shall constitute the Court's findings of fact and conclusions of law.[73]

SO ORDERED.

Dated: April 20, 2006
Issued at: 4:25 P.M.

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[73] The parties explicitly waived an evidentiary hearing. Tr., Mar. 28, 2006, at 55. *Hold v. Continental Grp., Inc.,* 708 F.2d 87, 90 n.2 (2d Cir. 1983) (where party resisting preliminary injunction "elects to gamble on a 'battle of affidavits' [it] must live by that choice") (quoting *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1204-05 (2d Cir. 1970) (Friendly, J.)). In any case, this is not a motion that turns on sharply disputed questions of historical fact.