UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

INTERNATIONAL EQUITY INVESTMENTS,
INC. and CITIGROUP VENTURE CAPITAL
INTERNATIONAL BRAZIL, LLC, on behalf of
itself and Citigroup Venture Capital International
Brazil, L.P. (f.k.a. CVC/Opportunity Equity
Partners, L.P.),

     Plaintiffs,

    -against-         05 Civ. 2745 (LAK)

OPPORTUNITY EQUITY PARTNERS LTD.
(f.k.a. CVC/Opportunity Equity Partners, Ltd.)
and DANIEL VALENTE DANTAS,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

   Howard S. Zelbo
   Carmine D. Boccuzzi
   CLEARY GOTTLIEB STTEN & HAMILTON LLP
   *Attorneys for Plaintiffs*

   Philip C. Korologos
   George F. Carpinello
   Howard L. Vickery
   Eric Brenner
   BOIES, SCHILLER & FLEXNER LLP
   *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge*.

   Once again, this matter is before the Court on a motion for a preliminary injunction.

The Court finds that plaintiffs are likely to prevail on their claim that defendants are breaching their

fiduciary duties to plaintiffs by their proposed conduct.

*Facts*

A.    *The Investments in Brasil Telecom*

In the late 1990s, Citibank N.A. ("Citibank") and a group of Brazilian pension funds (the "Pension Funds") selected defendant Daniel Valente Dantas and his entity, defendant Opportunity Equity Partners, Ltd. ("Opportunity"), to manage investment funds in Brazil on their respective behalfs.[1]  Opportunity became the sole general partner of Citibank's fund, then known as CVC/Opportunity Equity Partners, L.P. (the "CVC Fund"), under an agreement that provided that any disputes between Citibank, Dantas, and Opportunity in regard to the CVC Fund would be resolved exclusively by litigation in New York.[2]  Opportunity became also the sole manager of the Pension Funds' investment vehicle (the "Onshore Fund") under a separate agreement.[3]

As has been set forth exhaustively in previous decisions by the Court, familiarity with which is presumed,[4] all went well for a time.  The CVC Fund and the Onshore Fund put up nearly all of the money used to acquire and hold, through a complex holding company structure, at the top of which stands Opportunity Zain, S.A. ("Zain"), a majority of the stock of Brasil Telecom,

---

[1]    *See Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 2006 WL 1044265, *1-*2 (S.D.N.Y. Apr. 20, 2006) ("*IEII II*").

[2]    *See id.*

[3]    *See id.*

[4]    *See generally, e.g., IEII II*; *Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 407 F. Supp. 2d 483 (S.D.N.Y. 2005) ("*IEII I*").  Capitalized terms used herein have the same meanings as defined in *IEII I* and *IEII II*.

S.A. ("Brasil Telecom").[5]   As Opportunity was the general partner of the CVC Fund and the manager of the Onshore Fund, "Dantas had the power to control Zain, the holding companies through which Zain owned a majority of the shares of Brasil Telecom, and Brasil Telecom itself."[6] This control was exercised as a fiduciary for both funds.[7]  During this period, the boards of many or all of the companies in the Brasil Telecom holding structure included many of Dantas's close associates.[8]

In the summer of 2003, defendants began to fear that the Pension Funds, under pressure from an allegedly anti-Dantas Brazilian government, might remove Opportunity from management of the Onshore Fund.[9]  Accordingly, Opportunity drafted the so-called Umbrella Agreement, which provided in substance that if either the CVC or Onshore Fund were to remove Opportunity as general partner or manager, that fund would lose its voting rights in Zain.[10]  The parties dispute whether and to what extent Citibank was aware and approved of the Umbrella

---

[5] *See IEII II*, 2006 WL 1044265, *2.  The shares in Brasil Telecom are ultimately held by Zain.  *See id.*  The CVC and Onshore Funds each own approximately 45% of Zain; Opportunity owns the remaining portion.  *See id.*

[6] *Id.* at *1.

[7] *See id.*

[8] *See IEII I*, 407 F. Supp. 2d at 488 & n.12.

[9] *See id.* at *2.

[10] *See id.*

Agreement, but there is no dispute that Opportunity signed it on behalf of the CVC and Onshore Funds in 2003.[11]

The Onshore Fund removed Opportunity as its manager in October 2003, and the CVC Fund followed suit in March 2005.[12] Citibank then sought to regain control over the CVC Fund's interests in Zain and the other holding structure companies and encountered significant resistance from Dantas and Opportunity. It first brought this action in March 2005 to compel defendants to register the change of the CVC Fund's general partner from Opportunity to CVC Brasil and to enjoin certain proposed Brasil Telecom asset sales. The Court granted the request (the "March 17 Injunction") and enjoined defendants from, among other things, "taking any action that would impair the value of the CVC Fund or its assets or interfere with plaintiff[s'] control over those assets."[13]

Citibank then returned to this Court in June 2005 after the Opportunity-dominated Brasil Telecom board entered into a series of agreements with Dantas and Telecom Italia International N.V. ("Telecom Italia") that, among other things, would have transferred Brasil Telecom's cellular assets to Telecom Italia for low consideration and given Opportunity a windfall

---

[11]

> See *id.* at *2-*3. In late 2004, at Citibank's request, defendants waived their rights to enforce the Umbrella Agreement's voting rights provisions against Citibank. *See id.* at *3.

