UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

INTERNATIONAL EQUITY INVESTMENTS,
INC., et al.,

                Plaintiffs,

        -against-                            05 Civ. 2745 (LAK)

OPPORTUNITY EQUITY PARTNERS LTD.
(f.k.a. CVC/Opportunity Equity Partners Ltd.),
et al.,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

                Howard S. Zelbo
                Carmine D. Boccuzzi
                Kurt A. Mayr
                CLEARY GOTTLIEB STEEN & HAMILTON LLP
                *Attorneys for Plaintiffs*

                Philip C. Korologos
                George F. Carpinello
                Howard L. Vickery
                Eric Brenner
                BOIES, SCHILLER & FLEXNER LLP
                *Attorneys for Defendant Opportunity Equity Partners Ltd.*

LEWIS A. KAPLAN, *District Judge*.

In the late 1990s, Citibank, N.A. ("Citibank"), International Equity Investments, Inc. ("IEII"), a wholly-owned subsidiary of Citibank, and Opportunity Equity Partners, Ltd. ("Opportunity Equity"[1]), an entity controlled by Daniel Valente Dantas, formed CVC/Opportunity Equity Partners, L.P. (the "CVC Fund"), a Cayman Islands exempted limited liability partnership.  Under the limited partnership agreement, IEII was the sole limited partner and provided the entire $728 million capital investment.[2]  Opportunity Equity was the sole general partner.

Conflicts eventually ensued between Dantas and Citibank, resulting, in 2005, in IEII's removal of Opportunity Equity as the CVC Fund's general partner.  IEII and Citigroup Venture Capital International Brasil ("CVC Brazil"), the new general partner that replaced Opportunity Equity and a subsidiary of IEII, appearing on its own behalf and on behalf of the CVC Fund, have sued Opportunity Equity and Dantas on several grounds.[3]  Opportunity Equity has counterclaimed.  Plaintiffs now move to dismiss four of Opportunity Equity's counterclaims.

*Background*

This action has been before the Court several times on preliminary injunction motions

---

[1] The parties and the relevant contracts all use a different shorthand term for Opportunity Equity Partners, Ltd.  The Court here continues to use the term it adopted in prior opinions.

[2] *See* Answer to Amended Cpt. ¶ 11; Answer to Third Amended Cpt. ¶ 18.

[3] An amended complaint added several other defendants, not relevant for the purposes of this motion.  Motions to dismiss made by these defendants are currently pending.

3

and defendants' motion to dismiss.[4]  The Court assumes familiarity with the facts described in those opinions and sets forth only those relevant to the instant motion.

As this is plaintiffs' motion to dismiss, the Court here assumes the truth of the facts alleged in Opportunity Equity's counterclaims.  The counterclaims, however, rely heavily on two contracts, the CVC Fund's limited partnership agreement and an Operating Agreement setting forth a strategy of coordinated investments with other entities.   These contracts are before the Court as attachments to plaintiffs' moving papers[5] and are relied heavily upon by all parties.  The Court therefore considers them,[6] and is "not constrained to accept the allegations of the [counterclaims] in respect of the construction of the [contracts], although – at this stage in the proceedings – [the Court] will strive to resolve any contractual ambiguities in [Opportunity Equity's] favor."[7]

---

[4]

*E.g.*, 441 F. Supp. 2d 552 (S.D.N.Y. 2006); 427 F. Supp. 2d 491 (S.D.N.Y. 2006); 411 F. Supp. 2d 458 (S.D.N.Y. 2006); 407 F. Supp. 2d 483 (S.D.N.Y. 2005).

[5]

Mayr Decl., Exs. A, B.

[6]

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ("'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991)) (first alteration added).

[7]

*Id.*

4

A.      The Contracts

        1.      The Partnership Agreement

        The Amended and Restated Limited Partnership Agreement of December 30, 1997

("Partnership Agreement"), is the agreement among Opportunity Equity,[8] Citibank (as the "initial

limited partner") and IEII.[9]  It is governed by the law of the Cayman Islands[10] and identifies the

"entire agreement" between the parties as the Partnership Agreement, the Operating Agreement, and

three other documents.[11]

        The stated objective of the CVC Fund is to "invest through publicly bid and privately

negotiated equity and equity-related investments in companies based and primarily operating in

Brazil."[12]  The Partnership Agreement, echoing the substance of the Operating Agreement as

described below, sets forth provisions for "side-by-side" investment with other entities.[13]  In essence,

the CVC Fund invests and divests in conjunction with other funds managed by entities under common

---

[8]

        Opportunity Equity is referred to as the "General Partner" in the Partnership and Operating
        Agreements.  Partnership Agreement, Appx. I at I-12; Operating Agreement at 1.

[9]

        Partnership Agreement at 1, Appx. II.  The Partnership Agreement reflected Citibank's
        withdrawal from the CVC Fund.  *Id.* at 1.