[12]

> See *id.* at *2-*3. The replacement general partner was Citigroup Venture Capital International Brasil, LLC ("CVC Brasil").

[13]

> See docket item 26. IEII subsequently amended the complaint to add CVC Brasil as a plaintiff.

of hundreds of millions of dollars.[14]   The Court concluded that plaintiffs were likely to prevail on

their contention that defendants threatened to exploit, for their own benefit, "board seats and other

positions conferred upon them as fiduciaries and to act to the detriment of their *cestuis que*

*trustent*."[15]   It therefore enjoined the transactions (the "June 2 Injunction").[16]

Citibank and the Pension Funds thereafter moved down the holding company

structure, removing and replacing Dantas loyalists as managers and directors.[17]   That process was

completed in September 2005 with the replacement of Brasil Telecom's officers and directors, giving

plaintiffs and the Pension Funds – who are aligned[18] – complete control over Brasil Telecom.[19]

B.       *The Litigation in Brazil and the April 20, 2006 Injunction*

Meanwhile, additional litigation has been proceeding in Brazil.   In April 2004,

investors in the Onshore Fund challenged in the Brazilian courts the validity of the Umbrella

---

[14]

See IEII I*, 407 F. Supp. 2d at 494-95; *IEII II*, 2006 WL 1044265 at *3.

[15]

IEII II*, 2006 WL 1044265 at *3.

[16]

See IEII I*, 407 F. Supp. 2d at 495.  The June 2 Injunction was modified shortly thereafter to prevent Opportunity from engaging in any transaction pursuant to which it would receive any consideration from Telecom Italia, absent prior approval of the Court (the "June 7 Injunction").  *See* docket item 104.

[17]

See IEII II*, 2006 WL 1044265 at *4.

[18]

See IEII I*, 407 F. Supp. 2d at 494 (describing agreement between the CVC and Onshore Funds).

[19]

See IEII II*, WL 1044265 at *4.

Agreement as between the Onshore Fund and Opportunity.[20]  On May 11, 2005, a Brazilian court granted the investors' request for a preliminary injunction staying the effect of that agreement as between those parties (the "Brazilian Injunction").[21]  After numerous failed appeals by Opportunity, on April 11, 2006, an intermediate appellate court dismissed the investors' petition on statute of limitation grounds and vacated the Brazilian Injunction (the "April 11 Brazilian Decision").

Without the protection of the Brazilian Injunction, plaintiffs feared that defendants would use the Umbrella Agreement to vote the Onshore Fund's shares in Zain, which, combined with Opportunity's own Zain shares, would give Opportunity majority control of Zain and thus of Brasil Telecom.[22]  Plaintiffs thus sought an injunction from this Court preventing defendants from enforcing or giving effect to the Umbrella Agreement.[23]

After considering the history of the parties' relationship, including the evidence in the record about the early relationship among Citibank, the Pension Funds, and Dantas, the Court concluded that Opportunity "became the manager of the Onshore Fund, and gained a position that enabled it to sign the Umbrella Agreement on its behalf, as a result of its relationship with Citibank."[24]  Thus, the Court continued, if Opportunity were to emerge victorious from its battle with

---

[20]

　　　*See id.*

[21]

　　　*See id.*

[22]

　　　*See id.*

[23]

　　　*See id.*

[24]

　　　*Id.* at *7; *see also id.* at *1 ("There is little direct evidence of the precise chain of events that lead to Opportunity being designated manager of the Onshore Fund.  But Citibank selected Dantas as its local partner when it decided to expand its Brazilian investments.  It

the Pension Fund investors over the viability of the Umbrella Agreement as between Opportunity and the Onshore Fund,

> "defendants nevertheless will owe their positions of influence over Zain and Brasil Telecom to the fact that Opportunity was the sole general partner of the CVC Fund. They may use these positions only in a manner consistent with the fiduciary duty they owe to it, which means that they may not use them to its detriment or to benefit themselves. That is precisely what defendants threaten to do."[25]

Accordingly, the Court held that plaintiffs were likely to prevail on their claim that defendants' proposed use of the Umbrella Agreement to take control of Zain and ultimately Brasil Telecom would breach their fiduciary duties to the CVC Fund. It enjoined defendants from enforcing or otherwise giving effect to the Umbrella Agreement (the "April 20 Injunction").[26]

C.      *The Instant Motion*

The April 20 Injunction did not end the dispute about the April 11 Brazilian Decision. The parties disagree as to whether that decision is self-executing. It states that "[a]s a logical result of the dismissal of the original action, it is imperative for the parties to return to the status quo ante upon the reversal of the decision that granted anticipatory relief on merit, and the annulment of all

---

joined forces with the Pension Funds to buy Brasil Telecom. The logical inference, and the inference drawn by the Court, is that the Dantas-Opportunity position as manager of the Onshore Fund was a product of the fact that Dantas had become Citibank's 'man in Rio' and that Opportunity was the sole general partner of the CVC Fund.").