[10]

        *Id.* § 13.7.

[11]

        *Id.* § 13.4.  Two of the other documents, a Subscription Agreement and a Citibank Investor
        Letter, are given no significance by either party.  *See* Pls.' Mem. at 6 n.6.  The third, a
        Private Placement Memorandum for the CVC Fund, was used to solicit additional investors.

[12]

        Partnership Agreement § 2.1.

[13]

        *Id.* § 2.5.

5

control with Opportunity Equity.[14]

Opportunity Equity initially was the CVC Fund's sole general partner[15] and thus charged with exclusive authority over the "management, control, operation and policy" of the partnership.[16]  The Partnership Agreement contemplates a limited role for other entities, however. Forty percent of the general partner's Investment Committee, responsible for the CVC Fund's investment decisions, is appointed by IEII.[17]  An Advisory Committee, made up of the limited partners, approves or rejects asset appraisal, exceptions to the investment policy, resolution of conflicts of interest, and various other discrete matters.[18]

The general partner is expressly acknowledged to be a fiduciary of the limited partners.[19]  It is liable for repaying the debts and obligations of the CVC Fund, but is indemnified by the partnership to the extent that it acts in good faith and without breaching its fiduciary duty.[20]  The general partner's compensation is a management fee and a share of the partnership's profit called a

---

[14]

*Id.*

[15]

*Id.*, Appx. I at I-12.

[16]

*Id.* § 6.1.1.

[17]

*Id.*, Appx I at I-14 (defining "Investment Committee"), I-21 (defining "Significant Investor"), Appx. II (listing IEII's total commitment).

[18]

*Id.* §§ 6.4.1, 6.4.2.

[19]

*Id.* § 6.1.5.

[20]

*Id.* §§ 1.9(b), 6.7.1.

"carried interest."[21]  Opportunity Equity characterizes the carried interest as "approximately 20% of the capital appreciation of the Portfolio Assets upon divestment, after IEII was reimbursed for its capital contribution plus a preferred return of 10% per year on a compound basis."[22]

Limited partners are precluded from participating in the management, control or direction of the CVC Fund's affairs and from transacting business for the CVC Fund.[23]  They may consult with the general partner, however, as part of the Advisory Committee,[24] and participate in the Investment Committee.  Further, they have the authority to remove the general partner with or without cause.[25]  Limited partners are expressly not liable for the debts and obligations of the partnership[26] and "may engage in any business of any kind whatsoever, including those which conflict or compete with the activities of the [CVC] Fund or any [CVC Fund investment]."[27]

---

[21]     *Id.* §§ 4.2.1, 4.2.3, 5.2, 6.9, Appx. I at I-4 (defining "Carried Interest").

[22]     Ctrclm. ¶ 54.

[23]     Partnership Agreement § 7.1.

[24]     *Id.* § 6.4.

[25]     *Id.* §§ 7.3, 7.4.

[26]     *Id.* § 7.1.

[27]     *Id.* § 6.2.2(b).

## 2. The Operating Agreement

The Operating Agreement, governed by New York law,[28] was executed on December 30, 1997 among Opportunity Equity, Citibank "or an affiliate thereof," Dantas, and other parties.[29] It sets forth a coordinated investment strategy of the CVC Fund, another fund managed by an entity thus under common control with Opportunity Equity ("On-Shore Fund"), and one or more funds to be established with funds from an entity separate from but affiliated with Opportunity Equity ("Opportunity Funds").[30]  The Opportunity Funds, under the terms of the agreement, were to be managed by Opportunity Equity or an entity under common control with Opportunity Equity.[31]

The Operating Agreement contemplates that the funds would invest and divest on a side-by-side basis.[32]  Any variation from this strategy by the CVC Fund or the Opportunity Funds is allowed only with IEII's prior written consent.[33]  The agreement resulted from the "objective" of the

---

[28]

Operating Agreement § 7.05.

[29]

*Id.* at 1.

[30]

Partnership Agreement § 2.5(e) (stating that the managers of the other funds are "Under Common Control with [Opportunity Equity]"), Appx. I at I-7 (defining "control" for purposes of the Partnership Agreement as "ownership of 51% or more of the voting shares or quotas of such Person"); Operating Agreement at 1 (defining "Opportunity" as an entity other than Opportunity Equity), § 3.01(a) ("Opportunity agrees to commit to invest US$30 million . . . which will invest on a side-by-side basis with [the CVC Fund].").

[31]

Operating Agreement § 3.02; *see also id.* at 3 (defining "control" for purposes of the Operating Agreement as "ownership of 99% or more of the equity of such Person").

[32]

*Id.* § 5.02.