[25]

*Id.* at *7.

[26]

*See id.* at *9. The Court invited the parties to submit proposed alternative forms of order, *see id.*, and ultimately affirmed the format of the April 20 Injunction. *See* docket item 338.

acts and effects resulting therefrom."[27]  Defendants argue that this language automatically restored the composition of the boards to those in place on May 11, 2005 – a time when Opportunity remained in control of the holding structure companies and Citibank and the Pension Funds had not yet replaced the Dantas-affiliated officers and directors.  Plaintiffs counter that the April 11 Brazilian Decision did no more than vacate the May 11 Injunction and did not automatically remove the current officers and directors from their positions.

On April 19, 2006, the Superior Tribunal de Justiça ("STJ"), Brazil's highest non-constitutional court, held that the April 11 Brazilian Decision does not conflict with earlier decisions of the STJ concerning the company's management as it contains "no reference to the replacement of Brasil Telecom's controllers."[28]  Thus, the STJ has held that the April 11 Brazilian Decision is not self-executing.

Faced with this STJ ruling, defendants tried a new tack.  On May 3, 2006, Opportunity filed a petition with a Brazilian court for an order compelling the officers and directors of the Portfolio Companies to step down immediately and permitting those individuals in office on May 11, 2005 to retake their positions.[29]  Plaintiffs promptly sought relief in this Court, arguing that defendants impermissibly were seeking to retake control of Brasil Telecom and to violate their fiduciary duties to plaintiffs.  Pursuant to a temporary restraining order issued by this Court on May 4, 2006, defendants withdrew the petition without prejudice.  Plaintiffs now seek a preliminary

---

[27]  *Id.*

[28]  Galdino Decl. ¶¶ 10-13, Ex. D.

[29]  *See* Zelbo Aff. ¶ 2, Ex. A.

injunction (1) restraining defendants from "attempting to retake control of the Portfolio Companies or from seeking to remove existing directors, officers or management of the Portfolio Companies," (2) preventing defendants from filing another petition before the Brazilian courts seeking an order reinstating those directors and officers that were in place at the Portfolio Companies on May 11, 2005, and (3) requiring defendants, in the event that they are returned to a position of control over any Portfolio Company, "to cause their representatives or designees to immediately resign and agree to appoint or ratify the appointment of designees named by the CVC Fund and the Onshore Fund in their place."[30]

### Discussion

A.     *The Dantas Declaration*

The Court must deal at the outset with a preliminary issue – the effort by defendants to relitigate findings of fact made on prior motions that are not to their liking, most notably the finding that the Dantas-Opportunity position vis-a-vis the Onshore Fund was a product of Dantas's relationship with Citibank and the CVC Fund.[31]

---

[30]

Pl. Mem. [docket item 332] at 2.

Plaintiffs originally sought an order requiring defendants to withdraw the May 3, 2006 petition before the Brazilian Court. *See id.* The Court included this provision in the order granted on May 4, 2006 and defendants accordingly withdrew the petition without prejudice. *See* docket item 333. At subsequent oral argument, plaintiffs conceded that since defendants had complied with the order, this precise aspect of their motion for a preliminary injunction was moot. *See* Tr., May 18, 2006, at 8:24-9:15. Instead, plaintiffs stated that they now are seeking an order barring defendants from re-filing such a petition. *Id.*

[31]

*See IEII II*, WL 1044265 at *1, *7.

For the first time in this litigation, Dantas has filed a declaration in support of his and Opportunity's position.[32] The declaration contains thirty-one paragraphs, attaches twenty-four exhibits, and begins by explaining that

> "[a] variety of the preliminary factual findings by the Court in this action have been inaccurate, inconsistent with the facts previously set forth for the Court, and appear to have lead to a fundamental misunderstanding by the Court of the circumstances surrounding, and the motivations behind, the parties' past and current conduct."[33]

Dantas goes on to describe the relationship between Opportunity and the Pension Funds and asserts that the relationship "pre-dates Opportunity's relationship with Citibank."[34] After describing the Opportunity/Pension Fund relationship in detail, Dantas moves to Citibank's interaction with Opportunity and the Pension Funds and the origin of the Onshore and CVC Funds.[35] He states that "the control that Opportunity had over the Portfolio Companies was not (indeed could not be) dependent upon its relationship with the CVC Fund"[36] and that the parties had always intended to create side-by-side rights in all investments for all parties.[37] He concludes with several paragraphs describing his and Opportunity's dedicated work on the CVC Fund's behalf[38] and a description of

---

[32]

See generally Corrected Dantas Decl. [docket item 352].

[33]

Id. ¶ 2.

[34]

Id. ¶ 3; see also id. ¶¶ 4-9.