[33]

*Id.* § 5.02(b), (e) (Significant Investor or Advisory Committee must consent to variation); *see also* Partnership Agreement § 6.4.2 (members of the Advisory Committee selected from the Limited Partners), Appx. I at I-21 (defining "Significant Investor"), Appx. II (indicating that IEII qualifies as a Significant Investor).

CVC Fund and the On-Shore Fund "of generating superior rates of return through joint investments . . . ."[34]

Although Citibank or an affiliate were parties to the contract, none of the substantive provisions placed any constraints on their actions.  The Operating Agreement expressly stated that "neither Citibank nor any affiliate of Citibank will have any obligation to any Party hereto under this Agreement" and noted that, while the agreement "shall be binding on and inure to the benefit of" the parties, in the case of Citibank it only "shall inure to the benefit of" Citibank or its affiliates.[35]

B.    *The Counterclaims*

The counterclaims allege that plaintiffs conspired with certain investors in the On-Shore Fund to deprive Opportunity Equity of its share of the value of the CVC Fund's investments.[36]

Opportunity Equity alleges that the side-by-side investment strategy constituted a joint venture.[37]  The benefit to the joint venturers was the ability to "structure their investments to meet their particular needs, while at the same time, securing control premiums for their investments."[38] "The side-by-side concept was necessary to the success of the joint venture because Opportunity and the other investors Opportunity brought into the venture would not have made investments . . .

_____

[34]     Operating Agreement at 2.

[35]     *Id.* § 7.07.

[36]     Ctrclm. ¶ 1.

[37]     *Id.* ¶ 4.

[38]     *Id.*

9

without iron-clad assurances that they would have the right to participate in the control premium if and when the investments were sold."[39]   Indeed, "[n]either Opportunity nor [IEII] would have entered into the joint venture without the assurance that all investments would be protected by the side-by-side agreement."[40]

Opportunity Equity managed the CVC Fund to IEII's satisfaction for several years.[41] According to the allegations, the relationship between the parties soured after a management shift at Citibank.[42]   IEII, despite its position as the CVC Fund's limited partner, secretly entered into a Memorandum of Understanding on behalf of the CVC Fund with investors in the On-Shore Fund to "cut[] Opportunity out of the control premium."[43]   Opportunity Equity alleges also that IEII negotiated with third parties regarding a CVC Fund investment on behalf of the CVC Fund.[44]

On March 9, 2005, IEII "purportedly terminate[d]" Opportunity Equity as general

---

[39]

*Id.* ¶ 32.  The counterclaims define "Opportunity" as Opportunity Equity and various affiliated entities.  *Id.* ¶ 21.

[40]

*Id.* ¶ 4.  The counterclaims refer to IEII and Citibank, collectively, as "Citibank."  *Id.* ¶ 1. Since Citibank is not a party to this case, references to "Citibank" will be changed to IEII.

[41]

*Id.* ¶¶ 50-51.

[42]

*Id.* ¶¶ 7, 136.

[43]

*Id.* ¶ 148; *see also id.* ¶¶ 164, 168.

[44]

*Id.* ¶ 187.

10

partner of the CVC Fund.[45]  When the counterclaims were filed, Citibank and/or IEII was in the process of negotiating the sale of the CVC Fund's investments.

*Discussion*

A.    *Breach of Fiduciary Duty (First Counterclaim)*

Opportunity Equity pursues this claim on two theories: breach of fiduciary duties under the Partnership Agreement and breach of fiduciary duties owed as a joint venturer.  Although the counterclaim is brought against all plaintiffs, Opportunity Equity subsequently stated that it pursues it only against IEII and CVC Brazil in its individual capacity.[46]

1.    *Fiduciary Duties Owed Under the Partnership Agreement*

a.    *IEII*

Opportunity Equity argues that IEII, a limited partner owing no fiduciary duties under either the Partnership Agreement or Caymans law, assumed management duties for the CVC Fund and thus incurred the fiduciary obligations of a general partner.  Plaintiffs argue first that no such fiduciary duties can be assumed by a limited partner under Cayman law.  They contend also that IEII's actions did not constitute an assumption of management duties.

---

[45]

     *Id.* ¶ 184.  Pursuant to an injunction issued by this Court, Opportunity Equity was compelled to register the change of general partner with the Cayman authorities.  March 17, 2005 Order (docket item 10), at 2.

[46]

     Opp'n at 11 n.3.

The Partnership Agreement is governed by the Caymans Exempted Limited Partnership Law ("Limited Partnership Law"),[47] which does not expressly address the issue. Certain provisions, however, do provide that a limited partner taking part in the conduct of the business shall be liable *to third parties* engaging in dealings with the limited partner.[48] It is silent as to the assumption of fiduciary duties to the other partners.