[35]

See id. ¶¶ 9-11, 14.

[36]

Id. ¶ 15.

[37]

See id. ¶¶ 16-19, 21, 25.

[38]

See id. ¶¶ 20-26.

the creation of the Umbrella Agreement with Citibank's full approval and cooperation.[39]  Finally,

he declares that "Opportunity does not seek control for control's sake or to engage in any self dealing

transactions."[40]

Plaintiffs move to strike the declaration, arguing that it is an improper attempt to

reargue factual issues resolved previously.  Defendants counter that the declaration is appropriate

and relevant because the Court's previous findings of fact on motions for preliminary injunctions

may be revisited.

A finding of fact on a motion for a preliminary injunction is not binding at trial.[41]

Moreover, Rule 54(b) provides that any "order or other form of decision is subject to revision at any

time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the

parties."[42]  This provision, which confirms the Court's necessary power to correct itself, however

does not mean that findings made on a preliminary injunction motion are subject to constant re-

examination at all times prior to trial.  That would be a path to chaos.

"[T]he fact that a court may revise a prior order does not give a litigant the right to

require that it do so, particularly where the litigation seeks revision in light of materials that should

---

[39]

    *See id.* ¶¶ 27-30.

[40]

    *Id.* ¶ 31.

[41]

    *See, e.g., Irish Lesbian and Gay Organization v. Giuiliani*, 143 F.3d 638, 644 (2d Cir. 1998).

[42]

    FED. R. CIV. PROC. 54(b).

have been submitted earlier."[43]   The Court has discretion to revisit earlier rulings "subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."[44] In order to justify re-examination of an interlocutory finding or ruling, a litigant "ordinarily must demonstrate an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."[45]

Defendants have not attempted seriously to meet this burden.   The Umbrella Agreement, its origins, and its significance have been issues in repeated preliminary injunction motions, including two within the past several months.[46]   Indeed, the agreement was at issue also with regard to the June 2 Injunction, more than a full year ago.[47]   Certainly Dantas was in possession of all the information contained in his declaration at the time of all of those applications – he simply failed to offer it.   Indeed, given his central position at Opportunity and (by his own description) key personal involvement in the events at issue, it appears that he quite deliberately has avoided submitting any affidavit or declaration at all until now.

---

[43]

*In re Rezulin Prod. Liab. Litig.*, 224 F.R.D. 346, 349 (S.D.N.Y. 2004).

[44]

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003) (internal citations and quotations omitted).

[45]

*Rezulin*, 224 F.R.D. at 350 (internal citations omitted).

[46]

*See generally IEII II* (April 20 Injunction); *Int'l Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 2006 WL 1116437 (S.D.N.Y. Apr. 26, 2006) ("*IEII III*").

[47]

*See IEII I*, 407 F. Supp. 2d at 490 & n.30, 497.

No doubt there have been tactical reasons for Dantas's reticence, which included not only a lack of any prior affidavit or declaration but a failure to testify in person at a prior evidentiary hearing and a prior contempt hearing. Regardless, that is the choice that defendants made. They have offered no good reason – indeed, little reason at all – why the Court now should re-examine its findings on the basis of evidence that could have been offered, but was not.[48]

As defendants have presented no "cogent and compelling" reasons for the Court to re-examine its factual findings regarding the Umbrella Agreement or the role of the CVC Fund in relation to the Onshore Fund, it declines to do so.[49] To the extent that the Dantas declaration addresses matters on which the Court already has made findings,[50] it will not be considered and is not properly part of the record. Plaintiffs' motion to strike the declaration accordingly is denied as moot.

B.      *The Standard*

---

[48]

Plaintiffs surmise that the belated submission of the Dantas declaration is intended not only to aid the present motion, but to bolster the record on defendants' appeal of the April 20 Injunction. Given the declaration's detailed focus on the history of the Umbrella Agreement and its insistence that Opportunity's control over the Brasil Telecom holding companies "was not (indeed could not be) dependent upon its relationship with the CVC Fund," that conclusion appears to be warranted.

[49]

*Rezulin,* 224 F.R.D. at 350 (internal citations omitted).

[50]

*See* Corrected Dantas Decl. [docket item 352] ¶¶ 2-11, 14-19, 26-31 and corresponding exhibits. Defendants' opposition brief cites only to paragraphs 10-11, 28-31, and Exhibit C of the Dantas declaration. Of these, only Exhibit C, which is identified in paragraph 13, is properly in the record. *See* Def. Mem. [docket item 342] at 8-9, 17.