Plaintiffs' expert urges that this silence constitutes the exclusion of any other liabilities, citing the canon of statutory construction *expressio unius est exclusio alterius*.[49] However, the Limited Partnership Law expressly repudiates this construction, stating that "[t]he rules of equity and of common law applicable to partnerships . . . shall apply to an exempted limited partnership, except insofar as they are inconsistent with the express provisions of this Law."[50] If there is a common law rule that limited partners taking a management role assume fiduciary duties to other partners, it would not be "inconsistent" with the Limited Partnership Law provision regarding liability to third parties.

According to the authorities provided by both parties' experts, there indeed appears to be such a common law rule. The authorities provided by Opportunity Equity's expert support the proposition, familiar in American law as well, that a person assuming an office assumes also the

---

[47]
      Partnership Agreement § 1.1. The complete Limited Partnership Law (2003 Revision) is attached to the September 23, 2005 Brougham Declaration.

[48]
      Limited Partnership Law § 7(2).

[49]
      Brougham Decl. (9/23/05) ¶¶ 9, 11.

[50]
      Limited Partnership Law § 3.

fiduciary duties of that office.[51]  Although under the Partnership Agreement, the general partner expressly acknowledges fiduciary duties only to the limited partners,[52] this does not replace fiduciary duties under general partnership law principles which provide that "[e]ach partner owes to the others a duty of honesty and good faith."[53]  Thus, under Caymans law, a limited partner taking management control assumes fiduciary obligations to all other partners.

The question thus becomes whether IEII took actions amounting to assumption of management control.  At least some of Opportunity Equity's allegations are sufficient to survive this motion to dismiss.  It alleges, for example, that Citibank negotiated on behalf of the CVC Fund to sell certain investments[54] and that IEII entered into agreements on behalf of the CVC Fund prior to Opportunity Equity's removal as general partner.[55]  IEII contends that these were simply negotiations designed to protect its interests as it proceeded to remove Opportunity Equity as general partner. That, however, cannot be resolved on a motion to dismiss.

Accordingly, plaintiffs' motion to dismiss the counterclaim for breach of fiduciary duty under the Partnership Agreement against IEII is denied.  Whether Opportunity Equity ultimately

---

[51]

Oliver Decl. ¶ 6.  *Accord Goldwasser v. Geller*, 257 A.D.2d 489, 489, 684 N.Y.S.2d 210, 210 (1st Dep't 1999) ("[L]imited partners . . . assumed a fiduciary duty to plaintiff, also a limited partner . . . , when they took over managerial control of the partnership.").

[52]

Partnership Agreement § 6.1.5.

[53]

Brougham Decl. (9/23/05) ¶ 6 (quoting BLACKETT-ORD, PARTNERSHIP (2d ed. 2002) ¶ 10.1).

[54]

Ctrclm. ¶ 187.  The counterclaims define "Citibank" as both Citibank and IEII.  *Id.*  ¶ 1. The Court assumes, for the purposes of this motion, that this allegation refers to IEII.

[55]

*Id.* ¶ 168.

can prove that IEII did assume management duties or that IEII breached any fiduciary duties it may have owed Opportunity Equity are questions for another day.

> b.      *CVC Brazil*

Opportunity Equity next argues that CVC Brazil, as the CVC Fund's new general partner, owes Opportunity Equity fiduciary duties arising from (1) Opportunity Equity's "carried interest," and (2) the Partnership Agreement provision converting a general partner's interest to a limited partnership interest upon the general partner's removal.[56]

Opportunity Equity's "carried interest" is part of the contractual compensation for its performance as general partner of the partnership.   The parties' experts offer contradictory conclusions – both unsupported by any authority – regarding whether this is sufficient to give rise to a fiduciary relationship.[57]   The general partner owes fiduciary duties to limited partners pursuant to the Partnership Agreement and the Limited Partnership Act and to other general partners, as discussed above.   Opportunity Equity provides no authority, however, to support the proposition that a general partner owes duties to a party with a non-partnership interest in the partnership.

Opportunity Equity urges that it is owed fiduciary duties because it became a limited partner upon its removal pursuant to a provision in the Partnership Agreement providing that the general partner's removal shall not be effective "until the General Partner's Interest has been

---

[56]       The Partnership Agreement provided that a succeeding general partner "shall assume all obligations under this Agreement."   Partnership Agreement § 7.5.2.

[57]       Oliver Decl. ¶ 8; Brougham Decl. (2/22/06) ¶ 12.

converted to a Limited Partnership Interest in the Partnership."[58] The Partnership Agreement provides

also, however, that the general partner is a fiduciary "to the Limited Partners."[59]  "Limited Partners"

are "Persons listed on Appendix II as Limited Partners."[60]  In the Partnership Agreement before the

Court, Opportunity Equity is not so listed, and it has made no allegations that the Appendix has been

amended to include it.  Further, as this Court has previously noted, Opportunity Equity made a judicial

admission that IEII is the only limited partner in the CVC Fund.[61]  This precludes a finding that

Opportunity Equity became a limited partner upon its removal.