Ordinarily, "[a] party seeking a preliminary injunction in this Circuit must show: (1) irreparable harm in the absence of the injunction and (2) either a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor."[51]  Defendants, however, contend that plaintiffs are obliged to make a clear and substantial showing of success on the merits, as well as threatened irreparable injury, because certain aspects of the injunction sought are mandatory in nature.[52]  This Court disagrees.  As mandatory injunctions are those that disturb the *status quo*, while prohibitory injunctions preserve it,[53] the relief sought by plaintiffs – to protect the current control structure of the Portfolio Companies[54] – is prohibitory in nature despite any aspects that may require defendants to take affirmative action.[55]

Defendants further argue that this motion is governed by that the standard for an anti-suit injunction.  An anti-suit injunction is one that prevents a litigant from pursuing litigation before a foreign tribunal.[56]  Considerations of comity require that such injunctions be used sparingly, and

---

[51]

    *IEII II*, 2006 WL 1044265 at *5 (internal citations omitted).

[52]

    *See, e.g., Jolly v. Coughlin*, 76 F.3d 468, 473-74 (2d Cir. 1996).

[53]

    *See, e.g., Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir. 1988).

[54]

    Defendants concede that plaintiffs have been in control of all of the Portfolio Companies since September 2005.  *See, e.g.*, Tr., Apr. 26, 2006 at 4:7-17.

[55]

    *See, e.g., Alcatel Space, S.A. v. Loral Space & Comm. Ltd.*, 154 F. Supp. 2d 570, 580 (S.D.N.Y. 2001) ("Even though plaintiffs seek to require defendants to take positive acts, those acts are necessary to preserve the status quo").

[56]

    *See, e.g., United States v. Davis*, 767 F.2d 1025, 1038 (2d Cir. 1985).

so the movant first must demonstrate that the parties are the same in both matters and that "resolution of the case before the enjoining court is dispositive of the action to be enjoined."[57] "Once past this threshold, courts are directed to consider a number of additional factors, including whether the foreign action threatens the jurisdiction or the strong public policies of the enjoining forum."[58]

Despite the fact that the requested injunctive relief relates to the Brazilian litigation, it is by no means clear that this case presents concerns typically implicated by anti-suit injunctions. As noted by the *China Trade* court, concurrent proceedings are "ordinarily tolerable" for *in personam* cases because they do not necessarily present a conflict.[59] Defendants conclude that because the Brazilian litigation and this case ultimately will resolve different questions – for the Brazilian courts, the Umbrella Agreement's validity as between the Onshore Fund and Opportunity, and, for this Court, the propriety of defendants' conduct towards the CVC Fund and its interests – the proceedings are of this "ordinarily tolerable" kind and defendants should be allowed to take any steps relating to the Brazilian litigation that they wish.

This view is superficially appealing but does not withstand deeper analysis. The parties agreed that this Court would have exclusive jurisdiction over the relationship between defendants and the CVC Fund. In exercising that exclusive jurisdiction, this Court has enjoined defendants from various forms of conduct, including from interfering with the CVC Fund's control of its assets and enforcing the Umbrella Agreement. Thus, at the very time that this Court is

---

[57]

    *See China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35 (2d Cir. 1987).

[58]

    *Paramedics Electromedicina Comercial v. GE Med. Sys. Info Tech., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004).

[59]

    837 F. 2d at 36.

exercising its exclusive jurisdiction over defendants' behavior with regard to the CVC Fund's interests in the Portfolio Companies, defendants would use the Brazilian courts to retake control of those same companies while shielding their conduct by virtue of their participation in that other lawsuit. The question, then, is whether defendants should be permitted to use their legal rights in Brazil to breach their duties to plaintiffs and to achieve the very same status this Court has enjoined them from exploiting. When framed in this way, it is clear that this case is more akin to the *in rem* and *quasi in rem* cases identified by the *China Trade* court than to *in personam* cases[60] and that defendants' petition to the Brazilian courts was less of a "parallel proceeding" entitled to comity and more of an attempt to defeat this Court's plain jurisdiction over their conduct.

Moreover, the conclusion would remain the same even under the anti-suit injunction analysis. Defendants contend that plaintiffs cannot meet the first of the anti-suit injunction requirements because the parties in the Brazilian litigation are not identical to those before this Court – in particular, the Onshore Fund and its investors are not present in this litigation, and Dantas is not present in the Brazilian case. But defendants read this requirement too narrowly. Where parties to the two actions are affiliated or substantially similar, such that their interests are represented by one another, courts have found the first requirement is met.[61] Defendants do not contest, nor could they, that Dantas and Opportunity are both affiliated and substantially similar – Dantas controls Opportunity. Plaintiffs and the Onshore Fund and its investors have executed an agreement "to vote

---

[60]

    *See id.*

[61]

    *See, e.g., Paramedics Electromedicina*, 369 F.3d at 652; *Suchodolski Assoc., Inc. v. Cardell Fin. Corp.*, No. 03 Civ. 4148 WHP, 2006 WL 10886, *2 (S.D.N.Y. Jan. 3, 2006); *SG Avipro Fin. Ltd v. Cameroon Airlines*, No. 05 Civ. 655 (LTS), 2005 WL 1353955, *2 (S.D.N.Y. Jun. 8, 2005).

together in the selection of the Zain board, among other matters"[62] and the Onshore Fund has stated that it supports plaintiffs' application here.[63]  The Onshore Fund and plaintiffs therefore have the same interest in stopping defendants from avoiding its fiduciary obligations by means of the Brazilian litigation.