       Plaintiffs' motion to dismiss this claim as it relates to CVC Brazil's duties under the

Partnership Agreement is granted.

### 2.    *Fiduciary Duties Owed As Joint Venturers*

       Finally, Opportunity Equity presses this claim against IEII on the theory that IEII owed

it fiduciary duties as a joint venturer.[62]  Although the relationship between the two parties with respect

to the CVC Fund clearly is governed by the Partnership Agreement, Opportunity Equity argues that

---

[58]

    Partnership Agreement § 7.5.1.

[59]

    *Id.* § 6.1.5.

[60]

    *Id.* at 1.

[61]

    *IEII*, 411 F. Supp. 2d at 465.

[62]

    Opportunity Equity's brief argues this theory only against IEII, though it does not expressly clarify whether it pursues it also with respect to CVC Brazil.  In any event, CVC Brazil was not a party to any of the agreements cited by Opportunity Equity as forming the joint venture and thus could not be part of any agreement to form or have any intent to form a joint venture.

fiduciary duties are owed pursuant to a related but separate venture, the side-by-side investment strategy, and identifies three contracts that allegedly constitute "joint venture documentation" – the Operating Agreement, the Partnership Agreement, and the Private Placement Memorandum.[63]

Under New York law,[64] five elements must be present to form a joint venture: "(1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses."[65]

The documents to which Opportunity Equity refers perhaps might be construed to create a joint venture among the investment funds that invested on a side-by-side basis. They do not appear, however, to evidence a "joint venture" relationship between Opportunity Equity and IEII, as neither assumed additional or different roles pursuant to the side-by-side agreement than they did as partners governed by the Partnership Agreement. As partners in the CVC Fund and as participants in a side-by-side investment strategy, IEII provided capital to the CVC Fund and Opportunity Equity managed it for the CVC Fund. Opportunity Equity and IEII chose an exempted limited partnership as the vehicle for their relationship. Under the Partnership Agreement, Opportunity Equity owed fiduciary duties to IEII, but IEII owed none to Opportunity Equity. "The courts will not imply a joint

---

[63]

Opp'n at 5.

[64]

Both parties rely on New York law in arguing this point. This implied consent to the application of New York is sufficient to establish choice of law. *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001) (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

[65]

*Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990) (applying New York law).

venture relationship where the evidence indicates that the parties created a different business form."[66]

On occasion, courts have looked behind the characterizations made in parties' formal agreements to determine whether the elements of a joint venture nonetheless are present.[67]  Here, however, at least one of the joint venture elements is absent.[68]  By the plain terms of the agreements, IEII exercised no control over the business of the side-by-side investments.[69]  The limited provisions for IEII's advisory and oversight role[70] do not alter the fact that the management of the CVC Fund's

---

[66]

46 AM. JUR. 2D *Joint Ventures* § 1.

[67]

*See, e.g.*, *Sagamore Corp. v. Diamond W. Energy Corp.*, 806 F.2d 373, 378 (2d Cir. 1986) ("[W]hen the parties to a joint venture agreement, in forming a corporation to carry out one or more of its objectives, intend to reserve certain rights *inter sese* under their agreement, which do not interfere with or restrict the management of the affairs of the corporation, its exercise of corporate powers, or the rights of third parties doing business with it, these rights being extrinsic to the corporate entity and its operations, such joint venture agreement may be enforced."); *Richbell Info. Servs., Inc. v. Jupiter Partners, LP*, 309 A.D.2d 288, 300, 765 N.Y.S.2d 575, 585 (1st Dep't 2003) ("[T]he reasonable rule is to make the governing concern whether the parties' rights as joint venturers are in conflict with the corporation's functioning, rather than whether they expressly provided for a reservation of rights in the corporate governance documents.").

[68]

*See Itel*, 909 F.2d at 701 ("All of [the five] elements must be present before joint venture liability may be imposed.").

[69]

Partnership Agreement § 7.1 ("No Limited Partner shall participate in the management, control, or direction of the Partnership's operations, business, or affairs, transact any business for the Partnership, or have any right, power or authority to act for or on behalf of or to bind the Partnership, the same being vested solely and exclusively in the General Partner."); Operating Agreement § 5.02(a) ("Each of the Managers [defined to include Opportunity Equity and not IEII, *see id.* at 4] . . . shall cause . . . each Fund to make an investment as a side-by-side investment . . . .").

[70]

The counterclaims recognize the extremely limited role the Advisory Committee played, noting that it was created "to advise the general partner and to approve certain limited transactions." Ctrclm. ¶ 46. *See also* Partnership Agreement § 6.4.1 (proviso to description of Advisory Committee functions that "the General Partner shall retain ultimate responsibility for asset valuations . . . and for making all decisions relating to the operation and management of the Partnership, including, but not limited to, making all investment

involvement in the side-by-side investments was exclusively in Opportunity Equity's control.[71]  The

counterclaims do not allege otherwise.[72]  Thus, there was no joint control over the enterprise.