As for the second anti-suit injunction requirement, defendants argue that this Court has no jurisdiction to select the officers and directors of the Portfolio Companies or to determine the viability of the Umbrella Agreement as between the Onshore Fund and Opportunity and that this litigation therefore will not dispose of the case in Brazil.  The Court has no quarrel with that contention, but it misses the point.

The anti-suit aspect of plaintiffs' requested relief is narrow,  aimed at preventing defendants from bringing another petition to the Brazilian court to enforce the April 11 Brazilian Decision by ordering the reinstatement of those individuals in office on May 11, 2005.  As defendants concede, this Court *does* have exclusive jurisdiction over the determination of the fiduciary duties owed by defendants to plaintiffs, including whether the Umbrella Agreement and other actions by defendants violated those fiduciary duties.  The outcome of this case, therefore, *will* resolve the issue of whether defendants can take control of the Portfolio Companies consistent with those duties.  However that question is resolved, once it *is* resolved, it will render unnecessary any

---

[62]

     *IEII I*, 407 F. Supp. 2d at 494.

[63]

     *See* Galdino Decl. ¶ 21 ("I confirm that the Onshore Fund supports the CVC Fund's application for an injunction in this Court . . . the Onshore Fund's interests are aligned with the CVC Fund's interests with respect to its efforts to prevent Opportunity, in violation of its fiduciary duties, from retaking control of Brasil Telecom's board and management . . .".).

such petition to enforce the April 11 Brazilian Decision because this Court will have determined either that defendants cannot take control of the Portfolio Companies without violating their duties to plaintiffs, or that they can. In other words, Opportunity has requested a competing injunction from the Brazilian courts, returning it and its people to positions of control by reason of its powers under the Umbrella Agreement. Once this Court determines the propriety of that agreement as between the parties, among other actions by Opportunity, there will be no need for a competing injunction in Brazil. Accordingly, the case before this Court will resolve the sole claim of Opportunity's would-be petition to the Brazilian courts.[64]

Having met the threshold anti-suit injunction requirements, the Court next considers whether future versions of the petition to enforce the April 11 Brazilian Decision would "threaten[] the jurisdiction or the strong public policies of" this forum.[65] The Court finds that such petitions would indeed be an affront to the strong public policy in favor of forum selection clauses like the one agreed to by defendants, as well as a threat to this Court's jurisdiction as explained above. Mere weeks after this Court's April 20 Injunction put defendants on clear notice that giving effect to the Umbrella Agreement was impermissible, and over a year after defendants were instructed not to interfere with the CVC Fund's control of its assets, Opportunity filed the May 3 petition. The object of that petition clearly was to regain temporary control of the Portfolio Companies, giving effect to the Umbrella Agreement and interfering with the CVC Fund's control of its assets. Such attempts

---

[64]

*Cf. Int'l Fasion Prods. B.V. v. Calvin Klein, Inc.*, 95 Civ. 0982 (JFK), 1995 WL 92321, *1-*2 (S.D.N.Y. Mar. 7, 1995) (holding second prong of anti-suit injunction test met where competing requests for injunctive relief concerned the same subject matter).

[65]

*Paramedics Electromedicina*, 369 F.3d at 652.

to make end runs around the forum selection clause and this Court's jurisdiction cannot be tolerated. Indeed, the justification for an anti-suit injunction "crests" when a party seeks the aid of a foreign proceeding "in a blatant attempt to evade the rightful authority of the forum court."[66]

Accordingly, even assuming that such analysis is necessary, the requirements for an anti-suit injunction have been met.

## C.  *Threat of Irreparable Harm*

"Conduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company" may constitute irreparable harm.[67]  Irreparable injury has been found also in "[t]he dilution of a party's stake in, or a party's loss of control of, a business."[68]

In *IEII I*, the Court determined that plaintiffs were threatened with irreparable harm by Opportunity's attempts to exercise control over Brasil Telecom – control obtained through positions that Opportunity held largely for the benefit of plaintiffs – to cause Brasil Telecom to part

---

[66]
    *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 20 (1st Cir. 2004); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 60 (2d Cir. 2004) ("[O]rders of foreign courts are not entitled to comity if the litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders.") (internal citations omitted).

[67]
    *IEII I*, 407 F. Supp. 2d at 496 (internal citations omitted); *see also IEII II*, 2006 WL 1044265 at *5-*6.