Accordingly, plaintiffs' motion to dismiss the claim under a joint venturer theory is

granted.

B.      *Breach of Implied Covenant of Good Faith (Third Counterclaim)*

Opportunity Equity presses this claim only with respect to the Operating Agreement,[73]

which is governed by New York law.[74]

---

decisions.").

[71]

*See Martin v. Peyton*, 246 N.Y. 213, 221-22 (1927) (no fiduciary duties where party "may not initiate any transaction" nor "bind the firm by any action of their own"); *Stratford Group., Ltd. v. Interstate Bakeries Corp.*, 590 F. Supp. 859, 863 (S.D.N.Y. 1984) ("The control deemed essential for a joint venture is power over decision-making.").

[72]

*See* Ctrclm. ¶¶ 30 ("The Operating Agreement gave [Opportunity Equity] the authority, as general partner of the CVC Fund, to bind the Fund to [the] side-by-side investments."), 45 ("Article 6.1 of the [Partnership Agreement] vested exclusive management and control powers of the CVC Fund in [Opportunity Equity] as the general partner.  The general partner was given absolute discretion, inter alia, . . . to acquire and divest investments held by the CVC Fund."), 46-47 ("[The Partnership Agreement] precluded the limited partners from acting for or on behalf of the [CVC] Fund . . . . [and] from taking any part in the management or conduct of the business of the CVC Fund."), 135 ("The [Partnership Agreement] and the Operating Agreement gave the general partner complete discretion to determine when [the CVC Fund's] assets would be sold and on what terms.").  An allegation clearly designed to satisfy the joint control requirement alleges joint control among the funds, not between Opportunity Equity and IEII.  *Id.* ¶ 36 ("[B]y virtue of the side-by-side arrangement and their appointment of Opportunity and Banco Opportunity as manager or administrator of each of their respective funds, the joint venturers exercised joint control over the various enterprises.").

[73]

Opp'n at 24.

[74]

Operating Agreement § 7.05.

18

Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance."[75]   The covenant protects a party's reasonable expectations under the contract.[76]   "Integral to a finding of a breach of the implied covenant is a party's action that directly violates an obligation that may be presumed to have been intended by the parties."[77]

The threshold question is which parties here were bound by the contract.  Opportunity Equity was a party to the Operating Agreement.[78]  Neither the CVC Fund nor CVC Brazil was a party to the Operating Agreement.  Although the counterclaim is alleged against all plaintiffs, Opportunity Equity's brief presses it only with respect to IEII.  In any event, since neither the CVC Fund nor CVC Brazil was a party to the Operating Agreement, neither incurred any obligation to act in good faith pursuant to it, and no such claim can be sustained against them.

Opportunity Equity contends that IEII was a party designated as "an affiliate [of Citibank]."[79]  As the contractual language is ambiguous and Opportunity Equity is entitled to all advantageous interpretations of the contracts considered by the Court, the Court accepts this for the purposes of this motion.

The inquiry thus becomes the scope of the parties' reasonable expectations under the

---

[75]

 *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 979 (1995).

[76]

 *Id.*

[77]

 *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990).

[78]

 Operating Agreement at 1.

[79]

 *Id.*

Operating Agreement. The Operating Agreement, by its express terms, imposed no obligations on IEII.[80] The substantive provisions do not contradict this term, imposing limitations only on the actions of Opportunity Equity and third parties. It simply cannot be a "reasonable expectation" of a party to this contract that IEII incurred any obligations at all.

Opportunity Equity urges the reasonable expectation that "it would be permitted to act jointly with its affiliates and [other parties] in order [to] pursue the side-by-side investments that would generate the 'superior rates of return' that would maximize [Opportunity Equity's] own return based on its Carried Interest."[81] This argument fails for two reasons.

First, to the extent that the argument is based on IEII's removal of Opportunity Equity as general partner of the CVC Fund, the Partnership Agreement provided IEII with mechanisms to remove Opportunity Equity with or without cause.[82] Although the parties dispute whether or not such a contractual right precludes a violation of the implied covenant of good faith, the answer is immaterial – the implied covenant resides in the Operating Agreement, not the Partnership Agreement. The significance of the removal provisions lies in Opportunity Equity's reasonable expectations under the Operating Agreement. Opportunity Equity was well aware of this provision in the Partnership Agreement at the time the Operating Agreement was executed.[83] It cannot now

---

[80]     *Id.* § 7.07 ("[N]either Citibank nor any affiliate of Citibank will have any obligation to any Party hereto under this Agreement.").

[81]     Opp'n at 26.