[68]
    *IEII I*, 407 F. Supp. 2d at 496 (internal citations omitted); *see also IEII II*, 2006 WL 1044265 at *5-*6.

with its cellular business and to dilute plaintiffs' control or influence over Brasil Telecom.[69]  It

similarly concluded that the April 11 Brazilian Decision, by potentially freeing Opportunity to use

the Umbrella Agreement to vote the Onshore Fund's shares in Zain, put plaintiffs at risk of similar

irreparable injury.[70]

So here.  If defendants regain their positions of control at Brasil Telecom and its

upstream entities, whether by a petition to the Brazilian courts or by other means, plaintiffs' "efforts

to obtain or preserve the right to participate in the management of" those companies would be

irreparably harmed.[71]

Defendants contend that since they are enjoined already from giving effect to the

Umbrella Agreement or otherwise interfering with the CVC Fund's control of its assets, plaintiffs

are not at risk of any harm whatsoever, much less irreparable.  They are mistaken.  First, the loss of

control itself – even if temporary – may constitute irreparable harm.  Further, as the Court stated in

its May 10, 2006 order, it "lacks confidence that defendants will behave in an honorable fashion

absent legal compulsion . . . [I]f this litigation has yielded one truth, it is that the creativity of the

principals and their advisors is indeed impressive."[72]  Given the history of this case, defendants'

argument that plaintiffs have nothing to fear is not credible.  The irreparable injury requirement is

---

[69]

See *IEII I*, 407 F. Supp. 2d at 497.

[70]

See *IEII II*, 2006 WL 1044265 at*6.

[71]

*IEII I*, 407 F. Supp. 2d at 496 (internal citations omitted); *see also IEII II*, 2006 WL 1044265 at *5-*6.

[72]

Docket item 338 at 2-3.

satisfied.

D.      *Likelihood of Success on the Merits*

   The parties have spent a great deal of time discussing whether the CVC Fund had a *per se* right to control the Portfolio Companies.  Defendants maintain that Citibank was intended – indeed, was required – to act as a passive investor only, without any right to control the companies in which the CVC Fund invested.[73]  Further, they contend that defendants' return to control through the reconstitution of the companies' boards and officers as they existed on May 11, 2005 would not constitute a use of the Umbrella Agreement, as defendants would not be attaining those positions by voting the Onshore Fund's shares.  Accordingly, they argue that plaintiffs cannot show that they are likely to succeed on a claim that Opportunity's exertion of control over the Portfolio Companies now would violate its fiduciary duties to plaintiffs.

   Defendants miss the forest for the trees.  As this Court held previously, the *only* reason that defendants were in control of Brasil Telecom and its holding companies on May 11, 2005 (or, indeed, at any other time) was through the use of powers Opportunity obtained and exercised on behalf or by reason of the CVC Fund, its *cestuis que trustent*.[74]  If defendants were to return to

---

[73]  As explained above, the Court did not rely upon the Dantas declaration's improperly-offered evidence as to this issue, and it is not properly part of the record.

[74]  *See, e.g., IEII I,* 407 F. Supp. 2d at 500 ("Opportunity has control over Zain and therefore the entire Brasil Telecom holding structure largely by reason of its former position as manager of the CVC Fund . . . The CVC Fund and the Onshore Fund hold interests in Zain for the precise purpose of controlling Brasil Telecom.  In entrusting their investments to Opportunity, they necessarily entrusted Opportunity with control over the holding company structure that confers control over Brasil Telecom.  Opportunity therefore may not use its control over Brasil Telecom – control it would not have but for its former position as

any position of authority and control, they again would hold that power by virtue of their former position as the general partner of the CVC Fund, albeit against its wishes and contrary to its interests.

Plaintiffs have demonstrated already in relation to the March 17 and June 2 Injunctions that they are likely to succeed on their claims that defendants' actions, including their improper retention of positions achieved through Opportunity's fiduciary status and their use of those positions for their own selfish interests, violated their fiduciary duties.[75] Defendants' focus on the Umbrella Agreement, as though implementing it were the only means by which they could violate fiduciary duties to plaintiffs, does not address the broader issue of whether striving to regain control of positions they possessed only through as a fiduciary would violate those same duties. This is particularly true given the limited time for which that control would last, as plaintiffs and the Onshore Fund would begin immediately – and again – the process for removing defendants' appointees from those same positions.[76] It is plain (and defendants do not deny) that defendants hope to use this admittedly temporary return to power to improve their own position at the expense of plaintiffs, perhaps by signing new agreements with Telecom Italia on behalf of the Portfolio

---

general partner of the CVC Fund – in ways detrimental to the CVC Fund, or for the purpose of securing a benefit for itself.").

[75]

*See, e.g., id.* at 498-512.

[76]

Counsel for defendants conceded at oral argument that Opportunity's return to authority over any part of the holding company structure would be short-lived: "[I]f there are steps taken to again remove [the May 11, 2005 officers and directors], then we won't be able to stop that . . . because we cannot enforce or give effect to the umbrella agreement at a shareholder meeting." Tr., May 4, 2006, at 17:22-18:4.

Companies or by increasing defendants' leverage to bargain for a share of any control premium.[77]

This behavior would constitute acting "in ways detrimental to the CVC Fund," quite likely "for the

purpose of securing a benefit" for themselves.[78]

        The Court therefore finds, in keeping with its prior decisions, that plaintiffs are likely

to succeed on their claim that defendants' usurpation of control over the CVC Fund's assets is a

violation of their fiduciary duties to plaintiffs.