[82]     Partnership Agreement §§ 7.3, 7.4.

[83]     The Operating and Partnership Agreements were executed on the same day, and the cross-references between the documents clearly show that they were contemplated together. *See Cross & Cross Props., Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989) ("In

claim that IEII's exercise of its contractual right under the Partnership Agreement violated Opportunity Equity's reasonable expectations under the Operating Agreement.

Second, to the extent that Opportunity Equity's argument is based on the allegation that "Plaintiffs have simply abandoned the goal of achieving the 'superior rates of return' on the CVC Fund investments in order to pursue Citibank's global commercial interests,"[84] such actions by IEII do not violate Opportunity Equity's stated reasonable expectations, which were "that it would be permitted to act . . . to pursue the side-by-side investments . . . ." IEII's actions have not precluded Opportunity Equity from "pursu[ing]" investments. In any event, "the implied covenant does not extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract,"[85] especially where, as here, the agreement expressly states that "[a]ny Limited Partner may engage in any business of any kind whatsoever, including those which conflict or compete with the activities of the Fund or any Portfolio Investment."[86]

C.      *Unjust Enrichment (Fourth Counterclaim)*

Opportunity Equity alleges that it took actions "above and beyond those required by

---

[84]

Opp'n at 26.

[85]

*Galesi*, 904 F.2d at 136 (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 46, 330 N.Y.S.2d 329, 334 (1972)).

[86]

Partnership Agreement § 6.2.2(b).

attempting to construe the contracting parties' intent fairly and reasonably, we must consider (among other things) the specific language of the contract, and the context within which that contract was formed.") (citations omitted).

its contractual obligations under the [Partnership Agreement]" which "provided substantial benefits to Plaintiffs."[87]  It thus seeks a remedy for unjust enrichment.

The parties argue both Caymans and New York law.  In both jurisdictions, the existence of an adequate legal remedy precludes a remedy for unjust enrichment.[88]  Under New York law, this proposition has led to the logical corollary that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[89]  If no contract governs the matter, Opportunity Equity must still establish "1) that [plaintiff] benefitted; 2) at [Opportunity Equity's] expense; and 3) that 'equity and good conscience' require restitution."[90]

The actions Opportunity Equity alleges it took "above and beyond" the contract were (1) paying out-of-pocket litigation and arbitration expenses on behalf of the CVC Fund, which were

---

[87]

Ctrclm. ¶ 213.

[88]

*See* Brougham Decl. (9/23/05) ¶ 18 ("'Unjust enrichment', in English and Cayman law, is primarily concerned with the appropriateness in any particular case of restitutionary remedies."); Brougham Decl. (2/22/06) ¶¶ 15-17 (discussing cases supporting proposition that "remedies based on unjust enrichment are granted in substitution for contractual remedies which are unavailable to the claimant because he has no contract with the defendant").  The analysis of Opportunity Equity's expert does not contradict this conclusion.  Oliver Decl. ¶ 9.

[89]

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656 (1987) (citing *Blanchard v. Blanchard*, 201 N.Y. 134, 138 (1911)).  "[I]n the absence of proof to the contrary, foreign law may be presumed the same as local law."  *IEII*, 407 F. Supp. 2d at 500 n.91.

[90]

*Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (applying New York law).  The parties' experts provided no interpretation of Caymans unjust enrichment law beyond that stated above.  In the absence of evidence that it conflicts with New York law, or that Caymans law conclusively governs this issue, the Court will proceed with an analysis under New York law.  *See, e.g.*, *Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 133 & n.26 (S.D.N.Y. 2000).

reimbursed pursuant to the Partnership Agreement until 2004, when such reimbursement ceased "in breach of [Citibank's] contractual obligations under the [Partnership Agreement],"[91] (2) purchasing shares on behalf of the CVC Fund and third-parties[92] to prevent a hostile takeover of a company in which the CVC Fund was invested,[93] (3) "rais[ing] funds" to purchase shares to prevent a takeover of another company in which the CVC Fund was invested,[94] and (4) "endur[ing] years of abuse and defamatory statements in the press" by third parties.[95]

A quasi-contractual remedy is clearly unavailable for the first of these actions, as Opportunity Equity asserts that the allegedly wrongful act was a breach of the contract between the

---

[91]

Ctrclm. ¶¶ 130-31.