*E.*     *The Bond*

        Opportunity argues again that its interest "and that of its co-investors in Brasil Telcom

alone, is at least $529 million. Their interest in all the Portfolio Companies exceeds $1 billion,

including a control premium of $544 million."[79] Defendants argue that the bond therefore should

be increased accordingly to at least $750 million.

        Rule 65(c) provides in pertinent part that:

> "No restraining order or preliminary injunction shall issue except upon the giving of
> security by the applicant, in such sum as the court deems proper, for the payment of
> such costs and damages as may be incurred or suffered by any party who is found to
> have been wrongly enjoined or restrained."

As the Court has explained previously, this is intended to afford security only for those damages, if

---

[77]         *See, e.g.,* Def. Mem. [docket item 342] at 23 ("An injunction prohibiting Opportunity from returning to control would give Plaintiffs and their allies unfettered Opportunity [sic] to sell the Portfolio Companies and to deprive Opportunity of its control premium.").

[78]         *Id.* at 500.

[79]         Def. Mem. [docket item 342] at 23.

any, that might be "proximately caused by the [wrongful] issuance of [an] injunction."[80]  In fixing

the amount of security required, a court is not required to order security in respect of claimed

economic damages that are no more than speculative.[81]  Moreover, the burden is on the party seeking

security to establish a rational basis for the amount of the proposed bond.[82]

Defendants argue that the bond must be large enough to compensate them for the loss

of their entire stake in the Portfolio Companies.  Even assuming defendants' data and estimates as

to the value of their stake were correct – as well as their claim to a control premium – [83] they would

have provided no rational basis to conclude that their entire investment is at risk.[84]  Defendants offer

no persuasive rationale as to why there is an cognizable risk that their investment would be rendered

worthless by the requested injunction.

Further, defendants again take aim at the wrong injunction.  They concede that, as

---

[80]

    *B.G. Soft Ltd. v. BG Soft Int'l, Inc.*, No. Cv.-01-17 (RR)(VVP), 2002 WL 1467744, *2 (E.D.N.Y. Apr. 29, 2002) (internal citations omitted).

[81]

    *See, e.g., Interlink Int'l Fin. Serv., Inc. v. Block*, 145 F. Supp. 2d 312, 315 (S.D.N.Y. 2001).

[82]

    *See, e.g., Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 140 (E.D.N.Y. 1997); *Bass v. Richardson*, 338 F. Supp. 478, 491 (S.D.N.Y. 1971).

[83]

    *See, e.g.,* de Carvalho Decl. [docket items 347, 351], ¶ 22 (claiming value of Opportunity's stake in the Portfolio Companies as over $1 billion; citing no support for calculations). Notably, de Carvalho's assessment of Opportunity's Brasil Telecom stake at $529 million is $89 million more than Telecom Italia agreed to pay defendants for that same stake a year ago.  *See IEII I*, 407 F. Supp. 2d at 508-09.  The Court has determined already that that agreement was conditioned on Brasil Telecom selling its cellular business to Telecom Italia for low consideration.  *See id.*

[84]

    *See* Tr., May 4, 2006, at 19:24-20:13 (entire stake at risk only if "there were a cognizable possibility that [defendants'] investment would be lost 100 percent").

matters stand now, any return to control of the Portfolio Companies would be temporary and that, consistent with the April 20 Injunction, they could not vote the Onshore Fund's shares under the Umbrella Agreement in any event.[85] Thus, their arguments about the potential loss of their stake in Brasil Telecom are directed not at this requested relief, but at the April 20 Injunction, which prevents them from implementing the Umbrella Agreement and taking actual control of the Portfolio Companies.[86]

The Court accordingly declines to require an increase in the bond.

*Conclusion*

In view of the fact that the Court disregards those parts of the Dantas declaration as would have been pertinent previously, the motion to strike it[87] is denied as moot. Plaintiffs' motion for a preliminary injunction[88] is granted. Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and hereby are enjoined and restrained, pending the final determination of this action, from

> (1) attempting to retake control of the Portfolio Companies or from seeking to remove existing directors, officers, or management of the Portfolio Companies,

---

[85]

*See, e.g.*, Tr., May 4, 2006, at 17:22-18:4.

[86]

*Cf. IEII III,* 2006 WL 1116437 at *3.

[87]

Docket item 365.

[88]

Docket item 333.

(2) filing any application before any Brazilian court seeking an order reinstating those directors and officers that were in place at the Portfolio Companies on May 11, 2005, or any of them, or removing any person as an officer or director of any Portfolio Company who was serving in such position on April 10, 2006, or otherwise seeking to implement or give effect to the April 11 Brazilian Decision.

Defendants are further required, in the in the event that they are returned to a position of control over any Portfolio Company, to cause their representatives or designees or persons otherwise affiliated with them to resign immediately and to agree to appoint or ratify the appointment of designees named by the CVC Fund and the Onshore Fund in their place.

SO ORDERED.

Dated: July 26, 2006
Issued at: 8:45 a.m.

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)