[92]

The counterclaim allegations are somewhat unclear as to whether Opportunity Equity used any of its own funds in this matter. *See id.* ¶¶ 21 (defining "Opportunity" as Opportunity Equity and affiliates), 28 (defining "Opportunity Funds" as "Opportunity's" funds and that of third-parties invested under "Opportunity's" control), 129 ("[T]he Opportunity Funds invested their own funds . . . ."). However, it appears clear that this did not include Opportunity Equity's funds, *see, e.g.*, Operating Agreement § 3.01 (entity affiliated with Opportunity Equity commits to investing $30 million in side-by-side investments), Ctrclm. ¶¶ 43-44 ("[Opportunity Equity was expressly precluded] from making any capital contributions to the CVC Fund. An Opportunity affiliate, however, committed to invest a minimum of $30 million on a side-by-side basis with the other joint venturers. . . . Over time, however, it was necessary for the Opportunity Funds to make substantially greater investments so as to protect the interests of the Funds."). Opportunity Equity's brief supports this conclusion. *See* Opp'n at 16 & n.6 (describing Opportunity Equity's contribution to the alleged joint venture as its "involvement as a 'Manager'" and countering plaintiffs' argument that Opportunity Equity "lacks standing to raise claims relating to the joint venture because [Opportunity Equity] did not itself make the side-by-side investments, which occurred through an Opportunity affiliate" with the argument that "[t]he relevant question is whether [Opportunity Equity] is a joint venturer, not which legal entity provided funding in the collective pool of capital").

[93]

Ctrclm. ¶¶ 75-76, 129.

[94]

*Id.* ¶ 129.

[95]

*Id.* ¶ 133. *See generally* Opp'n at 29 (identifying relevant counterclaim paragraphs).

23

parties.

The second and third reflect actions taken as an investment manager, allegedly to protect the CVC Fund's investment. This subject matter is covered by the Partnership Agreement and the Operating Agreement, so a quasi-contract remedy is precluded for that reason alone. Even were it not, Opportunity Equity has not shown how any benefit that accrued to plaintiffs was at Opportunity Equity's expense or, accordingly, how "equity and good conscience" require a remedy. Opportunity Equity concedes that it benefitted from the second action, noting that absent its action, "[t]he value of the joint venturers' stake in Brasil Telecom would have been dramatically reduced."[96]  As one of the alleged joint venturers, Opportunity Equity will not be heard now to argue that any benefit to the plaintiffs was at its expense. Similarly, Opportunity Equity's allegations state that it will be rewarded under the provisions of the Partnership Agreement for efforts that protected the CVC Fund's investments.[97]  Thus, the Court cannot conclude that "equity and good conscience" require a restitutionary remedy, if one even were available.

Finally, Opportunity Equity makes no allegation, nor is there any indication, that plaintiffs benefitted in any way from the alleged defamatory statements made about Opportunity Equity by third parties. In any event, any possible benefit would be too remote to support a claim.[98]

---

[96]     Ctrclm. ¶ 75.

[97]     See id. ¶ 5 (Opportunity Equity "was guaranteed compensation based upon the value of Citibank's investments upon divestment").

[98]     See Kaye, 202 F.3d at 616 (benefit to defending party must be "specific and direct").

D.      *Declaratory Judgment (Second Counterclaim)*

Opportunity Equity seeks a declaratory judgment that "it is entitled to its share of the profits from the sale of the assets of [the CVC Fund]" pursuant to its contractual entitlement under the Partnership Agreement.  Opportunity Equity's claim for declaratory relief presents no "actual controversy" and thus plaintiffs' motion to dismiss is granted.

The Declaratory Judgment Act authorizes federal courts to provide declaratory relief "[i]n a case of actual controversy."[99]  This language "incorporates into the statute the case or controversy limitation on federal jurisdiction found in Article III of the Constitution."[100]  Thus, there must be "a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment."[101]

Here, Opportunity Equity alleges that sales triggering its alleged entitlement are imminent.  The counterclaims, however, make no allegations suggesting that the CVC Fund denies Opportunity Equity's claimed entitlement, and plaintiffs have taken no such stand before the Court.[102]  Absent allegations that the CVC Fund will not pay Opportunity Equity any carried interest that

---

[99]     28 U.S.C. § 2201(a).

[100]    *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996).

[101]    *Id.* (quoting *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir.1993)) (emphasis in original).

[102]    The statement in Opportunity Equity's brief that "Plaintiffs studiously avoid acknowledging that they will pay [Opportunity Equity] its contractually required Carried Interest" is insufficient to raise an inference that plaintiffs likely will not pay.  Compare, for example, *Fusco v. Rome Cable Corp.*, 859 F. Supp. 624 (N.D.N.Y. 1994), cited by Opportunity Equity, in which the court found an actual controversy where the respondent had denied liability in its answer to the complaint.  *Id.* at 631 & n.9.

25

Opportunity Equity may be due under the Partnership Agreement, there is no controversy "of sufficient immediacy and reality" for the Court to adjudicate.

*Conclusion*

For the foregoing reasons, plaintiffs' motion to dismiss is denied with respect to Opportunity Equity's first counterclaim against IEII for breach of fiduciary duties allegedly owed pursuant to the Partnership Agreement.  It is granted in all other respects.

SO ORDERED.

Dated: January 30, 2007

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)